1 BRYAN H. HECKENLIVELY (State Bar No. 279140)
bryan.heckenlively@mto.com
2 SKYLAR B. GROVE (State Bar No. 310707)
skylar.grove@mto.com
3 MILES W. UNTERREINER (State Bar No. 347959)
miles.unterreiner@mto.com
4 MUNGER, TOLLES & OLSON LLP
560 Mission Street Twenty-Seventh Floor
5 San Francisco, California 94105
Telephone:     (415) 512-4000
6 Facsimile:     (415) 512-4077

7 Attorneys for Defendants The Regents of the
University of California, Sam Hawgood,
8 Catherine Lucey, Robert Wachter, Won Ha,
Tracey Tsugawa, and Brian Alldredge

9

10                    UNITED STATES DISTRICT COURT

11                    NORTHERN DISTRICT OF CALIFORNIA

12

13 RUPA MARYA, M.D.,                          Case No. 3:25-cv-04716-MMC

14            Plaintiff,                       **DECLARATION OF CLAIRE GROTE IN**
                                               **SUPPORT OF DEFENDANTS' MOTION**
15       vs.                                   **TO DISMISS**

16 BOARD OF REGENTS OF THE
17 UNIVERSITY OF CALIFORNIA; SAM              Date:        January 30, 2026
   HAWGOOD; CATHERINE LUCEY;                  Time:        9:00 a.m.
18 ROBERT WACHTER; TRACY TSUGAWA;             Judge:       Hon. Maxine M. Chesney
   BRIAN ALLDREDGE; WAN HA; AND               Courtroom:   7
19 DOES 1-20,

20            Defendants.

21

22

23

24

25

26

27

28

## DECLARATION OF CLAIRE GROTE

I, Claire Grote, declare as follows:

    1.     I am the Academic Employee Relations Manager at the University of California, San Francisco ("UCSF"). Except where stated otherwise, the contents of this declaration are based on my personal knowledge, and if called as a witness, I could and would testify competently to the facts in this declaration.

### My Background

    2.     I have worked at UCSF for more than 12 years and have served as an Academic Employee Relations Manager at UCSF for approximately 6 years. Prior to my current position, I served as an Academic Employee Relations Specialist for approximately 4 years. I have a J.D. from the University of San Francisco School of Law but am not serving as legal counsel to UCSF.

    3.     As an Academic Employee Relations Manager, I work in the office of the Vice Provost for Academic Affairs. My job responsibilities include helping to interpret and ensure compliance with academic personnel policies, and administering procedures for discipline and grievances for academic employees.

    4.     In that role, I assisted in coordinating the faculty disciplinary proceeding involving Dr. Rupa Marya.

### Dr. Marya's Non-Senate Term Appointment

    5.     Prior to her dismissal, Dr. Marya was a Health Sciences Clinical Professor in the Department of Medicine at UCSF. Dr. Marya was appointed to this position for a set term of one year pursuant to Academic Personnel Manual ("APM") 137 and 278. She was not tenured and was not a member of the Academic Senate. Attached as **Exhibit A** is a true and correct copy of APM 137. Attached as **Exhibit B** is a true and correct copy of APM 278.

    6.     On July 1, 2024, UCSF gave Dr. Marya an annual notice that she had been reappointed as a Health Sciences Clinical Professor, Step 1, for the term of July 1, 2024 through June 30, 2025. Attached as **Exhibit C** is a true and correct copy of the July 1, 2024 reappointment notice.

## UCSF's Faculty Misconduct Procedures

7. While she was a faculty member, Dr. Marya was subject to the University of California's ("UC") Faculty Code of Conduct, set forth in APM 015. Attached as **Exhibit D** is a true and correct copy of APM 015.

8. APM 150 provides the system-wide standards and procedures for instituting corrective action or dismissal of non-Senate academic appointees such as Dr. Marya for violations of the Faculty Code of Conduct. This policy allows a non-Senate academic appointee to be placed on immediate investigatory leave with pay, without prior written notice, for the purpose of reviewing or investigating conduct that, in the Chancellor's judgment, requires removing the appointee from University premises. Prior to initiating the actions of written censure, suspension without pay, reduction in salary, demotion, or dismissal, the University is required to provide a written Notice of Intent to the appointee. Attached as **Exhibit E** is a true and correct copy of APM 150.

9. APM 150 directs the Chancellor of each UC campus to issue guidelines and procedures for instituting corrective action and dismissal of non-Senate academic appointees at their campus. UCSF's "Procedure for the Investigation of Faculty Misconduct and the Administration of Discipline," a true and correct copy of which is attached hereto as **Exhibit F**, sets forth UCSF's specific campus guidelines and procedures, in accordance with APM 015 and APM 150. Attached as **Exhibit G** is a true and correct copy of a flowchart that visually represents UCSF's faculty misconduct investigation process at a general level.

10. APM 140 provides non-Senate academic appointees the opportunity to present grievances, including to grieve corrective action or dismissal. Attached as **Exhibit H** is a true and correct copy of APM 140. In addition, prior to dismissing a non-Senate faculty member, the University is required to apprise them of the opportunity for a hearing before the properly constituted advisory committee of the Academic Senate pursuant to Regents' Bylaw 40.3(c). Senate Bylaw 337 explains the procedure for such a hearing. Attached as **Exhibit I** is a true and correct copy of Senate Bylaw 337.

## Faculty Misconduct Investigation and Dismissal of Dr. Marya

2     11.     Each of the policies discussed above—APM 015, APM 150, APM 140, and UCSF's "Procedure for the Investigation of Faculty Misconduct and the Administration of Discipline"—applied to Dr. Marya as a non-Senate academic appointee. UCSF followed these policies and procedures in conducting its Faculty Misconduct Investigation and administration of discipline of Dr. Marya.

12.     Between mid-October 2023 and March 20, 2024, UCSF's Office for the Prevention of Harassment and Discrimination (OPHD) received at least 122 complaints regarding Dr. Marya's social media posts related to the conflict in the Middle East. On March 20, 2024, OPHD referred the complaints to the Office of Faculty and Academic Affairs. Separately, thousands of complaints regarding Dr. Marya's social media activity were submitted directly to the Vice Provost throughout 2024.

13.     The Vice Provost requested that Associate Dean Paul Garcia conduct a Preliminary Investigation into the allegations. On July 26, 2024, the Vice Provost accepted the Preliminary Investigation Report, and on August 8, 2024, the Vice Provost informed Dr. Marya of the outcome and the opportunity to respond to a redacted copy of the report. Dr. Marya submitted a response to the redacted copy of the report on September 6, 2024.

14.     On September 10, 2024, the Office of Ethics and Compliance (OEC) referred an additional complaint regarding Dr. Marya's social media posts to outside investigators with Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss") for a Subject Matter Expert Investigation.

15.     On September 21, 2024, Dr. Marya made a social media post on X expressing concern that an incoming UCSF medical student from Israel may have "participated in the genocide of Palestinians." On September 22, 2024, the Chancellor notified Dr. Marya that she was being placed on immediate investigatory leave with pay pursuant to APM 150 for the purpose of investigating her conduct related to this social media post, which had caused disruption of the education environment. Attached as **Exhibit J** is a true and correct copy of the Chancellor's notice to Dr. Marya regarding her paid investigatory leave.

16.     On October 9, 2024, after accepting Associate Dean Paul Garcia's Preliminary Investigation Report, the Vice Provost appointed three faculty members to an *Ad Hoc* Investigation Committee to conduct a formal Faculty Code of Conduct Investigation pursuant to UCSF's campus procedures.

17.     Paul Weiss completed its Subject Matter Expert Report on December 13, 2024, and the Vice Provost accepted it on January 27, 2025.  On February 6, 2025, the Vice Provost informed Dr. Marya of her right to respond to a redacted copy of the report, but Dr. Marya did not submit a response.

18.     As part of the *Ad Hoc* Investigation Committee's formal Faculty Code of Conduct investigation, the Committee conducted interviews, including with Dr. Marya, and reviewed relevant documents and policies.  On April 1, 2025, the Committee issued a Faculty Code of Conduct Probable Cause Investigation Report to the Vice Provost.  As set forth in the report, the Committee found that a preponderance of the evidence established probable cause that Dr. Marya had repeatedly violated the Faculty Code of Conduct, both through direct violations and serious violations of other University policy.  In light of its findings, the Committee unanimously recommended dismissal and issuance of a 10-year Letter of Censure.  On April 22, 2025, Dr. Marya submitted a written response to the redacted report.

19.     On April 28, 2025, the Chancellor sent Dr. Marya a Notice of Intent to Impose Discipline.  The Notice informed Dr. Marya that, after considering the *Ad Hoc* Committee's Investigation Report, Dr. Marya's response, and the Vice Provost's recommendation, the Chancellor accepted the Committee's findings that a preponderance of the evidence established probable cause that Dr. Marya's conduct violated the Faculty Code of Conduct and constituted good cause under APM 150.  The Notice further informed Dr. Marya that the Chancellor proposed dismissal and a 10-year Letter of Censure as discipline.  The Notice advised Dr. Marya that she had 15 business days to notify the Vice Provost in writing whether she accepted the proposed sanction, and that a failure to respond by the deadline would be deemed to be an acceptance.  The Notice explained that if Dr. Marya declined to accept the findings and proposed sanction of dismissal, she could file a grievance under APM 140 or request a hearing before the properly

constituted advisory committee of the Academic Senate as provided by Regents Bylaw 40.3(c). It also explained that if Dr. Marya declined to accept the findings and proposed sanction with respect to the Letter of Censure, she could also file a grievance under APM 140 as to that proposed discipline. Attached as **Exhibit K** is a true and correct copy of the Notice of Intent to Impose Discipline.

20. Dr. Marya did not file a grievance under APM 140 or follow the procedures under Senate Bylaw 337 to request a hearing before the properly constituted advisory committee of the Academic Senate.

21. On May 20, 2025, the Chancellor sent Dr. Marya a Notice of Action notifying her that the proposed sanctions of dismissal and a 10-year Letter of Censure were imposed effective as of that day, and that her faculty appointment was thereby terminated. Attached as **Exhibit L** is a true and correct copy of the Notice of Action: Dismissal and Letter of Censure.

22. On May 20, 2025, the Chancellor also sent Dr. Marya a copy of the 10-year Letter of Censure. Attached as **Exhibit M** is a true and correct copy of the Letter of Censure.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct and that this declaration was executed on October 9, 2025 in Berkeley, California.


_____
CLAIRE GROTE

DECLARATION OF CLAIRE GROTE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

# EXHIBIT A

137-0    **Policy**

It is the University's policy to provide written notice of an appointment or
reappointment to each non-Senate academic appointee with a term appointment.


137-4    **Definition**

A term appointment is an appointment for a specific period which ends on a
specified date.  An appointment with an established ending date is self-terminating
subject to the notice requirements of APM - 137-32.

APM - 137 does not apply to non-Senate academic appointees who have an
appointment with no specific ending date.

The University has the discretion to appoint and reappoint non-Senate academic
appointees with term appointments; reappointment is not automatic.  For the
purposes of this policy, a non-reappointment is a decision not to reappoint an
individual beyond the established ending date.


137-14    **Eligibility**

This policy applies to all academic appointees of the University with term
appointments who are not members of the Academic Senate.  If an appointee also
holds a Senate title, this policy applies to the non-Senate title only.  For non-Senate
academic appointees covered by a Memorandum of Understanding (MOU), this
policy applies only to the extent provided for in the MOU.


137-17    **Written Notice of Appointment or Reappointment**

a.    When a non-Senate academic appointee is offered an appointment or
reappointment that is a term appointment, the University should notify the
appointee in writing of the following:

(1)    the title of the position;

(2)    the salary rate;

(3)    the name of the department in which the appointment is located;

      (4)   the beginning and ending dates of the appointment;

      (5)   the percentage of time;

      (6)   the general responsibilities; and

      (7)   the name of the individual to whom the academic appointee reports.

b.   The University shall not be required to provide written notice of the information specified in APM - 137-17-a to appointees who are offered appointments at less than 50 percent time or short-term appointments of no more than one quarter or semester.

**137-20   Conditions of Employment**

a.   Where aspects of an Academic Personnel policy pertaining to a specific non-Senate academic title or title series conflict with APM - 137, the policy governing the specific title or title series applies.

b.   A non-Senate academic appointee with a term appointment is considered to be separated from employment at the expiration of such an appointment.  This is not a layoff.

c.   APM - 140 (Non-Senate Academic Appointees/Grievances) applies to non-Senate academic appointees with term appointments.

d.   APM - 145 (Non-Senate Academic Appointees/Layoff and Involuntary Reduction in Time) applies to non-Senate academic appointees with term appointments.  Appointees may be subject to layoff or involuntary reduction in time before the expiration of their appointments.

e.   APM - 150 (Non-Senate Academic Appointees/Corrective Action and Dismissal) applies to non-Senate academic appointees with term appointments.

137-30    **Non-Reappointment**

a.    **Appointments of Less Than 50 Percent Time or Short-Term
Appointments of No More than One Semester**

The University shall not be required to give written notice of non-
reappointment to appointees who hold appointments at less than 50 percent
time or short-term appointments of no more than one quarter or semester.

b.    **Fewer Than Eight Consecutive Years of Service**

For appointees who have served fewer than eight consecutive years in the
same academic title or title series on a campus, the appointment terminates
automatically on its specified ending date unless notice of reappointment is
given.  It is within the University's sole discretion not to reappoint an
appointee under this section, so long as the reasons for non-reappointment are
not unlawful or in violation of University policy.

c.    **Eight or More Consecutive Years of Service**

For appointees who have served at least 50 percent time for eight or more
consecutive years in the same academic title or title series on a campus, notice
of non-reappointment shall be given in accordance with APM - 137-32.  The
University may decide not to renew a term appointment under this section,
when, in its judgment, the programmatic needs of the department or unit, lack
of work, the availability of suitable funding for the position, or the appointee's
conduct or performance do not justify renewal of the appointment.

137-32    **Procedures for Non-Reappointment of an Appointee Who Has Served Eight
or More Consecutive Years**

a.    **Written Notice of Intent**

The University shall provide a written Notice of Intent not to reappoint at least
sixty (60) days prior to the appointment's specified ending date.  The
appointment may be extended to provide the required notice, or appropriate
pay in lieu of notice may be given.  The Notice shall state:  (l) the intended
action is not to reappoint the appointee and the proposed effective date; (2) the
basis for non-reappointment, including a copy of any materials supporting the
decision not to reappoint; (3) the appointee's right to respond either orally or
in writing within fourteen (14) calendar days of the date of

issuance of the written Notice of Intent; and (4) the name of the person to whom the appointee should respond.

b.   **Response to Written Notice of Intent**

The appointee who receives a written Notice of Intent shall be entitled to respond, either orally or in writing, within fourteen (14) calendar days of the date of issuance of the written Notice of Intent.  The response, if any, shall be reviewed by the administration.

c.   **Written Notice of Action**

If the University decides not to reappoint a non-Senate academic appointee who holds a term appointment, following the review of a timely response, if any, from the appointee, and within thirty (30) calendar days of the date of issuance of the written Notice of Intent, the University shall issue a written Notice of Action to the appointee of the non-reappointment and its effective date.  The Notice of Action also shall notify the appointee of the right to grieve the action under APM - 140.

# EXHIBIT B

## Appointment and Promotion: APM - 278 - Health Sciences Clinical Professor Series

### 278-0    Policy

The Health Sciences Clinical Professor series is designed to meet the University's mission in ways that are unique to the health sciences disciplines through teaching, professional activity, scholarly or creative activity, and University and public service. Health Sciences Clinical Professor series faculty make substantial contributions to the University through excellence in teaching, clinical expertise, scholarly or creative achievement, and engagement in service.

### 278-4    Definition

Faculty in the Health Sciences Clinical Professor series teach the application of basic sciences, the mastery of clinical procedures, and other health science topics to students, postdoctoral scholars, fellows, interns, residents, and other clinicians in all academic disciplines concerned with patient care, including dentistry, medicine, nursing, optometry, pharmacy, physician assistant studies, psychology, veterinary medicine, the allied health professions, and other health care professions. Health Sciences Clinical Professor series faculty engage in scholarly or creative activities which derive from and support their primary responsibilities in clinical teaching and professional and service activities.

The Health Sciences Clinical Professor series is distinct from the Volunteer Clinical Professor series that is governed by APM - 279, Volunteer Clinical Professor Series. University-paid staff physicians and staff clinicians and other clinicians and physicians practicing at non-UC-affiliated sites with teaching responsibilities may be appointed to titles in the Volunteer Clinical Professor series under APM - 279. University-paid staff physicians and staff clinicians and other clinicians and physicians practicing at UC-affiliated facilities without teaching responsibilities may be appointed to the Clinical Associate title under APM - 350, Clinical Associate.

### 278-8    Types of Appointment

Faculty in the Health Sciences Clinical Professor series may serve the University on a full-time or part-time basis and may be appointed with or without salary. An appointment without salary at the University may be made for an individual who (1) holds a without salary or salaried clinical appointment at an institution with which the University has a formal affiliation agreement (a UC-affiliated facility), and (2) meets the criteria for appointment in this series as described in section 278-10.

    a.   Titles (and ranks) in this series are:

        (1)  Health Sciences Clinical Instructor

        (2)  Health Sciences Assistant Clinical Professor

      (3)  Health Sciences Associate Clinical Professor

      (4)  Health Sciences Clinical Professor

b.  *An appointment* (as distinguished from a promotion) to one of the four ranks listed above occurs if the individual's immediately previous status was:

      (1)  not in the employ of the University; or

      (2)  in the employ of the University but not in this series; or

      (3)  moving from Health Sciences Clinical Instructor to Health Sciences Assistant Professor.

c.  A *change of series* is a type of new appointment for an individual whose last appointment was within the University of California, usually in a faculty title. A change of series may occur because an individual's duties change. A regular academic review is required for this action. A competitive search may or may not be required (see APM - 278-16-b).

d.  A *promotion* is advancement within this series from Assistant to Associate and Associate to Professor.

e.  A *merit increase* is advancement in salary step or to an above-scale salary rate without a change in rank (see APM - 610, Salary Increases).

f.  A *reappointment* is the renewal of an appointment in this series immediately following the end date of the previous appointment (i.e., without a break in service). A reappointment may or may not be accompanied by a promotion or a merit increase.

## 278-10  Criteria

A candidate for appointment or advancement in this series shall be evaluated by the following criteria, which shall be appropriately weighted according to the primary emphasis on clinical and clinically-relevant teaching and patient care services and also according to the needs of the campus and the individual's responsibilities in the specific discipline. The Dean's or the Department Chair's recommendation letter placed in the dossier shall document the faculty member's expected balance of activities and shall be shared with the faculty member. The four criteria are:

a.  Teaching

b.  Professional competence and activity

c.  Scholarly or creative activity

d.  University and public service

These criteria and standards are set forth in APM - 210-6, *Instructions to Review Committees That Advise on Actions Concerning the Health Sciences Clinical Professor Series.*

## 278-16  Restrictions

### a.  Funding

No State funds shall be used for any salary above the Scale 0 rate associated with the Health Sciences Compensation Plan participant's rank and step on the Fiscal Year Salary Scale. Any compensation above the Fiscal Year Salary Scale 0 shall be funded using Health Sciences Compensation Plan funds and/or other non-State funds in compliance with any relevant fund source restrictions as outlined in APM - 670-18, Health Sciences Compensation Plan.

### b.  Change of series of appointees to other titles

An appointee in the Health Sciences Clinical Professor series may change to another academic or professorial series following academic review. A competitive search may or may not be required. The Chancellor may grant a waiver of the search requirement in exceptional circumstances.

### c.  Appointees at affiliated institutions

In the case of an appointee in the Health Sciences Clinical Professor series who holds an appointment at an affiliated institution, the continuation of the academic appointment is contingent upon the continuation of the faculty member's appointment at the affiliated institution. In the case of an appointee in the Health Sciences Clinical Professor series who is partially paid by the affiliate and UC, the UC appointment may continue if the appointment at the affiliate ends. The decision to continue the UC appointment will be made by the Department Chair or Dean based on an assessment of the clinical and/or teaching needs of the Department or School.

## 278-17  Terms of Service

An appointment in the Health Sciences Clinical Professor series shall have a specified ending date. Written notice of the appointment or reappointment shall follow the provisions of APM - 137-17, Non-Senate Academic Appointees/Term Appointment. Typically, the effective date of an appointment will coincide with the University's fiscal year (July 1 through June 30). See APM - 220, Professor Series for general academic personnel policy regarding appointment and promotion.

### a.  Health Sciences Clinical Instructor

At this rank, an initial appointment is limited to one year or less. Total service as a Health Sciences Clinical Instructor paid by the University or paid by an affiliated institution may not exceed two years. The Chancellor may grant an exception to the two-year limit.

**b.  Health Sciences Assistant Clinical Professor**

Each appointment and reappointment at this rank is limited to one year or less. The normal period of service is two years at each step. Total University service at more than 50 percent time in this title, combined with service at more than 50 percent time in any of those titles listed in APM - 133-0-b and -c, Limitation on Total Period of Service with Certain Academic Titles, may not exceed eight years of service.

Only those quarters or semesters at more than 50 percent time in a University-paid or affiliate-paid faculty position will count toward the eight-year limit.

Faculty holding a without salary Health Sciences Clinical Professor series appointment along with a salaried appointment at an affiliated institution at more than 50 percent time may not exceed eight years of service unless the Chancellor grants an exception to the eight-year limit for these appointees.

There is no eight-year limit for individuals holding an appointment at 50 percent or less time, whether salaried or without salary, unless the Chancellor establishes such a limit.

**c.  Health Sciences Associate Clinical Professor and Health Sciences Clinical Professor**

Each appointment and reappointment at this rank is limited to a term of one year or less until the faculty member reaches Step VI. The normal period of service is two years at each step for a Health Sciences Associate Clinical Professor (Steps I, II, and III). The normal period of service is three years at each step for a Health Sciences Associate Clinical Professor (Steps IV and V) and for a Health Sciences Clinical Professor. Service at Step V or higher may be of indefinite duration. Advancement from Step VI to Step VII, from Step VII to Step VIII, and from Step VIII to Step IX will only be granted on evidence of continuing achievement at the level required for advancement to Step VI and usually will not occur after less than three years of service at the lower step. Except in rare and compelling cases, advancement to Above Scale status will not occur before at least four years of service at Step IX.


## 278-18 Salary

a.  The Fiscal Year Salary Scale for the Professor series shall apply, subject to the terms of special salary scales or the Health Sciences Compensation Plan Salary Scales. Salary provisions for Health Sciences Compensation Plan members are outlined in APM - 670-18, Health Sciences Compensation Plan.

b.  Normal periods of service at each step in this series coincide with those of the Professor series as described in APM - 220-18-b.

c.  Typically, a promotion or merit increase is effective July 1.

**278-20  Conditions of Employment**

a.  Appointees in this series are not members of the Academic Senate.

b.  Neither tenure nor security of employment is acquired by appointment to a title in this series, regardless of percentage of State funding.

c.  Prior to appointment each candidate's clinical competence shall be reviewed and approved by the Department Chair and/or the Dean as appropriate to the position and to the School. Evidence of clinical competence may be determined by campus guidelines appropriate to the specific discipline. At the discretion of the department, loss of professional license, credentialing, board certification, and/or active medical staff privileges may result in reassignment of duties or termination of appointment for cause under APM - 150, Non-Senate Academic Appointees/Corrective Action and Dismissal.

**d.  Expiration of an appointment, layoff, and termination**

(1)  APM - 137, Non-Senate Academic Appointees/Term Appointment, applies to this series.

(2)  A Health Sciences Assistant Clinical Professor who, because of the eight- year limitation of service, is not reappointed as a result of a personnel review, may request a written statement of the reasons for non- reappointment. The written request must be made within 30 (thirty) calendar days of the notice of non-reappointment, and a written response shall be made within 60 (sixty) calendar days of the request. The written notice of non-reappointment shall be given to the individual before the specified ending date, whenever possible.

However, the appointment will expire on the specified ending date, regardless of whether the notice was provided before the specified ending date.

(3)  Termination of an appointment prior to the specified ending date shall be only for good cause, and in accordance with the provisions of Regents' Bylaw 40.3(c). When the reason for termination is based on budgetary reasons, lack of work, or programmatic needs, the procedures described in APM - 145, Non-Senate Academic Appointees/Layoff and Involuntary Reduction in Time, shall apply. When the reason for termination is for cause, such as misconduct, unsatisfactory work performance, dereliction of duty, or violation of University policy, the procedures described in APM - 150, Non-Senate Academic Appointees/Corrective Action and Dismissal, shall apply.

e.  An appointee with a title in this series is eligible for leave with pay under APM - 758, Leaves of Absence/Other Leaves with Pay, when the leave is in the interest of the University and to the extent allowable by the fund source(s) from which the salary is paid.

f.  Appointees with a title in this series are not eligible for sabbatical leave (APM - 740, Leaves of Absence/Sabbatical Leaves).

g.  The Faculty Code of Conduct (APM - 015) applies to all appointees with titles in this series.

h.  The provisions of APM - 140, Non-Senate Academic Appointees/Grievances concerning grievances of non-Senate academic appointees shall apply to appointees with titles in this series.

i.  The provisions of APM - 145, Non-Senate Academic Appointees/Layoff and Involuntary reduction in Time concerning layoff and involuntary reduction in time shall apply to appointees with titles in this series.

j.  The provisions of APM - 150, Non-Senate Academic Appointees/Corrective Action and Dismissal concerning corrective action and dismissal shall apply to appointees with titles in this series.

**278-24 Authority**

The Chancellor has authority to approve academic personnel actions (e.g., appointments, reappointments, merit increases, promotions, and terminations) in this series in accordance with this and other applicable academic personnel policies. The Chancellor has authority to approve Above-Scale base salaries up to and including the Indexed Compensation Level threshold. Authority rests with the Provost and Executive Vice President for Academic Affairs to approve base salaries above the Indexed Compensation Level threshold (see APM - 600-4-g).

**278-80 Review Procedures**

The general provisions of APM - 220-80, Professor Series, apply to faculty appointed in the Health Sciences Clinical Professor series. The Chancellor, with the advice of the Academic Senate and clinical departments or other units as appropriate, shall develop local review procedures for this series and for all academic personnel actions (e.g., appointment, reappointment, advancement, and termination). Such procedures shall be developed within the guidelines described in APM - 210-6, *Instructions to Review Committees That Advise on Actions Concerning the Health Sciences Clinical Professor Series.*

**Revision History**

April 20, 2022:
• Technical revisions to update references to Regental governing documents.

For details on prior revisions, please visit the Academic Personnel and Programs website.

# EXHIBIT C

**CHAIR**

Robert M. Wachter, MD
Professor and Chair
Department of Medicine, UCSF

505 Parnassus Avenue, Box 0120
San Francisco, CA 94143-0120
Phone: 415-476-9494
Fax: 415-502-2660
Robert.Wachter@ucsf.edu

**VICE CHAIRS**

Kenneth McQuaid, MD
Chief of Medical Service
San Francisco VA Health Care System

Michelle Mourad, MD
Clinical Affairs & Value

Neil R. Powe, MD, MPH, MBA
Chief of Medical Services
Zuckerberg SF General Hospital

Vineet Jain, MD, MS
Interim Chief of Medicine
UCSF Fresno

**ASSOCIATE CHAIRS**

Michael Chen
Finance

David Erle, MD
Biomedical Research

Diane Havlir, MD
Clinical Research

Medell Johnson, MD
Diversity, Equity & Inclusion

Maria Novelero, MA, MPA
Administration

Jennifer Perkins, MD, MBA
Ambulatory Care & Population
Health

Emmanuelle Surface, MD, MPH
Faculty Experience

Brian Schwartz, MD
Education

ANNUAL REAPPOINTMENT NOTICE

July 1, 2024

Rupa Marya, MD
Division of Hospital Medicine at UCSF Health

Dear Rupa Marya:

In accordance with University Academic Policy (Academic Personnel Manual Section 137), this is to notify you of your reappointment in the Division of Hospital Medicine at UCSF Health effective July 1, 2024 through June 30, 2025. An appointment with an established ending date is self-terminating subject to the notice requirements of APM 137-32.

Your total annual salary is $284,275. Pro-rated by your appointment percent of 65%, your annual gross salary will be $184,779.

Your appointment as Health Sciences Clinical Professor, Step 1, with an annual base (X + X') salary of $176,000, prorated by your appointment percentage, is used for calculating your primary retirement benefits up to the amount permissible by law. Your negotiated compensation (Y) will be $108,275. This component is beyond your base salary and is not guaranteed beyond the year for which it is negotiated.

The HSCP salary to which you have been assigned is APU scale 4. Salary scales may change by Regental action.

You will continue to be a member of the Medicine Health Sciences Compensation Plan where you will find detailed information on your salary and benefits as well as your responsibilities as a member. Regulations governing conflict of commitment and outside professional activities and the disposition of income from outside professional activities, including which income may be retained and which income needs to be remitted to the Department are also specified.

As a faculty member in the Health Sciences Clinical Professor series (APM - 278 at https://www.ucop.edu/academic-personnel-programs/_files/apm/apm-278.pdf), your primary duties are (1) teaching, (2) professional competence and activity, (3) scholarly or creative activity, and (4) University and public service in an academic school/academic department. In addition, you are responsible for participating in activities that advance professional competence, which may include providing patient care and supervising trainees, as well as performing other related duties as required.

Duties include clinical service and participation in other functions of the Department (for example, Medical Grand Rounds, teaching conferences, and research conferences).

██████████ is the person to whom you report and with whom you should discuss matters related to your appointment. We look forward to working with you in the coming year.

Sincerely,

*Wachter*

Robert Wachter, MD
Professor and Chair, Department of Medicine

Holly Smith Distinguished Professor in Science and Medicine
Marc and Lynne Benioff Endowed Chair
University of California, San Francisco

cc: Personnel File

http://www.ucop.edu/academic-personnel-programs/_files/apm/apm-137.pdf

# EXHIBIT D

## General University Policy Regarding Academic Appointees: APM - 015 - The Faculty Code of Conduct

This policy is the Faculty Code of Conduct as approved by the Assembly of the Academic Senate on June 15, 1971, and amended by the Assembly on May 30, 1974, and with amendments approved by the Assembly on March 9, 1983, May 6, 1986, May 7, 1992, October 31, 2001, May 28, 2003, June 12, 2013, and February 8, 2017 and by The Regents on July 18, 1986, May 15, 1987, June 19, 1992, November 15, 2001, July 17, 2003, July 18, 2013, and March 15, 2017. In addition, technical changes were made September 1, 1988, June 11, 2010, and September 23, 2020.

Additional policies regarding the scope and application of the Faculty Code of Conduct and the University's policies on faculty conduct and the administration of discipline are set forth in APM - 016, the University Policy on Faculty Conduct and the Administration of Discipline.

**The Faculty Code of Conduct as Approved
by the Assembly of the Academic Senate**

(Code of Professional Rights, Responsibilities,
and Conduct of University Faculty, and
University Disciplinary Procedures)

**Preamble**

The University seeks to provide and sustain an environment conducive to sharing, extending, and critically examining knowledge and values, and to furthering the search for wisdom. Effective performance of these central functions requires that faculty members be free within their respective fields of competence to pursue and teach the truth in accord with appropriate standards of scholarly inquiry.

The faculty's privileges and protections, including that of tenure, rest on the mutually supportive relationships between the faculty's special professional competence, its academic freedom, and the central functions of the University. These relationships are also the source of the professional responsibilities of faculty members.

It is the intent of the Faculty Code of Conduct to protect academic freedom, to help preserve the highest standards of teaching and scholarship, and to advance the mission of the University as an institution of higher learning.

Part I of this Code sets forth the responsibility of the University to maintain conditions and rights supportive of the faculty's pursuit of the University's central functions.

Part II of this Code elaborates standards of professional conduct, derived from general professional consensus about the existence of certain precepts as basic to acceptable faculty behavior. Conduct which departs from these precepts is viewed by faculty as unacceptable because it is inconsistent with the mission of the University. The articulation of types of unacceptable faculty conduct is appropriate both to verify that a consensus about minimally acceptable standards in fact does exist and to give fair notice to all that departures from these minimal standards may give rise to disciplinary proceedings.

In Part II a clear distinction is made between statements of (1) ethical principles and (2) types of unacceptable behavior.

1. **Ethical Principles**

   These are drawn primarily from the 1966 *Statement on Professional Ethics* and subsequent revisions of June, 1987, issued by the American Association of University Professors. They comprise ethical prescriptions affirming the highest professional ideals. They are aspirational in character, and represent objectives toward which faculty members should strive. Behavior in accordance with these principles clearly precludes the application of a disciplinary sanction. These Ethical Principles are to be distinguished from *Types of Unacceptable Faculty Conduct* referred to in the following paragraph. The *Types of Unacceptable Faculty Conduct*, unlike the Ethical Principles, are mandatory in character, and state minimum levels of conduct below which a faculty member cannot fall without being subject to University discipline.

2. **Types of Unacceptable Faculty Conduct**

   Derived from the Ethical Principles, these statements specify examples of types of unacceptable faculty behavior which are subject to University discipline because, as stated in the introductory section to Part II, they are "not justified by the Ethical Principles" and they "significantly impair the University's central functions as set forth in the Preamble."

The Ethical Principles encompass major concerns traditionally and currently important to the profession. The examples of types of unacceptable faculty conduct set forth below are not exhaustive. It is expected that case adjudication, the lessons of experience and evolving standards of the profession will promote reasoned adaptation and change of this Code. Faculty may be subjected to disciplinary action under this Code for any type of conduct which, although not specifically enumerated herein, meets the standard for unacceptable faculty behavior set forth above. It should be noted, however, that no provision of the Code shall be construed as providing the basis for judging the propriety or impropriety of collective withholding of services by faculty. Rules and sanctions that presently exist to cover such actions derive from sources external to this Code.

Part III of this Code deals with the enforcement process applicable to unacceptable faculty behavior. That process must meet basic standards of fairness and must reflect significant faculty involvement. In order to guide each campus in the development of disciplinary procedures that comply with this policy and Senate Bylaws, Part III provides an outline of mandatory principles to which each Division must adhere and discretionary principles which are strongly recommended.

## Part I – Professional Rights of Faculty

In support of the University's central functions as an institution of higher learning, a major responsibility of the administration is to protect and encourage the faculty in its teaching, learning, research, and public service. The authority to discipline faculty members in appropriate cases derives from the shared recognition by the faculty and the administration that the purpose of discipline is to preserve conditions hospitable to these pursuits. Such conditions, as they relate to the faculty, include, for example:

1. free inquiry, and exchange of ideas;

2. the right to present controversial material relevant to a course of instruction;

3. enjoyment of constitutionally protected freedom of expression;

4. freedom to address any matter of institutional policy or action when acting as a member of the faculty whether or not as a member of an agency of institutional governance;

5. participation in the governance of the University, as provided in the Bylaws and Standing Orders of The Regents and the regulations of the University, including

   (a) approval of course content and manner of instruction,

   (b) establishment of requirements for matriculation and for degrees,

   (c) appointment and promotion of faculty,

   (d) selection of chairs of departments and certain academic administrators,

   (e) discipline of members of the faculty, and the formulation of rules and procedures for discipline of students,

   (f) establishment of norms for teaching responsibilities and for evaluation of both faculty and student achievement, and

   (g) determination of the forms of departmental governance;

6. the right to be judged by one's colleagues, in accordance with fair procedures and due process, in matters of promotion, tenure, and discipline, solely on the basis of the faculty members' professional qualifications and professional conduct.

## Part II – Professional Responsibilities, Ethical Principles, and Unacceptable Faculty Conduct

This listing of faculty responsibilities, ethical principles, and types of unacceptable behavior is organized around the individual faculty member's relation to teaching and students, to scholarship, to the University,

to colleagues, and to the community. Since University discipline, as distinguished from other forms of reproval or administrative actions, should be reserved for faculty misconduct that is either serious in itself or is made serious through its repetition, or its consequences, the following general principle is intended to govern all instances of its application:

> University discipline under this Code may be imposed on a faculty member only for conduct which is not justified by the ethical principles and which significantly impairs the University's central functions as set forth in the Preamble. To the extent that violations of University policies mentioned in the examples below are not also inconsistent with the ethical principles, these policy violations may not be independent grounds for imposing discipline as defined herein. The *Types of Unacceptable Conduct* listed below in Sections A through E are examples of types of conduct which meet the preceding standards and hence are presumptively subject to University discipline. Other types of serious misconduct, not specifically enumerated herein, may nonetheless be the basis for disciplinary action if they also meet the preceding standards.

A. **Teaching and Students**

**Ethical Principles**. "As teachers, the professors encourage the free pursuit of learning of their students. They hold before them the best scholarly standards of their discipline. Professors demonstrate respect for students as individuals and adhere to their proper roles as intellectual guides and counselors. Professors make every reasonable effort to foster honest academic conduct and to assure that their evaluations of students reflect each student's true merit. They respect the confidential nature of the relationship between professor and student. They avoid any exploitation, harassment, or discriminatory treatment of students. They acknowledge significant academic or scholarly assistance from them. They protect their academic freedom." (AAUP Statement, 1966; Revised, 1987)

The integrity of the faculty-student relationship is the foundation of the University's educational mission. This relationship vests considerable trust in the faculty member, who, in turn, bears authority and accountability as mentor, educator, and evaluator. The unequal institutional power inherent in this relationship heightens the vulnerability of the student and the potential for coercion. The pedagogical relationship between faculty member and student must be protected from influences or activities that can interfere with learning consistent with the goals and ideals of the University. Whenever a faculty member is responsible for academic supervision of a student, a personal relationship between them of a romantic or sexual nature, even if consensual, is inappropriate. Any such relationship jeopardizes the integrity of the educational process.

In this section, the term student refers to all individuals under the academic supervision of faculty.

**Types of unacceptable conduct:**

1. Failure to meet the responsibilities of instruction, including:

    (a) arbitrary denial of access to instruction;

    (b) significant intrusion of material unrelated to the course;

    (c) significant failure to adhere, without legitimate reason, to the rules of the faculty in the conduct of courses, to meet class, to keep office hours, or to hold examinations as scheduled;

    (d) evaluation of student work by criteria not directly reflective of course performance;

    (e) undue and unexcused delay in evaluating student work.

2. Discrimination, including harassment, against a student on political grounds, or for reasons of race, color, religion, sex, sexual orientation, gender, gender expression, gender identity, ethnic origin, national origin, ancestry, marital status, pregnancy, physical or mental disability, medical condition (cancer-related or genetic characteristics), genetic information (including family medical history), or service in the uniformed services as defined by the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA), as well as state military and naval service, or, within the limits imposed by law or University regulations, because of age or citizenship or for other arbitrary or personal reasons.

3. Sexual violence and sexual harassment, as defined by University policy, of a student.

4. Violation of the University policy, including the pertinent guidelines, applying to nondiscrimination against students on the basis of disability.

5. Use of the position or powers of a faculty member to coerce the judgment or conscience of a student or to cause harm to a student for arbitrary or personal reasons.

6. Participating in or deliberately abetting disruption, interference, or intimidation in the classroom.

7. Entering into a romantic or sexual relationship with any student for whom a faculty member has, or should reasonably expect to have in the future[1], academic responsibility (instructional, evaluative, or supervisory).

---

[1] A faculty member should reasonably expect to have in the future academic responsibility (instructional, evaluative, or supervisory) for (1) students whose academic program will require them to enroll in a course taught by the faculty member, (2) students known to the faculty member to have an interest in an academic area within the faculty member's academic expertise, or (3) any student for whom a faculty member must have academic responsibility (instructional, evaluative, or supervisory) in the pursuit of a degree.

8. Exercising academic responsibility (instructional, evaluative, or supervisory) for any student with whom a faculty member has a romantic or sexual relationship.

B. **Scholarship**

**Ethical Principles**. "Professors, guided by a deep conviction of the worth and dignity of the advancement of knowledge, recognize the special responsibilities placed upon them. Their primary responsibility to their subject is to seek and to state the truth as they see it. To this end professors devote their energies to developing and improving their scholarly competence. They accept the obligation to exercise critical self- discipline and judgment in using, extending, and transmitting knowledge. They practice intellectual honesty. Although professors may follow subsidiary interests, these interests must never seriously hamper or compromise their freedom of inquiry." (AAUP Statement, 1966; Revised, 1987)

**Types of unacceptable conduct:**

Violation of canons of intellectual honesty, such as research misconduct and/or intentional misappropriation of the writings, research, and findings of others.

C. **The University**

**Ethical Principles**. "As a member of an academic institution, professors seek above all to be effective teachers and scholars. Although professors observe the stated regulations of the institution, provided the regulations do not contravene academic freedom, they maintain their right to criticize and seek revision. Professors give due regard to their paramount responsibilities within their institution in determining the amount and character of the work done outside it. When considering the interruption or termination of their service, professors recognize the effect of their decision upon the program of the institution and give due notice of their intentions." (AAUP Statement, 1966; Revised, 1987)

**Types of unacceptable conduct:**

1. Intentional disruption of functions or activities sponsored or authorized by the University.

2. Incitement of others to disobey University rules when such incitement constitutes a clear and present danger that violence or abuse against persons or property will occur or that the University's central functions will be significantly impaired.

3. Unauthorized use of University resources or facilities on a significant scale for personal, commercial, political, or religious purposes.

4. Forcible detention, threats of physical harm to, or harassment of another member of the University community, that interferes with that person's performance of University activities.

5. Discrimination, including harassment, against University employees or individuals seeking employment; providing services pursuant to a contract; or applying for or engaged in an unpaid internship, volunteer capacity, or training program leading to employment on political grounds, or for reasons of race, color, religion, sex, sexual orientation, gender, gender expression, gender identity, ethnic origin, national origin, ancestry, marital status, pregnancy, physical or mental disability, medical condition (cancer-related or genetic characteristics), genetic information (including family medical history), or service in the uniformed services as defined by the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA), as well as state military and naval service, or, within the limits imposed by law or University regulations, because of age or citizenship or for other arbitrary or personal reasons.

6. Sexual violence and sexual harassment, as defined by University policy, of another member of the University community.

7. Violation of the University policy, including the pertinent guidelines, applying to nondiscrimination against employees on the basis of disability.

8. Serious violation of University policies governing the professional conduct of faculty, including but not limited to policies applying to research, outside professional activities, conflicts of commitment, clinical practices, violence in the workplace, and whistleblower protections.

D. **Colleagues**

**Ethical Principles**. "As colleagues, professors have obligations that derive from common membership in the community of scholars. Professors do not discriminate against or harass colleagues. They respect and defend the free inquiry of associates. In the exchange of criticism and ideas professors show due respect for the opinions of others. Professors acknowledge academic debts and strive to be objective in their professional judgment of colleagues. Professors accept their share of faculty responsibilities for the governance of their institution." (AAUP Statement, 1966; Revised, 1987)

**Types of unacceptable conduct:**

1. Making evaluations of the professional competence of faculty members by criteria not directly reflective of professional performance.

2. Discrimination, including harassment, against faculty on political grounds, or for reasons of race, color, religion, sex, sexual orientation, gender, gender expression, gender

identity, ethnic origin, national origin, ancestry, marital status, pregnancy, physical or mental disability, medical condition (cancer- related or genetic characteristics), genetic information (including family medical history), or service in the uniformed services as defined by the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA), as well as state military and naval service, or, within the limits imposed by law or University regulations, because of age or citizenship or for other arbitrary or personal reasons.

3.  Sexual violence and sexual harassment, as defined by University policy, of another member of the University community.

4.  Violation of the University policy, including the pertinent guidelines, applying to nondiscrimination against faculty on the basis of disability.

5.  Breach of established rules governing confidentiality in personnel procedures.

E.  **The Community**

    **Ethical Principles**. "Faculty members have the same rights and obligations as all citizens. They are as free as other citizens to express their views and to participate in the political processes of the community. When they act or speak in their personal and private capacities, they should avoid deliberately creating the impression that they represent the University." (U.C. Academic Council Statement, 1971)

    **Types of unacceptable conduct:**

1.  Intentional misrepresentation of personal views as a statement of position of the University or any of its agencies. (An institutional affiliation appended to a faculty member's name in a public statement or appearance is permissible, if used solely for purposes of identification.)

2.  Commission of a criminal act which has led to conviction in a court of law and which clearly demonstrates unfitness to continue as a member of the faculty.

### Part III – Enforcement and Sanctions

The Assembly of the Academic Senate recommends that each Division, in cooperation with the campus administration, develop and periodically re-examine procedures dealing with the investigation of allegations of faculty misconduct and the conduct of disciplinary proceedings.

Procedures shall be consistent with the Bylaws of the Academic Senate. Each Division should duly notify the University Committee on Rules and Jurisdiction and the University Committee on Privilege and Tenure of the procedures it has adopted and any subsequent changes therein. These Committees in turn are directed to report periodically to the Assembly of the Academic Senate on procedures

adopted by the Divisions and to recommend to the Assembly such action as they deem appropriate for assuring compliance with the Bylaws of the Academic Senate or the promotion of uniformity among Divisions to the extent to which it appears necessary and desirable.

A.  In the development of disciplinary procedures, each Division must adhere to the following principles:

    1.  No disciplinary sanction for professional misconduct shall be imposed by the administration except in accordance with specified campus procedures adopted after appropriate consultation with agencies of the Academic Senate, as prescribed in the introduction to this part of the Code. Systemwide procedures for the conduct of disciplinary hearings are set forth in Academic Senate Bylaw 336.

    2.  No disciplinary sanction shall be imposed until after the faculty member has had an opportunity for a hearing before the Divisional Committee on Privilege and Tenure, subsequent to a filing of a charge by the appropriate administrative officer, as described in Academic Senate Bylaw 336.

    3.  The Chancellor is deemed to know about an alleged violation of the Faculty Code of Conduct when it is reported to any academic administrator at the level of department chair or above. Additionally, for an allegation of sexual violence or sexual harassment, the Chancellor is deemed to know about an alleged violation of the Faculty Code of Conduct when the allegation is first reported to any academic administrator at the level of department chair or above or the campus Title IX Officer. The Chancellor must initiate related disciplinary action by delivering notice of proposed action to the respondent no later than three years after the Chancellor is deemed to have known about the alleged violation. There is no limit on the time within which a complainant may report an alleged violation.

    4.  The Chancellor may not initiate notice of proposed disciplinary action unless there has been a finding of *probable cause*. The *probable cause* standard means that the facts as alleged in the complaint, if true, justify the imposition of discipline for a violation of the Faculty Code of Conduct and that the Chancellor is satisfied that the University can produce credible evidence to support the claim. In cases where the Chancellor wants a disciplinary action to proceed, the Divisional hearing committee must hold a hearing and make findings on the evidence presented unless the accused faculty member settles the matter with the Chancellor prior to the hearing or the accused faculty member explicitly waives the right to a hearing.

    5.  The procedures adopted shall include designation of the following disciplinary sanctions authorized in the University Policy on Faculty Conduct and the Administration of Discipline, of which this Faculty Code of Conduct is an integral part: written censure, reduction in salary, demotion, suspension, denial or curtailment of emeritus status, and dismissal from the employ of the University. The Divisional Committee on Privilege and Tenure shall not recommend the imposition of a sanction more severe than that in the notice

of proposed disciplinary action. More than one disciplinary sanction may be imposed for a single act of misconduct, e.g. a letter of censure and a suspension.

B.   In the development of disciplinary procedures, it is recommended that each Division adhere to the following principles:

1.   In order to facilitate the efficient and timely handling of disciplinary matters, it is recommended that procedures be developed that allow each Divisional Committee on Privilege and Tenure to sit in hearing panels smaller than the full committee.

2.   There should be an appropriate mechanism for consideration and investigation of allegations of misconduct received from members of the faculty, staff, students, the administration, and other members of the University community. Procedures should be developed which encourage a single formal investigation of the allegations leading to the proposed disciplinary action.

3.   Because it is desirable that the faculty meaningfully participate in its own self- discipline, and in order to provide the administration with faculty advice in the beginning stages of what may become formal disciplinary proceedings, appropriate procedures should be developed to involve the faculty in participating in the investigation of allegations of misconduct and/or in making recommendations to appropriate administrative officers whether a disciplinary charge should be filed. Divisions are encouraged to develop procedures to provide faculty investigators with training, consultation, or legal counsel to assist with the investigation of faculty disciplinary cases.

4.   There should be provision for early resolution of allegations of faculty misconduct before formal disciplinary proceedings are instituted. Procedures should be developed for mediation of cases where mediation is viewed as acceptable by the Chancellor and the faculty member accused of misconduct. Mediators should be trained in mediation, be regarded as neutral third parties and have experience in the University environment. In cases where a settlement resolving disciplinary charges is entered into after a matter has been referred to an Academic Senate committee, the Chancellor is encouraged to consult with the Chair of the Divisional Committee on Privilege and Tenure prior to finalizing the settlement.

5.   Appropriate precautions should be taken to safeguard the confidentiality of investigative and disciplinary proceedings. Procedures should be developed that allow information about an ongoing disciplinary proceeding, including information about the outcome, to be shared with complainant(s), to the extent allowable by State law and University policy.

6.   There should be provision, to the maximum feasible extent, for separating investigative and judicial functions. A faculty member who has participated in investigating an allegation of misconduct or in recommending that a charge should be filed should thereafter not participate, as a member of the Committee on Privilege and Tenure, in the hearing of that charge.

7. In the implementation of all procedures, specific provisions should be made for the time span within which certain actions may or must be taken. Every effort should be made to conform to reasonable, specified time frames. Ideally, a hearing should commence within 90 days of the date on which the accused faculty member has been notified of the intention to initiate a disciplinary proceeding. A faculty member who is entitled to a hearing should not be permitted thereafter to delay imposition of discipline by refusing to cooperate or being unavailable for a scheduled hearing. A hearing shall not be postponed because the faculty member is on leave or fails to appear.

8. There should be consideration of provision for the availability of removal or termination of a sanction, either automatically or by administrative discretion, in individual cases. The nature and circumstances of the offense should determine the severity and type of discipline.

9. Procedures should be developed for keeping records of disciplinary matters in a confidential manner and sharing such records with Senate and administrative officers with a need to know in accordance with State law and University policy.

**Revision History**

September 23, 2020:

- Technical revision to remove gendered language.

For details on prior revisions, please visit the Academic Personnel and Programs website.

# EXHIBIT E

**General University Policy Regarding Academic Appointees: APM - 150: Non-Senate Academic Appointees/Corrective Action and Dismissal**

**150-0   Policy**

    a. This policy provides the standards and procedures for instituting corrective action or dismissal of non-Senate academic appointees. Corrective action or dismissal may be instituted for good cause, including but not limited to misconduct, unsatisfactory work performance, dereliction of duty, or violation of University policy. Corrective action is intended to give the non-Senate academic appointee an opportunity to improve and/or correct conduct or performance.

    b. Non-Senate academic appointees are expected to maintain a standard of academic responsibility that requires service consistent with the objectives of the University. Non-Senate faculty appointees are also subject to the standards set forth in the Faculty Code of Conduct (APM - 015).

**150-6   Responsibility**

    a. It is the responsibility of each Chancellor to establish and issue guidelines and procedures for instituting corrective action and dismissal of non-Senate academic appointees.

    b. Corrective action or dismissal may be instituted and implemented by the department chair, unit head, supervisor, or other appropriate administrative authority in accordance with campus procedures. Campus procedures shall outline appropriate consultation requirements for corrective action and dismissal.

**150-14  Eligibility**

    a. This policy applies to all academic appointees of the University who are not members of the Academic Senate except as provided in APM - 150-14-b and -c. For non-Senate academic appointees covered by a Memorandum of Understanding (MOU), this policy applies only to the extent provided for in the MOU.

    b. APM - 150 does not apply to Postdoctoral Students (see APM - 390).

    c. Student academic appointees not covered by an MOU are subject to this policy to the extent that corrective action or dismissal are based solely upon their employment relationship with the University.

d. For non-Senate academic appointees who are subject to peer review for performance evaluation, demotion and dismissal for unsatisfactory work performance shall involve the regular peer review process. Such a peer review shall be advisory to the administrator authorized to institute the demotion or dismissal action.

## 150-30  Types of Corrective Action and Dismissal

a. Corrective action is a written warning, written censure, suspension without pay, reduction in salary, or demotion for good cause, including but not limited to misconduct, unsatisfactory work performance, dereliction of duty, or violation of University policy.

(1) A written warning is a communication that informs the appointee of the nature of the misconduct or deficiency, the method of correction, and the probable consequence of continued misconduct or deficiency. A written warning is to be distinguished from an informal spoken warning. An informal spoken warning or a letter outlining performance expectations is not an official corrective action.

(2) A written censure is a formal written expression of institutional rebuke that contains a description of the censured conduct. A written censure must be delivered to the recipient and a copy must be maintained in a designated file or files, or for the period of time specified in the writing.

(3) A suspension is debarment without pay from appointment responsibilities for a stated period of time. Unless otherwise noted, the terms of a suspension will include loss of normal employee privileges such as access to University property and parking and library privileges.

(4) A reduction in salary is a reduction to a lower salary without a change in rank or step. The amount and duration of the reduced salary shall be specified.

(5) A demotion is a reduction to a lower rank or step with a corresponding reduction in salary.

b. Dismissal is the termination of an appointment for good cause initiated by the University prior to the ending date of appointment.  Good cause includes but is not limited to misconduct, continued unsatisfactory work performance, dereliction of duty, or serious violation of University policy. In the case of dismissal of a non-Senate faculty member, refer to Regents' Bylaw 40.3(c) and APM - 150-40.

**150-32  Procedures for Corrective Action and Dismissal**

a. **Informal Resolution**

   Prior to instituting corrective action or dismissal, efforts to resolve the issue(s) informally should be attempted where appropriate.

b. **Investigatory Leave**

   An appointee may be placed on immediate investigatory leave with pay, without prior written notice, for the purpose of reviewing or investigating conduct which in the judgment of the Chancellor requires removing the appointee from University premises. While on such leave, the appointee's return to University premises without written permission may create independent grounds for dismissal. Such investigatory leave must be documented in writing after it is instituted.

c. **Written Notice of Intent**

   (1) The University shall provide a written Notice of Intent to the appointee prior to initiating the actions of written censure, suspension without pay, reduction in salary, demotion, or dismissal.  The Notice shall state:

      (a) the intended action, including reasons for the action and the proposed effective date; (b) the basis of the charges, including copies of pertinent materials supporting the charges; (c) the appointee's right to respond either orally or in writing within fourteen (14) calendar days of the date of issuance of the written Notice of Intent; and (d) the name of the person to whom the appointee should respond.  No Notice of Intent is required for a written warning.

   (2) Prior to instituting the dismissal of a non-Senate faculty member, the appointee should be apprised of the opportunity for a hearing before the properly constituted advisory committee of the Academic Senate pursuant to Regents' Bylaw 40.3(c).

d. **Response to Written Notice of Intent**

   The appointee who receives a written Notice of Intent shall be entitled to respond, either orally or in writing, within fourteen (14) calendar days of the date of issuance of the written Notice of Intent. The response, if any, shall be reviewed by the administration.

e. **Written Notice of Action**

   If the University determines to institute the corrective action or dismissal following the review of a timely response, if any, from the appointee, and within thirty (30) calendar

days of the date of issuance of the written Notice of Intent, the University shall issue a written Notice of Action to the appointee of the corrective action or dismissal to be taken and its effective date. The Notice of Action also shall notify the appointee of the right to grieve the action under APM - 140. The Notice of Action may not include an action more severe than that described in the Notice of Intent. A copy of the Notice of Action also shall be placed in the employee's personnel file(s).

f.   **Representation**

Appointees may represent themselves or may be represented by another person at any stage of the corrective action or dismissal process.

g.   **Extension of Time**

Upon written request and prior to the expiration of any time limit stated in this policy, the Chancellor may grant extensions, as appropriate.

## 150-40  Procedures for Dismissal of a Non-Senate Faculty Appointee

Regents' Bylaw 40.3(c) provides that termination of the appointment of any member of the faculty before the expiration of the faculty member's appointment shall be only for good cause, after the opportunity for a hearing before the properly constituted advisory committee of the Academic Senate, except as otherwise provided in a MOU for faculty who are not members of the Academic Senate. A non-Senate faculty appointee is entitled to select only one grievance review mechanism, either APM - 140 or an Academic Senate hearing as provided by Regents' Bylaw 40.3(c). If a non-Senate faculty appointee elects an Academic Senate hearing, good cause shall be defined as set forth in APM - 150-0. For a non-Senate faculty appointee with a term appointment if the hearing has not commenced by the ending date of the appointment, the dismissal becomes a non-reappointment effective at the end of the appointment. The appointee has thirty (30) calendar days from the ending date of the appointment to grieve the non-reappointment pursuant to APM - 137 and 140.

**Revision History**

April 20, 2022:
- Technical revisions to update references to Regental governing documents.

September 23, 2020:
- Technical revision to remove gendered language and correct minor grammatical errors.

For details on prior revisions, please visit the Academic Personnel and Programs website.

# EXHIBIT
# F

Office of Academic Affairs
Revised March 1, 2023
Effective Date: March 1, 2023



# Procedure for the Investigation of Faculty Misconduct and the Administration of Discipline

# TABLE OF CONTENTS

Page

**Introduction**                                                                                    2
    Governing Policies
    Authority for this Procedure
    Applicability
    Effective Date
    Role of the Vice Provost, Academic Affairs

**Resources**                                                                                       3
    Consultation/Contact Information
    Investigation Process Flowchart

**I.   General Information**                                                          3
    A. Participants in an Investigation and Notifications
    B. Standards
    C. Timeframes
    D. Confidentiality
    E. Informal Resolution
    F. Investigation Records

**II.  Reporting Faculty Misconduct**                                                     6

**III. Initial Review**                                                                        7
    A. Preliminary Investigation
    B. Subject Matter Expert Investigation
    C. Cases Involving Both Subject Matter Expert Investigations and Preliminary Investigations
    D. Cases Initiated by Receipt of an Investigation Report from Another Unit

**IV. Faculty Code of Conduct Investigation**                                                 12
    A. Appointment of *Ad Hoc* Investigation Committee
    B. Start of the Investigation
    C. Charge to the *Ad Hoc* Investigation Committee
    D. *Ad Hoc* Investigation Committee Report
    E. Notice to the Respondent and Opportunity to Respond
    F. Outcome

**V.  Sanctions**                                                                          16
    A. Notice of Proposed Sanctions
    B. Response to Proposed Sanctions
    C. Procedural Privileges and Protections
    D. Findings, Conclusions and Recommendations
    E. Chancellor's Final Decision

**Appendix A:  Definitions**                                                              19
    Allegations/Complaint
    Business Day
    Faculty Misconduct
    Preliminary Investigation
    Preliminary Investigator
    Subject Matter Expert
    Subject Matter Expert Investigation

**Appendix B:  Authorized Disciplinary Sanctions**                                        20

# INTRODUCTION

**Governing Policies:**  The University of California's Faculty Code of Conduct is set forth in Academic Personnel Manual (APM) 015. This system-wide policy sets out the rights, privileges and professional responsibilities of faculty at the University. Part II of APM 015 presents the professional responsibilities of faculty, the ethical principles governing faculty, and examples of types of unacceptable conduct.

APM 016 outlines the types of formal discipline that may be imposed on Academic Senate faculty for violating the Faculty Code of Conduct. APM 016 states that campus develop the Faculty Code of Conduct "is the official basis for imposing discipline on members of the faculty for professional misconduct." The disciplinary sanctions described in APM 016 "may not be imposed on faculty members other than through the procedures pursuant to APM 015 and 016." APM 150 addresses discipline that may be imposed on non-Senate faculty for, among other things, violations of the Faculty Code of Conduct.

**Authority for this Procedure:**  The Chancellor is responsible for establishing procedures for the administration of discipline on the campus in consultation with the Academic Senate. The Assembly of the UC Academic Senate recommends that each campus develop procedures for handling investigations of alleged faculty misconduct and conducting disciplinary proceedings. This Procedure for the Investigation of Faculty Misconduct and the Administration of Discipline (Procedure) was developed in consultation with the San Francisco Division of the Academic Senate, and is to be used in investigating allegations of faculty misconduct, in accord with APM 015, and in imposing sanctions on faculty members, in accord with APM 016 and APM 150.

**Applicability:**  This Procedure applies to both Academic Senate and non-Senate faculty unless superseded by a memorandum of understanding or collective bargaining agreement. Any perceived conflict between the provisions of APM 015 and APM 016 and this Procedure is unintended; the provisions of APM 015 and APM 016 are controlling. This Procedure implements APM 150 with respect to the imposition of discipline on non-Senate faculty.

This Procedure does not apply to allegations falling under the UC Sexual Violence and Sexual Harassment Policy (SVSH Policy). Such allegations shall be handled in accord with the Interim Procedures: Adjudication Process for Faculty and Other Non-represented Academic Appointees in Cases Involving Sexual Violence and Sexual Harassment (Interim SVSH Procedures), or the prevailing procedures at the time of the underlying complaint. When allegations falling under the UC Nondiscrimination Policy are alleged in conjunction with allegations falling under the SVSH Policy, both types of allegations shall be handled in accord with the Interim SVSH Procedure, or the prevailing procedures at the time of the underlying complaint. Allegations falling under the Nondiscrimination Policy which are not alleged in conjunction with allegations falling under the SVSH Policy shall be handled in accord with this Procedure.

**Effective Date:**  This Procedure is effective as of March 1, 2023, and applies to any complaint of faculty misconduct received on or after the effective date. Faculty misconduct allegations or complaints received after the effective date, but which allege facts that occurred prior to the effective date will be administered under the Procedure for Investigation of Faculty Misconduct and the Administration of Discipline, effective September 1, 2017 (2017 Investigation Procedure).

**Role of the Vice Provost, Academic Affairs:** The Vice Provost, Academic Affairs (Vice Provost) oversees the administration of Faculty Code of Conduct investigations and makes recommendations related to these investigations to the Chancellor. The Vice Provost has been delegated the authority to close cases where faculty misconduct is not found or there is an informal resolution to the satisfaction of the Vice Provost (see Section I-E below). The Vice Provost, as provided for in these Procedures, administers notices to appropriate parties, receives and accepts reports from Preliminary Investigators and Subject Matter Experts, appoints *ad hoc* committees, can grant extensions, and advises on policy and process.

## RESOURCES

**Consultation:** Questions about APM 015 and/or this Procedure may be directed to the Vice Provost, the Academic Employee Relations Manager, or an Academic Employee Relations Specialist. See Contact Information. Once a complaint has been filed, any communications to the Vice Provost will be referred to staff in the Vice Provost's Office due to the Vice Provost's decision-making role. All parties or witnesses involved in an investigation are encouraged to direct such inquiries to the Academic Employee Relations Manager or Specialists.

**Investigation Process Flowchart:** See also the Investigation Process Flowchart.

## I.   GENERAL INFORMATION

### A.  Participants in an Investigation and Notifications

UCSF policies prohibit retaliation against a person who reports prohibited conduct, assists someone with or participates in any manner in an investigation or resolution of such a report. Retaliation includes threats, intimidation, reprisals and/or adverse actions related to employment or education. Allegations of retaliation are taken seriously and can be the basis for a faculty misconduct allegation or proceeding, separate and apart from the original allegation(s), and can be the basis for imposing sanctions, up to and including dismissal.

**Complainant:** An individual who reports allegations of faculty misconduct. Any individual can make a complaint of faculty misconduct, including, but not limited to students, staff, trainees, non-faculty academics, faculty, and members of the community.

1. Role:  A Complainant reports allegations of faculty misconduct, provides information during the investigative process as requested, and may serve as a witness.

2. A Complainant should not investigate suspected faculty misconduct on their own.  Such actions may compromise the neutrality of the investigation, the integrity of evidence, and/or the integrity of the investigative process.

3. Notifications:  The Vice Provost's Office will notify Complainant(s) about the status of an investigation upon request. A Complainant does not have the right to receive information about

the outcome of an investigation or any sanctions that may be imposed on a Respondent unless otherwise required by law and/or University policy.

**Reporter:** An individual who reports allegations of faculty misconduct on behalf of another, a unit, or the University, but who is not themselves directly affected by the alleged misconduct.

1. <u>Role:</u> A Reporter reports allegations of faculty misconduct as outlined in Section II below, provides information during the investigative process as requested, and may serve as a witness.

2. A Reporter should not investigate suspected faculty misconduct on their own. Such actions may compromise the neutrality of the investigation, the integrity of evidence, and/or the integrity of the investigative process.

3. <u>Notifications:</u> A Reporter may be advised of the status of the investigation upon request. A Reporter does not have the right to receive information about the outcome of an investigation or any sanctions that may be imposed on a Respondent unless otherwise required by law and/or University policy.

**Respondent:** A faculty member against whom an allegation of faculty misconduct is made.

1. <u>Role:</u> A Respondent should not take any action that may compromise the neutrality of the investigation, the integrity of evidence, and/or the integrity of the investigative process.

2. A Respondent should not investigate alleged faculty misconduct on their own. Such actions may compromise the neutrality of the investigation, the integrity of evidence, and/or the integrity of the investigative process.

3. <u>Notifications:</u> Respondents will be notified of the outcome at the completion of each phase of an investigation, and will have an opportunity to respond.

## B. Standards

**Sufficient Substance:** The standard by which a preliminary investigator conducts a limited factual inquiry of the allegations to determine if a formal Faculty Code of Conduct investigation is warranted, based on the totality of the allegations and evidence reviewed.

**Probable Cause:** "The *probable cause* standard means that the facts, as alleged in the complaint, if true, justify the imposition of discipline for a violation of the Faculty Code of Conduct and that the Chancellor is satisfied that the University can produce credible evidence to support the claim." See APM 015, Part III-A-4.

**Preponderance of the Evidence:** The standard of proof by which probable cause is shown in a faculty misconduct investigation. A "preponderance" means that the greater weight of credible evidence shows that it is more likely than not that a fact is true or false.

UCSF Procedure for the Investigation of Faculty Misconduct and the Administration of Discipline | Effective: [March 1, 2023]

4

## C. Timeframes

1. No disciplinary action may commence if more than three (3) years have passed between the time the Chancellor knew or should have known about the alleged violation and the notice of proposed disciplinary action. See APM 015 Part III, Section A-3.

2. Every reasonable effort will be made to complete each phase of an investigation within the time frames stated in this Procedure. However, each case presents different circumstances and it is not always possible to maintain the timeframes set out in this Procedure. Where applicable, requests for extensions can be made and granted as provided for in these Procedures (see Sections III-A-2, III-A-4, III-B-4, III-B-6, III-C-3, IV-D, IV-E-3, and V-B).

3. For purposes of this Procedure, the investigation process ends when: (a) the case closes (see Sections I-E-4, III-A-5, IV-F-1, and V-A-2); or (b) when the Chancellor imposes sanctions on the Respondent.

## D. Confidentiality

Faculty misconduct investigations are confidential to the extent allowed or required by law and/or other University policies.

The University takes seriously the integrity of the investigation. Consideration of whether confidentiality admonitions will be issued will be based on whether there is a need for witness protection, evidence is in danger of being destroyed, testimony is in danger of being fabricated, or there is a need to prevent a cover up. If any one of these elements are reported or discovered, a tailored confidentiality admonition may be issued throughout the investigation. An individual who breaches any duty of confidentiality in connection with faculty misconduct investigations may be subject to sanctions, up to and including dismissal as provided in APM 016 and APM 015, and other relevant University policies.

## E. Informal Resolution

The Vice Provost has discretion to approve informal resolution efforts if they deem this to be appropriate.

1. Timing:  The Vice Provost may approve informal resolution at any stage of a faculty misconduct proceeding, to the extent permitted by law and/or UC policy.

2. Recommendations:  During a Preliminary Investigation or a Subject Matter Expert Investigation, if an investigator believes that the allegations are appropriate for informal resolution, the Preliminary Investigator or Subject Matter Expert may include a recommendation in the investigation report regarding informal resolution.

3. Process:  With the approval of the Vice Provost, the Preliminary Investigator may attempt to informally resolve the complaint. The Vice Provost or the Preliminary Investigator may enlist the Office of the Ombuds or other appropriate individuals to assist in informal resolution efforts. For

example, in some circumstances mediation, facilitated by the Ombuds Office, may be an appropriate informal resolution mechanism.

    a. Subject Matter Experts may informally resolve complaints referred to them by the Vice Provost, when appropriate.

4. <u>Outcome</u>: If informal resolution efforts are concluded to the satisfaction of the Vice Provost, the Vice Provost may close the case.

## F. Investigation Records

Records of disciplinary matters will be maintained in a confidential manner and will only be disclosed to the extent permitted and/or required by state or federal law and/or University policy.

## II. REPORTING FACULTY MISCONDUCT

A. Any member of the campus community, including students, trainees, staff, non-faculty academics and faculty, as well as any member of the public, may report allegations of faculty misconduct.

B. Reporting options:

1. Allegations of faculty misconduct may be reported directly to the Vice Provost.

2. Allegations of faculty misconduct may be reported through the UC Whistleblower hotline.

3. Allegations that a faculty member engaged in activity in violation of the UC Sexual Violence Sexual Harassment (SVSH) policy and/or discrimination, harassment and/or retaliation must be reported to the UCSF Office for the Prevention of Harassment and Discrimination (OPHD).

4. Allegations that a faculty member engaged in improper governmental activities or retaliatory actions related to a whistleblower complaint should be reported directly to the UCSF Chief Ethics and Compliance Officer.

5. Allegations of research misconduct that are within the scope of the UCSF Integrity of Research Policy (Campus Administrative Policy 100-29) may be reported to the UCSF Research Integrity Officer for investigation.[1]

---

[1] Allegations that any member of the UCSF community, including faculty, engaged in research misconduct in connection with federally funded research activities should be reported directly to the UCSF Research Integrity Officer. Allegations of research misconduct are governed by a different policy and investigated under the UCSF Integrity of Research Procedures. However, research misconduct can also be a violation of the Faculty Code of Conduct. If a formal research misconduct investigation is initiated against a faculty member (see UCSF Integrity of Research Procedures, section D. Investigation), then the UCSF RIO and the Vice Provost may appoint a joint committee to conduct this investigation. This joint committee will conduct the research misconduct investigation per the UCSF Integrity of Research Procedures, including being charged with, in accord with this Procedure, making a probable cause determination as to whether APM 015 was violated and to make a recommendation for

6. Allegations of faculty misconduct reported elsewhere may be referred to the Vice Provost.

C. Form: A Complaint of faculty misconduct made to the Vice Provost must be in writing and should be as complete as possible.[2] Supporting documentation should be included if applicable.

D. If it is determined at any point that a Complainant, Reporter, or anyone else was involved in intentionally and/or maliciously bringing unfounded charges, the Vice Provost may take appropriate action against those individual(s), including referring the matter for disciplinary action, up to and including dismissal under applicable policies and procedures.

# III.   INITIAL REVIEW

When allegations of faculty misconduct are received by the Vice Provost, the Vice Provost determines whether the allegations should be moved forward for Initial Review under these Procedures, or referred to a different unit because the allegations are not appropriate for a Faculty Code of Conduct investigation. The Vice Provost may in their discretion pursue informal resolution under Section I-E of these Procedures.

The Initial Review is intended to develop information to establish:[3] (1) whether an allegation has sufficient substance to warrant a formal Faculty Code of Conduct investigation, as determined by a Preliminary Investigator; or (2) whether a University policy has been violated, which may subject a faculty member to a finding of probable cause that APM 015 was violated (e.g., APM 015-II-C-7), which requires an evaluation by a Subject Matter Expert. The Vice Provost may receive investigation reports from another unit which may include findings that one or more University policies have been violated. These investigation reports can be treated as Subject Matter Expert Investigations.

Initial Review by the Vice Provost may be accomplished by:

A. A Preliminary Investigation; or

B. A Subject Matter Expert Investigation;

C. Both a Preliminary Investigation of one or more allegations, and a Subject Matter Expert Investigation of one or more allegations; or

D. Receipt and acceptance of a completed investigation report from another unit.

---

sanctions, if warranted. In addition to the Research Misconduct investigation report per the Integrity of Research Procedures, this joint committee will compose a separate report for the probable cause finding(s) and recommendation for sanction(s), which will serve as the investigation report per section IV-D of this Procedure. Staff from the UCSF RIO and Vice Provost office may support this committee.

[2] If accommodations are needed to file a complaint, or for other stages in this process, please reach out to Disability Management Services (415-476-2328).

[3] The purpose of the Initial Review is not to determine whether faculty misconduct occurred or to recommend sanctions.

## A. Preliminary Investigation

1. <u>Request for Preliminary Investigation:</u>  In those cases where a Preliminary Investigation is found to be warranted or required under these Procedures, then, within 15 business days of the date the allegations are deemed completed, the Vice Provost refers the allegations for a Preliminary Investigation to an appropriate faculty administrator. The faculty administrator should not have a bias or conflict of interest.

   a. <u>Charge to the Preliminary Investigator</u>:  The Vice Provost will specify the allegations and request that the Preliminary Investigator determine whether there is sufficient substance to each allegation to warrant a formal Faculty Code of Conduct investigation.

   b. <u>Delegation/Expert Assistance:</u>  The Preliminary Investigator may delegate the Preliminary Investigation to an appropriate faculty administrator, if necessary. If the allegations require specific knowledge or expertise that the Preliminary Investigator does not have, the Preliminary Investigator may seek assistance from an expert, so long as the expert has no bias or conflict of interest.

   c. <u>Additional Allegations:</u>  If other allegations are identified during the Preliminary Investigation, the Preliminary Investigator shall timely notify the Vice Provost, who will determine the appropriate next steps in accordance with this Procedure. The Vice Provost may:

      1. Ask the Preliminary Investigator to continue investigating the original allegation(s) and/or add some or all of the new allegations to the Preliminary Investigation; and/or

      2. Refer some or all of the new allegations to a Subject Matter Expert; and/or

      3. Take any other steps that are appropriate under the circumstances.

   d. <u>Additional Respondents Identified During Preliminary Investigation:</u>  If one or more additional Respondents are identified during a Preliminary Investigation, the Preliminary Investigator shall notify the Vice Provost, who shall determine the appropriate next steps.

2. <u>Preliminary Investigation Report:</u>  The Preliminary Investigator shall submit a written Preliminary Investigation report to the Vice Provost within 15 business days of the date of the request, unless an extension is requested and granted. All requests for an extension of time to complete and submit the Preliminary Investigation report must be: (1) made in writing to the Vice Provost, (2) supported by good cause, and (3) submitted to the Vice Provost before the deadline.

   a. <u>Findings:</u>  The report shall summarize the findings for each allegation as to whether there is sufficient substance to warrant a formal Faculty Code of Conduct investigation.

3. <u>Review and Acceptance:</u>  The Vice Provost shall review the Preliminary Investigation report and may ask the Preliminary Investigator for clarification, more information, or further investigation, as needed, before accepting the Preliminary Investigation report.

UCSF Procedure for the Investigation of Faculty Misconduct and the Administration of Discipline| Effective: [March 1, 2023]

8

4. <u>Notice to the Respondent and Opportunity to Respond</u>: The Respondent has the right to know the outcome of the Preliminary Investigation and to submit a written response for inclusion in the investigation case file. Any written response shall be submitted to the Vice Provost within 10 business days of the date the report is sent to the Respondent, unless an extension is requested and granted. All extension requests must be: (1) made in writing to the Vice Provost, (2) supported by good cause, and (3) submitted to the Vice Provost before the deadline.

   a. <u>If there is a finding of no sufficient substance</u> as to all allegations, the Vice Provost shall notify the Respondent that no violations were found and that the Vice Provost intends to close the case. The Respondent may request a copy of the redacted report[4] within 3 business days of receiving the notice. Any written response must be submitted to the Vice Provost in accordance with Section III-A-4.

   b. <u>If there is a finding of sufficient substance</u> as to any allegation, the Vice Provost shall send the Preliminary Investigation Report[5] to the Respondent. The Respondent will be notified if the Vice Provost intends to initiate a Faculty Code of Conduct investigation and that, if an investigation is initiated, any academic action or advancement packet will be held in abeyance,[6] until the end of the investigation process.

5. <u>Outcome</u>: Upon receipt of the Respondent's response, the Vice Provost will close the case or review the response to determine whether a formal Faculty Code of Conduct investigation is warranted.

## B. Subject Matter Expert Investigation

The following procedures apply when a Subject Matter Expert Investigation is appropriate (see Section III, page 7).

1. <u>Referral/Request for Subject Matter Expert Investigation</u>: When applicable, within 15 business days of the date the allegations are deemed complete, the Vice Provost may refer appropriate allegations to the proper Subject Matter Expert and request a Subject Matter Expert investigation. On a case-by-case basis, the Vice Provost determines if it is appropriate to refer allegations to different Subject Matter Experts, depending on the nature of the allegations.

   a. <u>Charge to the Subject Matter Expert</u>: The Vice Provost will specify the allegation(s) and request that the Subject Matter Expert conduct an investigation and determine whether the

---

[4] The Preliminary Investigation report will be redacted to protect third party privacy and any information otherwise protected by law, policy, and/or at the discretion of the University.
[5] The Preliminary Investigation report will be redacted to protect third party privacy and any information otherwise protected by law, policy, and/or at the discretion of the University.
[6] When allegations of research misconduct against a faculty member are being investigated under the UCSF Integrity of Research Procedures, and after the Inquiry, the Research Integrity Officer decides to initiate a research misconduct investigation, the Vice Provost shall be notified, and the faculty member's academic action or advancement packet will be held in abeyance pending the outcome of the investigation. The Vice Provost will notify the faculty member of the hold.

Respondent has violated University policies within the Subject Matter Expert's area of expertise, as alleged in the Complaint.

     i.    A Subject Matter Expert should follow their standard procedures for handling allegations received. If the standard procedure is to conduct a preliminary assessment to determine whether a formal investigation is warranted, and the assessment concludes that a formal investigation is not warranted, that assessment shall be sufficient to constitute the Subject Matter Expert investigation.

2. <u>Additional Allegations:</u>  If other allegations arise during the Subject Matter Expert Investigation, the Subject Matter Expert Investigator shall timely notify the Vice Provost, who will determine the appropriate next steps. The Vice Provost may:

    a.  Ask the Subject Matter Expert to investigate all allegations, make findings on all allegations within its purview, and refer the new allegation(s) to the Vice Provost for review/further action; or

    b.  Ask the Subject Matter Expert to continue investigating the original allegation(s) and to timely send some or all of the new allegations to the Vice Provost for review/further action; or

    c.  Appoint a faculty investigator to serve as a Preliminary Investigator and to investigate the new allegation(s) in conjunction with the Subject Matter Expert; or

    d.  Take any other reasonable steps that are appropriate under the circumstances.

3. <u>Additional Respondents Identified During Subject Matter Expert Investigation:</u>  If one or more additional faculty Respondents are identified during a Subject Matter Expert Investigation, the Subject Matter Expert individual/office shall notify the Vice Provost, who shall determine the appropriate next steps.

4. <u>Subject Matter Expert Investigation Report:</u>  The Subject Matter Expert investigator should submit a written Subject Matter Expert Investigation report to the Vice Provost within 60 business days of the date of the request. Since Subject Matter Expert Investigations may involve full fact-finding proceedings, the time needed to complete them may vary depending on the circumstances of the particular case, the workload of the Subject Matter Expert or other factors. If a Subject Matter Expert Investigation cannot be completed by the requested deadline, the Subject Matter Expert should request an extension from the Vice Provost. All extension requests must be: (1) made in writing, (2) supported by good cause, and (3) submitted to the Vice Provost before the deadline.

    a.  <u>Findings After Formal Investigation:</u>  The report shall include findings as to whether each allegation is substantiated. For each allegation that is substantiated, the report shall identify the relevant policies that were violated by the Respondent.

    b.  <u>Findings Where Formal Investigation is Not Warranted:</u>  In instances where the Subject Matter Expert determines that a formal investigation is not warranted, it shall be sufficient

for the Subject Matter Expert to notify the Vice Provost in writing of the determination and the basis for the determination.

5. <u>Review and Acceptance:</u> The Vice Provost shall review the Subject Matter Expert Investigation report and may ask the Subject Matter Expert for clarification, more information or further investigation, as needed, before accepting the Subject Matter Expert Investigation report.

6. <u>Notice to the Respondent and Opportunity to Respond:</u> The Respondent has the right to know the outcome of the Subject Matter Expert findings and to submit a written response for inclusion in the investigation file. Any written response shall be submitted to the Vice Provost within 10 business days of the date the report is transmitted to the Respondent, unless an extension is requested and granted. All extension requests must be: (1) made in writing, (2) supported by good cause, and (3) submitted to the Vice Provost before the deadline.

   a. <u>If the Subject Matter Expert Investigation results in a finding that no allegations are substantiated or that no investigation of the allegations was warranted,</u> the Vice Provost will notify the Respondent that no policy violations were found and that the Vice Provost intends to close the case. The Respondent may request a redacted report[7] within 3 business days of receiving the notice. Any written response shall be submitted to the Vice Provost in accordance with Section III-B-6.

   b. <u>If the Subject Matter Expert Investigation results in a finding that any allegation is substantiated,</u> the Vice Provost shall send the Subject Matter Expert Investigation Report[8] to the Respondent. The Respondent will be notified if the Vice Provost intends to initiate a Faculty Code of Conduct investigation and that, if an investigation is initiated, any academic action or advancement packet will be held in abeyance until the end of the investigation process.

7. <u>Outcome</u>: Upon receipt of the Respondent's response, the Vice Provost will close the case or review the response to determine whether a formal Faculty Code of Conduct investigation is warranted.

## C. Cases Involving Both Subject Matter Expert Investigation and Preliminary Investigation

Some cases may be appropriate for and/or require a Subject Matter Expert Investigation for one or more allegations and a Preliminary Investigation for one or more allegations.

1. <u>For Allegations Requiring Subject Matter Expert Investigation:</u> The Vice Provost will follow the procedure outlined in Section III-B (page 9) for allegations that are referred to a Subject Matter Expert.

---

[7] The Subject Matter Expert Investigation report will be redacted to protect third party privacy and any information otherwise protected by law, policy, and/or at the discretion of the University.
[8] The Subject Matter Expert Investigation report will be redacted to protect third party privacy and any information otherwise protected by law, policy, and/or at the discretion of the University.

    a. If information is developed during the Subject Matter Expert Investigation that results in new allegations outside the expertise of the Subject Matter Expert, the Vice Provost should be advised immediately, so that the Vice Provost may determine the appropriate next steps.

    b. The Respondent will be notified of any new allegations when the investigation reports are sent to the Respondent for response.

2. <u>For Allegations Requiring Preliminary Investigation:</u>  The Vice Provost may request a Preliminary Investigation at any point while the Subject Matter Expert Investigation is pending or at the conclusion of a Subject Matter Expert Investigation. Once the Preliminary Investigation has been requested, the Vice Provost will follow the procedure outlined in Section III-A (page 8).

    a. If information is developed during the Preliminary Investigation that results in new allegations, the Vice Provost should be advised immediately, so that the Vice Provost may determine the appropriate next steps.

    b. The Respondent will be notified of any new allegations when the investigation reports are sent to the Respondent for response.

3. <u>Respondent's Opportunity to Respond:</u>  Any written response by the Respondent shall be submitted to the Vice Provost within 10 business days of the date the report is transmitted to the Respondent, unless an extension is requested and granted. All extension requests must be: (1) made in writing, (2) supported by good cause, and (3) submitted to the Vice Provost before the deadline.

4. <u>Outcome:</u>  The outcome of the investigations discussed in this section will be handled according to the process outlined in Section III-A-5 (page 9) for Preliminary Investigations and in Section III-B-7 (page 11) for Subject Matter Expert Investigations. This may include a determination by the Vice Provost as to whether a formal Faculty Code of Conduct Investigation is warranted.

## D. Cases Initiated by Receipt of an Investigation Report from Another Unit

When the Vice Provost receives an investigation report from another unit, the report shall be treated as a Subject Matter Expert Report and shall be handled in accord with the process outlined in Section III-B-5 through III-B-7 above. The Vice Provost may initiate a Preliminary Investigation and/or an additional Subject Matter Expert Investigation(s) based on information in the report that was not investigated but appears to warrant further review or action.

## IV.  FACULTY CODE OF CONDUCT INVESTIGATION

The Investigation phase begins when, after reviewing the investigation report(s) from the Initial review as described above in Section III, and the Respondent's response, the Vice Provost determines that one or more allegations warrant formal investigation by an *ad hoc* Investigation Committee.

## A. Appointment of *Ad Hoc* Investigation Committee

Within 15 business days of the date the Vice Provost determines that a formal Faculty Code of Conduct Investigation is warranted, the Vice Provost will appoint at least three faculty members to serve as the *ad hoc* investigation committee. If appropriate, a larger committee may be appointed.[9] The Vice Provost shall designate one of the members to serve as Chair of the *ad hoc* investigation committee.

1. At least one member of the *ad hoc* investigation committee must be at the same rank or a higher rank than the Respondent(s).

2. At least one member of the *ad hoc* investigation committee shall hold an academic appointment in the same faculty series as the Respondent(s).

3. *Ad hoc* committee members should be unbiased, impartial, and without any conflicts of interest with the Respondent(s), the Complainant(s) or the Reporter.

4. The role of the Chair of the *ad hoc* investigation committee is to request extensions under these Procedures, attend all committee meetings and witness interviews, and to administer witness advisals during interviews.

## B. Start of the Investigation

The start date of the investigation is the date of the initial meeting of the *ad hoc* investigation committee. The initial meeting shall be held as soon as practicable after the *ad hoc* investigation committee is appointed.

## C. Charge to the *Ad Hoc* Investigation Committee

The Vice Provost will charge the *ad hoc* investigation committee to conduct a fair and thorough investigation of the allegations and to submit a report including findings as to whether there is credible evidence to show probable cause that the Faculty Code of Conduct has been violated, as well as a recommendation regarding sanctions. The *ad hoc* investigation committee may be advised by University counsel. The extent of the fact-finding by the *ad hoc* investigation committee may depend on whether a Subject Matter Expert Investigation has occurred.

1. If the *ad hoc* investigation committee learns of information that would support additional allegations, the committee should follow up on that information and make findings, as appropriate.

---

[9] If an investigation committee member is unable to serve through the end of the investigation, the Vice Provost may either allow the remaining members to complete the investigation, or appoint a new member who meets the qualifications outlined in this section in place of the member who can no longer serve.

2. If the *ad hoc* investigation committee learns of information that would support allegations against an individual who was not identified as a Respondent at the outset of the investigation, the committee shall notify the Vice Provost, who will determine the appropriate next steps.

3. The *ad hoc* investigation committee may accept a Subject Matter Expert's findings as to whether there has been a violation of University policy. However, the committee also has discretion to seek and develop information concerning a Subject Matter Expert's findings, and make findings as the committee deems appropriate.

4. Since a Preliminary Investigation is not a full fact finding investigation with a different charge than a formal Faculty Code of Conduct investigation, an *ad hoc* investigation committee may, in its discretion, seek and develop additional information regarding a Preliminary Investigator's findings, and may make findings as deemed appropriate. This may include making a finding to allegation(s) that were not found to have sufficient substance in a Preliminary Investigation.

## D. *Ad Hoc* Investigation Committee Report

The *ad hoc* investigation committee shall submit a written investigation report to the Vice Provost within 65 business days from the date of the initial meeting of the committee, unless an extension is requested and granted. All extension requests must be: (1) made in writing to the Vice Provost, (2) supported by good cause, and (3) submitted to the Vice Provost before the deadline.

1. <u>Findings:</u>  The *ad hoc* investigation committee report shall provide a finding for each allegation as to whether, by a preponderance of the evidence, there is probable cause to believe that the Faculty Code of Conduct was violated.

2. <u>Recommendation(s) Regarding Sanctions:</u>  In a report where there are findings of probable cause that the Faculty Code of Conduct was violated, the *ad hoc* investigation committee report shall also state the committee's recommendation regarding sanctions in accord with the provisions of APM 016 and APM 150. The investigation report may also include recommendations for administrative measures that the committee determines may be advisable to address the conduct at issue.

3. <u>Review and Acceptance of Report:</u>  The Vice Provost may ask the *ad hoc* investigation committee for clarification, more information, or further investigation, as needed, before accepting the investigation report. Once the Vice Provost is satisfied that the report is complete, the Vice Provost will accept the investigation report.

## E. Notice to the Respondent and Opportunity to Respond

The Respondent has the right to be informed of the outcome of the investigation, to receive a redacted copy of the investigation report, and to submit a written response for consideration.

1. <u>Findings of No Faculty Misconduct:</u>  In cases where the *ad hoc* investigation committee finds that there is not probable cause that misconduct occurred as to all allegations, and the Vice Provost accepts the investigation report, the Vice Provost will notify the Respondent that no

violations were found and that the Vice Provost intends to close the case. The Respondent may request a redacted copy of the investigation report within 3 business days of receiving the notice. When such a request is made, the investigation report will be redacted to protect third party privacy and any information otherwise protected by law, policy, and/or at the discretion of the University. The redacted report will be provided to the Respondent.

2. <u>Findings of Faculty Misconduct</u>: In cases where the *ad hoc* investigation committee finds probable cause that the Faculty Code of Conduct was violated as to any allegation, and the Vice Provost accepts the investigation report, the investigation report will be redacted to protect third party privacy and any information otherwise protected by law, policy, and/or at the discretion of the University. The redacted report will be provided to the Respondent.

3. <u>Response to the Investigation Report</u>: A respondent must submit any written response to the investigation report to the Vice Provost within 10 business days of the date the Respondent is notified of the finding(s) and recommendation(s) regarding sanctions or the report is sent to the Respondent, unless an extension is requested and granted. All extension requests must be: (1) made in writing to the Vice Provost, (2) supported by good cause, and (3) submitted to the Vice Provost before the deadline.

## F. Outcome

1. <u>Cases with Unanimous Findings of No Faculty Misconduct</u>: In such cases, the Vice Provost[10] shall close the case on the earlier date of: when the Respondent's response to the investigation report is received, the date the Respondent notifies the Vice Provost that no response will be submitted, or the deadline for response.

   a. <u>Release of Hold on Academic Action</u>: As part of the closure of the case, the Vice Provost will ensure that the hold on any academic action for the Respondent is immediately released so that any pending action can proceed.

   b. <u>Restoration of Reputation</u>: If the allegations are not substantiated, the Respondent may make a timely request to the Vice Provost. The Vice Provost may consider efforts to restore the reputation of the Respondent and others who were under investigation.

2. <u>Cases with Unanimous Findings of Faculty Misconduct</u>: In cases where the *ad hoc* investigation committee finds that there is probable cause that faculty misconduct occurred as to one or more allegations, the case shall proceed according to the Sanctions process outlined in Section V below.

3. <u>Cases without a Unanimous Decision Regarding Findings of Faculty Misconduct</u>: In cases where the *ad hoc* investigation committee did not reach a unanimous decision concerning whether there was probable cause that faculty misconduct occurred, and at least one committee member did find there to be probable cause that faculty misconduct occurred as to one or more

---

[10] The Chancellor has delegated to the Vice Provost the authority to close investigation cases where the *ad hoc* investigation committee does not find probable cause that faculty misconduct occurred.

allegations, the Chancellor shall be the final authority in deciding whether to follow section IV-F-1 or IV-F-2 of these Procedures.

## V.  SANCTIONS

### A. Notice of Proposed Sanctions

When the *ad hoc* investigation committee finds probable cause that the Faculty Code of Conduct was violated as to any allegation, the Chancellor shall notify the Respondent in writing of the finding(s) and of the proposed sanction(s).

1. If sanctions are proposed, the Chancellor shall notify the Respondent of procedures, including, as applicable:

   a. An Academic Senate member's right to a formal hearing by the Academic Senate Committee on Privilege and Tenure.

   b.  A Non-Senate member's right to contest the proposed sanctions by use of the APM 140 grievance procedure.

2. If the Chancellor decides that sanctions are not warranted, the Chancellor shall notify the Respondent and the Vice Provost, and the Vice Provost shall close the case.

### B. Response to Proposed Sanctions

Within 15 business days from the date of the Chancellor's notice to Respondent of finding(s) and proposed sanction(s), unless Respondent submits and is granted an extension, the Respondent shall notify the Vice Provost, in writing, whether they accept the proposed sanction(s). All extension requests by Respondent must be: (1) made in writing to the Vice Provost, (2) supported by good cause, and (3) submitted to the Vice Provost before the deadline. The Vice Provost will notify the Chancellor of the Respondent's decision.

1. Sanctions Accepted:  If the Respondent accepts the proposed sanction(s) or does not respond to the proposed sanctions by the deadline, the Chancellor may impose the proposed sanctions. A Respondent's failure to respond by the deadline is deemed to be an acceptance of the proposed findings and sanctions.

2. Sanctions Not Accepted:

   a. Academic Senate Members:  If a Respondent who is an Academic Senate member notifies the Chancellor by the deadline that they do not accept the proposed sanction(s) and the Chancellor wishes to proceed with the sanction(s), charges shall be filed against the Respondent with the Committee on Privilege and Tenure, which shall conduct a hearing in accordance with the procedures set forth in the Academic Senate Bylaw 336.

    b.  <u>Non-Senate Members:</u>  If a Respondent who is not an Academic Senate member notifies the Chancellor that they do not accept the proposed sanction(s) by the deadline, the Respondent may contest the proposed sanction(s) by use of the grievance procedure afforded by [APM 140](#).

## C. Procedural Privileges and Protections

1. <u>Academic Senate Members:</u>  A Respondent who is an Academic Senate member shall be entitled to all procedural privileges and protections before the Committee on Privilege and Tenure, as specified in the [Standing Orders of the Regents](#), and in the provisions of the Academic Senate Bylaws that implement such Orders. See [Academic Senate Bylaw 336](#).

2. <u>Non-Senate Members:</u>  A Respondent who is not an Academic Senate member shall be entitled to all procedural privileges and protections before a Hearing Officer, as specified in the [Standing Orders of the Regents](#), and in [APM 140](#).

## D. Findings, Conclusions and Recommendations

1. <u>Academic Senate Members:</u>  For Respondents who are Academic Senate members, as provided in [Academic Senate Bylaw 336](#), copies of the findings, conclusions, and recommendations of the Committee on Privilege and Tenure shall be transmitted to the Chancellor and the Respondent.

2. <u>Non-Senate Members:</u>  If a hearing is conducted for a Respondent who is not an Academic Senate member, a copy of the report of the hearing and recommended decision shall be transmitted to the Chancellor and the Respondent.

## E. Chancellor's Final Decision

The Senate will transmit all findings, conclusions, and recommendations to the Chancellor for the Chancellor's review after the conclusion of such hearings. The Respondent will be informed in writing of the Chancellor's final decision.

The Chancellor is granted authority by The Regents, and shall have final authority to determine and execute appropriate sanctions, in accord with APM 016, the University Policy on Faculty Conduct and the Administration of Discipline and APM 150, Non-Senate Academic Appointees/Corrective Action and Dismissal. In cases where the Chancellor disagrees with the recommendation of the UCSF Committee on Privilege and Tenure, the Chancellor shall inform the Chair of the Privilege and Tenure Committee in writing of the disagreement and ask if the Chair, or the whole committee, would like to meet with the Chancellor prior to the Chancellor issuing a final decision. The Chancellor may choose to waive or limit the imposition of a disciplinary sanction on the condition that the Respondent performs some specified action designed to address the harm caused by the misconduct.

If acceptable to the Chancellor and the Respondent, informal mediation may be considered for resolution of some or all of the issues addressed through this procedure. However, mediation of issues does not preclude the imposition of disciplinary sanctions.

In cases where a settlement resolving disciplinary charges is contemplated after a matter has been referred to an Academic Senate committee, the Chancellor is encouraged to consult with the Chair of the Committee on Privilege and Tenure prior to finalizing the settlement.

UCSF Procedure for the Investigation of Faculty Misconduct and the Administration of Discipline| Effective: [March 1, 2023]

18

# APPENDIX A: DEFINITIONS

**Allegations/Complaint:** Allegations are contentions that a faculty member has engaged in faculty misconduct. A complaint is composed of these allegations.

**Business Day:** Any official working day from and including Monday to Friday, and excluding weekends and University holidays.

**Faculty Misconduct:** Behavior that violates the Faculty Code of Conduct by breaching an ethical principle in APM 015 and significantly impairing a central function of the University, as defined in the Preamble to APM 015.

1. Part II of APM 015 lists several specific examples of unacceptable conduct. These illustrate types of conduct that violate an ethical principle and significantly impair a central function of the University, and that presumptively warrant the imposition of University discipline.

2. Serious violation of University policies other than APM 015 (including but not limited to policies related to conflict of interest, clinical practices, or whistleblower protection) may constitute a violation of the Faculty Code of Conduct.

**Preliminary Investigation:** An initial review of the allegations, involving only enough fact-finding to allow the Preliminary Investigator to determine whether there is sufficient substance to the allegations to warrant a formal Faculty Code of Conduct investigation.

**Preliminary Investigator:** An appropriate faculty administrator, appointed by the Vice Provost, to conduct a Preliminary Investigation.

1. Generally, the Preliminary Investigator is the Vice or Associate Dean for Academic Affairs for the School in which the Respondent holds an appointment.

2. If it is not appropriate for the relevant Vice or Associate Dean of Academic Affairs to conduct the Preliminary Investigation in a particular case, the Vice Provost may appoint another appropriate faculty administrator to serve in that role, including but not limited to the Vice or Associate Dean of Academic Affairs in a different School.

**Subject Matter Expert:** An individual or office with specialized knowledge, experience or training in a given area, with relevant University policies other than APM 015, or the designated responsible office of a particular University policy. Examples include the Office of the Prevention of Harassment and Discrimination (OPHD) (non-discrimination policies); Audit Services (whistleblower complaints).

**Subject Matter Expert Investigation:** A fact-finding investigation into allegations, conducted by an individual or office with appropriate subject matter expertise, or designated responsible office, to determine whether a Respondent has violated one or more University policies within the scope of the Subject Matter Expert.

1. The Vice Provost may request a Subject Matter Expert Investigation when allegations are received or at any appropriate time thereafter.

2. On occasion, allegations may be reported directly to a Subject Matter Expert without knowledge of the Vice Provost. If a Subject Matter Expert conducts an investigation that results in a finding that a faculty member violated a University policy other than APM 015, the Subject Matter Expert Investigation report will be sent to the Vice Provost for review and possible initiation of a Faculty Code of Conduct investigation.

# APPENDIX B: AUTHORIZED DISCIPLINARY SANCTIONS

## THE UNIVERSITY POLICY ON FACULTY CONDUCT AND THE ADMINISTRATION OF DISCIPLINE DEFINITIONS (APM 016)

According to the Part II of the University Policy on Faculty Conduct and the Administration of Discipline (APM 016), the types of discipline that may be imposed on a Senate faculty member, in order of increasing severity, are:

1. **Written Censure:**  A formal written expression of institutional rebuke that contains a brief description of the censured conduct, conveyed by the Chancellor.

2. **Reduction in Salary:**  Reduction to lower salary without change in rank or step.

3. **Demotion:**  Reduction to lower rank or step with corresponding reduction in salary.

4. **Suspension:**  Suspension of a faculty member without pay for some stated period of time from the continuance of the appointment on its normal terms.

5. **Denial or Curtailment of Emeritus Status:**  Denial or curtailment of current or future emeritus status of a faculty member, including the privileges associated with the emeritus status.

6. **Dismissal from the Employ of the University:**  The Chancellor has authority to dismiss a faculty member who does not have tenure or security of employment.

Additional information about University discipline, including information specific to each type of discipline, may be found in APM 016.

## THE UNIVERSITY POLICY FOR NON-SENATE ACADEMIC APPOINTEES/CORRECTIVE ACTION AND DISMISSAL (APM 150)

According to the University Policy on Non-Senate Academic Appointees/Corrective Action and Dismissal (APM 150), the types of discipline that may be imposed on Non-Senate faculty member are:

1. **Written Warning:**  A formal letter meant to inform of the nature of the misconduct, method of correction, and the consequence of continued misconduct.

2. **Written Censure:**  A formal written expression of institutional rebuke that contains a description of the censured conduct.

UCSF Procedure for the Investigation of Faculty Misconduct and the Administration of Discipline| Effective: [March 1, 2023]

20

3. **Suspension:** A debarment without pay for a stated period of time.

4. **Reduction in Salary:** Reduction to a lower salary without change in rank or step.

5. **Demotion:** Reduction to a lower rank or step with a corresponding reduction in salary.

6. **Dismissal:** Termination of an appointment for good cause prior to the end date of an appointment.

Additional information about University discipline for Non-Senate faculty members, including information specific to each type of discipline, may be found in APM 150.

UCSF Procedure for the Investigation of Faculty Misconduct and the Administration of Discipline| Effective: [March 1, 2023]

21

# EXHIBIT G

# Faculty Misconduct Investigation Process



Vice Provost receives allegations & initiates Preliminary Review

Vice/Associate Dean of Academic Affairs conducts **preliminary investigation** (does allegation warrant formal investigation?)

**and/or**

Subject matter expert conducts **subject matter expert investigation** (was relevant policy, other than APM 015, violated?)

Submits report finding investigation not warranted

Submits report finding investigation is warranted

Submits report finding policy was violated

Submits report finding policy was not violated

Vice Provost closes case

Vice Provost appoints investigation committee

Vice Provost closes case

**Investigation**

Probable cause for misconduct found

Probable cause for misconduct not found

Vice Provost closes case

**Chancellor proposes/imposes discipline**

Respondent accepts discipline

- Respondent declines proposed discipline
- Requests P&T hearing or files grievance

Effective September 1, 2017 this process does not apply to complaints of Sexual Violence and Sexual Harassment, either by themselves or in conjunction with complaints of discrimination based on a protected class

# EXHIBIT H

**General University Policy Regarding Academic Appointees: APM - 140 - Non-Senate Academic Appointees/Grievances**

## 140-0  Policy

This policy provides non-Senate academic appointees the opportunity to present grievances. The use of this policy shall not be discouraged by the University either directly or indirectly.

## 140-4  Scope/Definition

a.   A grievance is defined as a complaint by an eligible non-Senate academic appointee that alleges that:

   (1)  a specific administrative act was arbitrary or capricious and adversely affected the appointee's then-existing terms or conditions of appointment; and/or

   (2)  a violation of applicable University rules, regulations, or Academic Personnel policies occurred that adversely affected the appointee's then-existing terms or conditions of appointment.

b.   For the purposes of this policy, an act is not arbitrary or capricious if the decision-maker exercised reasoned judgment.

c.   A grievance alleging a violation of APM - 137 (Non-Senate Academic Appointees/Term Appointment), 145 (Non-Senate Academic Appointees/ Layoff and Involuntary Reduction in Time), or 150 (Non-Senate Academic Appointees/Corrective Action and Dismissal) shall be filed under APM - 140-4-a(2) only.

## 140-6  Responsibility

a.   It is the responsibility of each Chancellor to establish and publish procedures to implement this policy. Prior to planned issuance, such procedures should be submitted to the Provost and Executive Vice President–Academic Affairs for approval.

b.   Each Chancellor shall designate an administrator or office as the grievance liaison for academic appointees.

## 140-14 Eligibility

a. This policy applies to all academic appointees of the University who are not members of the Academic Senate except as provided in APM - 140-14-b, -c, and -d. For non-Senate academic appointees covered by a Memorandum of Understanding (MOU), this policy applies only to the extent provided for in the MOU.

b. APM - 140 does not apply to Postdoctoral Scholars (see APM - 390).

c. Under this policy, student academic appointees not covered by an MOU shall only be eligible to grieve matters related to their academic appointment. Complaints pertaining to academic standing or non-employment-related matters are under the jurisdiction of applicable student grievance or academic appeal procedures.

d. Housestaff (interns and residents) shall be eligible to use APM - 140 unless alternative policies and procedures are instituted by the campus.

e. When a non-Senate faculty member receives notice of termination before the expiration of the non-Senate faculty member's appointment, the non-Senate faculty member may select as a grievance mechanism either APM - 140, as described in this policy, or Regents' Bylaw 40.3(c), the procedures of which are described in Academic Senate Bylaw 337. In selecting either APM - 140 or Regents' Bylaw 40.3(c), the non-Senate faculty member waives the right to invoke the other mechanism to review the same grievance.

## 140-15 Mediation

The intent of this policy is to encourage voluntary resolution including mediation when it is desired by both parties. Each campus is encouraged to implement a mediation process to facilitate voluntary resolution of grievances.

## 140-23 Filing Deadlines

a. A Step II formal grievance must be filed in writing with the grievance liaison within thirty (30) calendar days from the date on which the appointee knew, or could reasonably be expected to know, of the event or act that gave rise to the grievance, or within thirty (30) calendar days after the date of separation, whichever is earlier.

b. A Step III formal grievance appeal must be filed in writing with the grievance liaison within fifteen (15) calendar days from the date on which the Step II response is issued.

    c.    Filing deadlines shall apply unless a written extension has been granted by the grievance liaison. Either party may submit a written request for an extension to a filing deadline. It is the responsibility of the grievant to file a Step II formal grievance or a Step III formal grievance appeal by the filing deadline or to file a written request for an extension before the filing deadline.

## 140-31  Step I – Informal Grievance Resolution

    a.    Step I of the grievance process is the attempt at informal resolution. Prior to filing a Step II formal grievance, the grievant is encouraged to attempt an informal resolution with the immediate supervisor or responsible administrator whose action is being grieved. Attempts at informal resolution do not extend the time limits for filing a formal grievance unless a written extension is granted by the grievance liaison.

    b.    If informal resolution with the immediate supervisor or responsible administrator is attempted but unsuccessful, a grievant may request that the grievance liaison assist in resolving the grievance. Where appropriate, the grievance liaison may work with the parties to reach an informal resolution.

    c.    When a grievance alleges sexual harassment, the grievant may elect to substitute the campus Sexual Harassment Complaint Resolution Procedure as Step I. If a grievant selects this mechanism and the complaint is not resolved to the grievant's satisfaction, the grievant may file a Step II formal grievance in writing with the grievance liaison within fifteen (15) calendar days from the date the grievant is notified of the result of the pre- grievance complaint resolution process of the sexual harassment procedure or within forty-five (45) calendar days from the date the grievant filed the sexual harassment complaint, whichever is earlier.

## 140-32  Step II – Formal Grievance Review

    a.    If a grievance is not resolved informally to the satisfaction of the grievant, the grievant may file a Step II formal grievance. A Step II grievance must be filed in writing with the grievance liaison within the thirty (30) calendar-day period specified in APM - 140-23-a unless a written extension has been granted by the grievance liaison. Except by written mutual agreement of the parties, no additional issues shall be introduced after the Step II grievance has been filed. Attempts at informal resolution do not extend the time limits for filing a formal grievance unless a written extension is granted by the grievance liaison. Attempts at informal resolution may continue after a formal grievance has been filed, but are not required.

    b.    The formal written grievance must include the following information.

(1) If the grievance alleges that a specific administrative act was arbitrary or capricious and adversely affected the grievant's then-existing terms or conditions of appointment, the grievance must state the specific administrative act(s) to be reviewed, the name of the person(s) alleged to have carried out the administrative act(s), the date(s) the alleged act(s) occurred, and a description of how the administrative act(s) were arbitrary or capricious.

(2) If the grievance alleges that a violation of applicable University rules, regulations, or Academic Personnel policies occurred that adversely affected the grievant's then- existing terms or conditions of appointment, the grievance must state the applicable University rules, regulations, or Academic Personnel policies the grievant believes have been violated; the name of the person(s) alleged to have violated the applicable University rules, regulations, or Academic Personnel policies; the date(s) the alleged violation(s) occurred; and a description of how the rules, regulations, or Academic Personnel policies have been violated.

(3) All grievances must state how the alleged act(s) and/or violation(s) adversely affected the grievant's then-existing terms or conditions of appointment and the remedy requested.

c.  Upon receipt of a formal written grievance, the grievance liaison shall complete an initial review of the grievance and determine whether the grievance is complete, timely, within the jurisdiction of APM - 140, and contains sufficient facts which support the allegations made in the grievance. Within ten (10) calendar days, the grievance liaison shall notify the grievant in writing of the acceptance of the grievance.  If the grievance is not accepted, the reasons shall be specified as follows:

(1) If the grievance liaison determines that the grievance is incomplete or factually insufficient, the grievant will have ten (10) calendar days from the date of the written notice to provide information to make the grievance complete, including additional facts. If the grievant fails to make the grievance complete or provide sufficient facts, the grievance will be dismissed.

(2) If the grievance liaison determines that the grievance is untimely or outside the jurisdiction of APM - 140, the grievance will be dismissed.

(3) If the grievance raises multiple issues, the grievance liaison will make a determination described above with regard to each issue. The grievance liaison may accept some issues and dismiss others pursuant to this review process.

(4) If all or part of a grievance is dismissed at this stage, the grievance liaison will provide the grievant with a written explanation of the basis for the dismissal.

    d.    When a formal written grievance is accepted, the grievance liaison shall forward the grievance and any supportive materials to the Step II reviewer for review and written decision, and notify the Step II reviewer and the grievant of the date the Step II response is due. Generally, the Step II reviewer will be the department or unit head. However, if the department or unit head took the action that is being grieved, the grievance liaison may exercise discretion and designate another administrator as the Step II reviewer, and so notify the department or unit head and the grievant.

    e.    If a Step II grievance raises allegations of discrimination, harassment, or retaliation in violation of APM - 035, the grievance liaison shall forward a copy of the grievance to the appropriate campus compliance office for review. Each campus shall implement procedures for the investigation of such grievances under this policy that include procedures for coordination with the relevant campus compliance offices such as Title IX, Title VII, ADA, and/or Equal Employment Office. The results of any related grievances or investigations shall be provided to the grievance liaison. At the discretion of the grievance liaison, information regarding related grievances or investigations may be forwarded to the Step II reviewer for consideration in making a Step II decision.

    f.    The Step II reviewer shall review the grievance and, if appropriate, shall investigate and/or meet with the parties. Within thirty (30) calendar days from the date of receipt of the formal grievance, the Step II reviewer shall send a written response to the grievant and the grievance liaison. The response will include a statement that the grievance is denied or upheld in whole or in part and that the grievant has the right to appeal the decision to Step III of the grievance procedure.

## 140-33  Step III – Formal Grievance Appeal

    a.    A formal grievance not resolved to the satisfaction of the grievant at Step II may be appealed in writing to Step III with the grievance liaison within fifteen (15) calendar days from the date on which the Step II response is issued. The Step III formal grievance appeal must set forth the unresolved issue(s) and the remedy requested. Except by written mutual agreement of the parties, no issues shall be introduced in the appeal that were not included in the original grievance.

    b.    All formal grievance appeals will be subject to Step III-A administrative consideration unless there is a written request for Step III-B hearing consideration and the issue(s) appealed are subject to Step III-B hearing consideration.

    (1)  **Step III-A  Administrative Consideration**

        (a)  Except when otherwise eligible for hearing consideration, within seven (7) calendar days from receipt of a formal grievance appeal, the grievance liaison

shall forward the appeal, the Step II formal grievance, and the Step II response to the Chancellor for review and written decision.

(b) Based on the record, the Chancellor shall determine whether the Step II formal grievance was properly reviewed and whether the decision made at Step II shall be upheld, rejected, or modified.

(c) The Chancellor shall provide a final written decision to the grievant within thirty (30) calendar days following receipt of the formal grievance appeal. The written decision shall include a statement of the reasons if the decision of the Step II reviewer is rejected or modified in whole or in part and a statement that the decision is final.

(2) **Step III-B   Hearing Consideration**

(a) Only the following issues may be appealed for Step III-B hearing consideration:

- non-reappointment (see APM - 137-30-c);

- layoff or involuntary reduction in time (see APM - 145);

- corrective action: written censure, suspension, reduction in salary, or demotion (see APM - 150);

- dismissal (see APM - 150);

- medical separation (see APM - 080);

- allegations of discrimination in violation of APM - 035 involving non-reappointment, layoff, involuntary reduction in time, corrective action, or dismissal;

- allegations that procedures in a personnel review were not in consonance with the applicable rules and requirements of the University and/or that the challenged decision was reached on the basis of impermissible criteria, including (but not limited to) race, color, national origin, religion, sex, sexual orientation, gender identity, pregnancy, physical or mental disability, medical condition (cancer-related or genetic characteristics), genetic information (including family medical history), ancestry, marital status, age, citizenship, service in the uniformed services as defined by the Uniformed Services Employment and Reemployment Rights Act of 1994 or political conviction.

(b) Within seven (7) calendar days from receipt of a written request for hearing consideration, the grievance liaison shall determine whether the grievant has identified an issue eligible to be appealed for hearing consideration. If the grievance liaison determines the appeal does not identify an issue eligible to be appealed for hearing consideration, the grievance liaison shall notify the grievant and submit the appeal for determination under Step III-A administrative consideration. When an appeal is eligible for hearing consideration, the grievance liaison shall coordinate a hearing consistent with the policies set forth in APM - 140-80.

## 140-80  Conduct of Hearing

In advance of the hearing, the parties shall attempt to stipulate in writing issues to be submitted for review at the hearing. If the parties cannot agree on the issues, the hearing officer shall define them.

Hearings shall be conducted in accordance with the following standards.

a. **Election of Hearing Officer**

(1) The grievant shall elect whether the grievance is heard by a University or a non-University hearing officer. Election by the grievant shall be in writing and shall be final. The Chancellor shall establish procedures for the selection of the University hearing officer. If the grievant elects a non-University hearing officer, in accord with campus procedures the University shall select the provider. The procedures of the chosen provider shall be used to select the hearing officer.

(2) Whenever possible, within forty-five (45) calendar days from the receipt of the election a hearing officer shall be selected and within sixty (60) calendar days thereafter a hearing date shall be scheduled. The hearing officer shall coordinate the hearing process through the grievance liaison.

b. **Hearing**

(1) The hearing officer shall convene a hearing in which each party shall have the opportunity to present evidence, cross-examine witnesses, and submit rebuttal evidence. Evidence may be oral and/or documentary. Issues regarding the admissibility and weight of evidence shall be decided by the hearing officer. The hearing officer shall not have the authority to issue subpoenas. The hearing officer shall handle all procedural issues that arise before and during the hearing.

(2) Upon request, each party shall provide the other with copies of materials to be introduced at the hearing and names of witnesses who will testify on the party's

behalf in its case. To the extent possible, such materials and names of witnesses shall be exchanged at least ten (10) calendar days prior to the hearing.

(3) In cases alleging a violation of APM - 137-30-c, 145, or 150, the University's representative shall proceed first in presenting the University's case at the hearing. In all other cases, the grievant shall proceed first in presenting the case at the hearing.

(4) The hearing shall be closed unless both parties agree in writing to the presence of additional persons. In the absence of such an agreement, the hearing shall be closed to all persons other than the principal parties to the grievance, i.e., the supervisor or department or unit head, the supervisor's or department or unit head's representative, the grievant, the grievant's representative, and the grievance liaison.

(5) All materials, reports, and other evidence introduced into the hearing and recorded by an audio recorder, stenographic services, or by other means shall be considered confidential to the extent allowed by law and University policy.

(6) The hearing officer shall be bound by the provisions of APM - 160-20- d(2) pertaining to the Academic Senate Committee on Privilege and Tenure regarding access to records.

(7) An audio recording will be made by the University unless the parties agree in advance to share the costs of making a stenographic record. The grievant shall be permitted to arrange for stenographic recording at the grievant's expense if the University does not agree to share the cost. The parties should be made aware that an audio recording is being made, who will have custody of the recording, and how copies may be obtained.

c. **Hearing Officer's Authority**

(1) The hearing officer shall provide the parties in the case and the Chancellor with a written statement of findings and recommendation(s) within thirty (30) calendar days of the close of the hearing. In cases alleging a violation of APM - 145 or 150, the hearing officer shall determine whether the University has established by a preponderance of evidence that it had good cause to take such action. In cases alleging a violation of APM - 137-30-c, the hearing officer shall determine whether the University has established by a preponderance of evidence that it met the standard set forth in APM - 137-30-c. In all other cases, the hearing officer shall determine whether the grievant has established that (1) a specific administrative act was arbitrary or capricious (see APM - 140-4-b) and adversely affected the appointee's then-existing terms or conditions of appointment; and/or (2) a violation of applicable University rules, regulations, or Academic Personnel policies occurred which adversely affected

the appointee's then-existing terms or conditions of appointment. The hearing officer shall make findings of fact based upon the evidence presented at the hearing. The hearing officer shall not recommend adding to, deleting from, or otherwise modifying the provisions of University rules, regulations, or Academic Personnel policies.

(2) No evidence other than that presented at the hearing shall be considered by the hearing officer or have weight, except that notice may be taken of any facts that are commonly known and accepted by the parties.

(3) The hearing officer shall not substitute the hearing officer's judgment for the academic judgment of a peer review committee or administrative officer, nor shall the hearing officer be empowered to evaluate the academic qualifications or competence of academic appointees.

(4) The Chancellor shall review the hearing officer's findings and recommendations and issue a final written decision within thirty (30) calendar days of receipt of the hearing officer's findings and recommendation(s). The Chancellor shall provide to the grievant a statement of the reasons if the hearing officer's recommendation(s) is rejected or modified. If a decision is based on facts different from those found by the hearing officer, those findings must be based on materials in the record.

d. **Fees**

There shall be no cost to the grievant for a University hearing officer. In the case of a grievance heard by a non-University hearing officer, the hearing officer's fees shall be borne equally by the University and the grievant if the Chancellor accepts the hearing officer's recommendation(s). The fee shall be borne entirely by the University if the Chancellor rejects or modifies the recommendation(s) of the non-University hearing officer.

## 140-85 General Provisions

a. **Representation**

Grievants may represent themselves or may be represented by another person at any stage of the grievance process. The University shall be represented as the Chancellor deems appropriate; representation may be provided by the Office of the General Counsel.

b. **Time Limits**

Prior to expiration of a time limit, extensions may be granted by the grievance liaison upon written request by either party. If the grievant fails to meet a deadline, the grievance will be considered resolved on the basis of the last University response. If a University official

fails to meet a deadline, the grievant may move the grievance to the next step in the process. Time limits that expire on days that are not business days at the location where the grievance is filed shall be automatically extended to the next University business day.

c. **Pay Status**

The grievant and the grievant's representative, if employed by the University, shall be granted leave with pay based on their regular pay status to attend hearings and meetings convened by the University to consider grievances under this policy. Time spent by the grievant and the grievant's representative in investigation and preparation of a grievance shall not be on pay status. Time spent by University employee-witnesses in meetings and hearings convened by the University shall be taken as leave with pay based on their regular pay status.

d. **Remedy**

If the grievance is sustained in whole or in part, the remedy shall not exceed restoring to the grievant the pay, benefits, or rights lost either as a result of the violation of University rules, regulations, or Academic Personnel policies, or as a result of an arbitrary or capricious administrative action, less any income earned from any other employment. If the hearing officer's findings and recommendation(s) include a remedy for back pay, the amount of back pay shall be determined by the administration. Disputes over the amount of back pay due may be referred back to the hearing officer for a separate recommendation. Any claim of back pay by a grievant must be supported by appropriate documentation. Payment of attorney's fees shall not be part of the remedy. Unless specifically authorized by the grievance liaison, compensation shall not be paid for any period that is the result of extension(s) of time requested by or on behalf of the grievant.

e. **Consolidation of Grievances**

The following may be consolidated in one review: grievances of two or more academic appointees, where the grievances are related and consolidation is appropriate under the circumstances; two or more grievances filed by the same grievant that are based on the same incident, issues, or act; or two or more grievances filed by the same grievant that are based on the same pattern of conduct. The grievance liaison shall decide whether grievances will be consolidated.

## Revision History

April 18, 2025:
- Technical revisions to remove redundant policy language and add Equal Employment Opportunity Office to the list of campus compliance offices.

April 20, 2022:
- Technical revisions to update references to Regental governing documents.

September 23, 2020:
- Technical revision to remove gendered language and to correct minor grammatical errors.

For details on prior revisions, please visit the [policy issuance web page](#).

# EXHIBIT I

### 337. Privilege and Tenure: Divisional Committees -- Early Termination Cases (En 23 May 2001 - See Bylaw 334)

A  Jurisdiction (Am 6 June 2012)

In cases of proposed termination of a Senate or non-Senate faculty member before the expiration of the faculty member's appointment, or in cases where a tenured faculty member faces termination for incompetent performance, or for other faculty members whose right to a hearing before a Senate committee is given by Section 103.9 or 103.10 of the Standing Orders of The Regents (Appendix I) (hereafter collectively referred to as early termination), the faculty member may request a hearing before a Divisional Privilege and Tenure Committee. The committee shall then conduct a hearing on the case to determine whether, in its judgment, the proposed early termination is for good cause and has been recommended in accordance with a procedure that does not violate the privileges of the faculty member. Resolution of the dispute, either through negotiation or mediation, is permissible and appropriate at any stage of these proceedings. Termination as a result of a disciplinary case pursuant to Bylaw 336 is not covered by this Bylaw.

No Senate or non Senate faculty member may be terminated prior to the expiration of an appointment without having an opportunity for a hearing before the Divisional Privilege and Tenure Committee. So long as the faculty member requests a hearing before the end of his or her appointment, the Divisional Privilege and Tenure Committee shall appoint a Hearing Committee and proceed according to Section B below. If the faculty member fails to request a hearing before the end date of the appointment in question, the faculty member may seek a grievance hearing by grieving the non reappointment pursuant to Senate Bylaw 335 in the case of Senate faculty or the Academic Personnel Manual in the case of non-Senate faculty.

B  Hearing and Post hearing Procedures

1. The Privilege and Tenure Committee shall appoint a Hearing Committee for each early termination case for which a hearing is requested by a faculty member. The Hearing Committee should consist of at least three Division members. At least two of the members shall be members of the Committee on Privilege and Tenure, one of whom shall chair the Hearing Committee. The committee may not appoint a member of the department or equivalent administrative unit of the faculty member facing early termination to the Hearing Committee. Hearing Committee members shall disclose to the Hearing Committee any circumstances that may interfere with their objective consideration of the case and recuse themselves as appropriate. A quorum for the conduct of the hearing shall consist of at least half but not less than three members of the Hearing Committee, including at least one member of the Committee on Privilege and Tenure.

2. Prior to the formal hearing, the Chair of the Hearing Committee shall schedule a conference with both the faculty member and the Chancellor's designee, and/or their representatives. This conference should attempt to:

   a. Determine the facts about which there is no dispute. At the hearing, these facts may be established by stipulation

   b. Define the issues to be decided by the Hearing Committee.

   c. Set a time for both sides to exchange a list of witnesses and copies of exhibits to be presented at the hearing. The Hearing Committee has the discretion to limit each party to those witnesses whose names were disclosed to the other party prior to the hearing and to otherwise limit evidence to that which is relevant to the issues before the Hearing Committee

   d. Specify whether prehearing and post-hearing briefs will be submitted by the parties as well as the deadlines for those briefs.

   e. Attain agreement about whether any person other than the Chancellor, the Chancellor's designee, the faculty member, and their representatives may be present during all or part of the hearing. In order to preserve the confidentiality of the hearing, persons whose presence is not essential to a determination of the facts shall, as a general rule, be excluded from the hearing

3. The Chancellor's designee and the faculty member and/or their representatives shall be entitled to be present at all sessions of the Hearing Committee when evidence is being received and to select a representative who may act as counsel. Each party shall have the right to be represented by counsel, to present its case by oral and documentary evidence, to submit rebuttal evidence, and to conduct such cross examination as may be required for a full and true disclosure of the facts.

4. The hearing need not be conducted according to the technical legal rules relating to evidence and witnesses. The Hearing Committee may, upon an appropriate showing of need by any party or on its own initiative, request files and documents under the control of the administration. All confidential information introduced into evidence, including the identity of confidential sources of personnel evaluations, shall remain so within the Hearing Committee. The Hearing Committee may call witnesses or make evidentiary requests on its own volition. The Hearing Committee also has the discretion to require that all witnesses affirm the veracity of their testimony.

5. No evidence other than that presented at the hearing shall be considered by the Hearing Committee or have weight in the proceedings, except that the Hearing Committee may take notice of any judicially noticeable facts that are commonly known. Parties present at the hearing shall be informed of matters thus noticed, and each party shall be given a reasonable opportunity to object to the Hearing Committee's notice of such matters

6. The Divisional Committee on Privilege and Tenure may, at its discretion, request the appointment of a qualified person or persons, designated by the Chair of the University Committee on Privilege and Tenure, to provide legal advice and/or to assist in the organization and conduct of the hearing.

7. At the hearing, the Chancellor's designee has the burden of proving, by clear and convincing evidence, that there is good cause for early termination. In assessing the evidence for good cause, the Hearing Committee may consider evidence regarding whether correct procedures were followed in the case.

8. At the conclusion of the hearing, the Hearing Committee shall promptly make its findings of fact, conclusions supported by a statement of reasons based on the evidence, and recommendation, and forward these to the parties in the case, the Chancellor, the Chair of the Divisional Committee on Privilege and Tenure, and the Chair of the University Committee on Privilege and Tenure. The findings, conclusions, recommendations, and record of the proceedings shall be confidential to the extent allowed by law and UC policy. The Hearing Committee may, however, with the consent of the faculty member, authorize release of the findings, conclusions, and recommendations to other individuals or entities, to the extent allowed by law.

9. The hearing shall be recorded. The Hearing Committee has the discretion to use a certified court reporter (whose cost is borne by the administration) for this purpose, and the parties and their representatives shall have the right to a copy of the recording or transcript. The cost of the copy shall be assumed by the requesting party

10. The Hearing Committee may reconsider a case if either party presents, within a reasonable time after the decision, newly discovered facts or circumstances that might significantly affect the previous decision and that were not reasonably discoverable at the time of the hearing.

# EXHIBIT
# J



University of California
San Francisco

**Sam Hawgood, MBBS**
Chancellor
Arthur and Toni Rembe Rock
   Distinguished Professor

Office of the Chancellor
UCSF Box 0402
550 16th Street, Room 7107
San Francisco, CA 94143

tel: 415.476.6582
Sam.Hawgood@ucsf.edu

www.ucsf.edu

September 22, 2024

Delivered by email and Fed Ex

RUPA MARYA, MD
Sent via email to: Rupa.Marya@ucsf.edu

In accordance with APM 150, I am placing you on immediate investigatory leave with pay for the purpose of investigating your conduct related to your social media post on 'X' yesterday, September 21, 2024, which has caused disruption of the education environment as described below. Consequently, it is my judgment that your presence on campus or participation in campus activities will exacerbate this disruption.

This is your post:

*"Med students at UCSF are concerned that a first year student from Israel is in their class. They're asking if he participated in the genocide of Palestinians in the IDF before matriculating into medical school in CA. How do we address this in our professional ranks?"*

This post publicly and irresponsibly singles out an individual first-year UCSF Medical School student by raising speculation as to whether that student engaged in certain activities based on their national origin. The post also asserts that other first year medical students are engaged in discrimination against a classmate by stereotyping based on national origin, which is contrary to UCSF policy and state and federal law. This post likely also violates the Family Educational Rights and Privacy Act (FERPA) since it provides information about a single student that could lead to their identification.

Even if your report is true, you deliberately chose to post on social media a message that accepts and amplifies discrimination, rather than raise any legitimate issues to the appropriate campus offices charged with addressing such issues, and with counseling students. This issue could have been dealt with in a way that would not have provided individual student information to the entire public which could be abused to identify, target, and harass that individual. This is reckless and highly inappropriate behavior for a faculty member.



The impact of your targeted post against the School of Medicine has been immediate and negative, causing disruption to the integrity of the educational environment. It has caused alarm in class members. It risks damaging the cohesiveness of the class by raising suspicion and distrust about which classmates may have engaged in discriminatory stereotyping and speculation, as well as spreading fear about classmates based on their national origin or perceived national origin.

Other members of the UCSF community have also expressed alarm and concern about the post and its disruption of UCSF programs and activities. Because of the significance of this disruption, I have referred this incident for investigation into potential violations of Federal Title VI, FERPA, the UC Anti-Discrimination policy, and any other applicable policies.

This incident follows your earlier conduct on social media that also disrupted UCSF programs and activities and undermined our University's mission and its provision of health care. We have counseled you previously that such behavior is harmful to UCSF and our people. In fact, you have received notice of a Faculty Code of Conduct investigation into your actions. Your latest post is especially disturbing because it appears deliberately calculated to achieve a divisive and harmful goal, and to invite others to target and harass a student.

We repeat our prior warnings and again direct that you must immediately cease and desist from using social media to target individuals within our community or to divide our community and to impact adversely our reputation and performance of our mission or from engaging in any other behavior that does so. Given your defiance of prior warnings and insistence on engaging in further harmful and disruptive behavior, should you persist in this conduct, the University will seek all available remedies, including those which go beyond University disciplinary action.

Your leave begins upon transmittal of this letter and will remain in effect for the duration of any and all investigation(s). During that time, you are not allowed on campus, except to access health care for yourself or your family. Your access to UCSF systems, including but not limited to UCSF Zoom, email, and APEX will be suspended.

Sam Hawgood, MBBS
Chancellor
Arthur and Toni Rembe Rock Distinguished Professor

# EXHIBIT K



University of California
San Francisco

**Sam Hawgood, MBBS**
Chancellor
Arthur and Toni Rembe Rock
 Distinguished Professor

Office of the Chancellor
UCSF Box 0402
550 16th Street, Room 7107
San Francisco, CA 94143

tel: 415.476.6582
Sam.Hawgood@ucsf.edu

www.ucsf.edu

**IN STRICT CONFIDENCE
TO BE OPENED BY ADDRESSEE ONLY**

<u>**NOTICE OF INTENT TO IMPOSE DISCIPLINE**</u>

April 28, 2025

*Sent via USPS to:*

RUPA MARYA, MD
███████████████

*Sent via email to:*  rupa.marya@ucsf.edu, ████████████████

In fulfilling my responsibility to determine whether you have violated the Faculty Code of Conduct, which would warrant the imposition of discipline, I reviewed the report of the *Ad Hoc* Committee which investigated allegations of misconduct on your part, as well as your response to that report.

<u>***Ad Hoc* Committee Findings:**</u>

In concluding that there is probable cause to believe that you have violated the Faculty Code of Conduct, the *Ad Hoc* Committee made the following findings.

*Dr. Marya violated the standards described in the Faculty Code of Conduct in her September 21, 2024 post on X.com.*

As described in the Committee's report:

> Per several witnesses interviewed by the Committee, this post on social media created an atmosphere of disruption and fear in the School of Medicine, specifically in the first-year class. Several witnesses, including Student 1 and 2, told the Committee that this statement led many Jewish students to feel marginalized and unsafe. Students were made vulnerable to speculation as to whether they were the person who was being named in the X post.

Further, the Committee detailed the consequences of this post:

> The administration had to go into crisis management mode to address the fear and anxiety among students. The administration met with the first-year class to discuss how to address the significant impact, including having support sessions for individual students and organizing additional programing to address disruptions. These efforts included additional office hours, restorative justice groups, and meetings with student leaders. Additionally, student leadership felt it was important to make all students feel welcome on campus and issued a letter condemning Dr. Marya's statement and avowing support for all their fellow students of all nationalities. These efforts to lessen the hostile environment created by Dr. Marya's statement took away valuable time from students, faculty and staff to advance learning and teaching which constitute valuable work of the University and one of its core missions.



As to the Faculty Code of Conduct, the Committee found this post "significantly impaired a central function of the University as it caused many disruptions to the learning environment and the functionality of the UCSF Medical School," and that "a preponderance of the evidence establishes probable cause that Dr. Marya violated the Ethical Principle as stated in APM 015 Part II, Section A of the Faculty Code of Conduct, and significantly impaired a central function of the University when she posted on social media about a first year UCSF medical student."

*Regarding conduct towards colleagues, the Committee found:*

> …once Dr. Marya disagrees with a colleague over a political or personal opinion, she does not hesitate to call them out publicly, in derogatory terms, misrepresenting their positions and exposing them to the rebuke of her followers on social media (of which she has 27,000 on X and 2,000 on Substack). This is not living up to the standards of the Faculty Code of Conduct which states, "In the exchange of criticism and ideas professors show due respect for the opinions of others.

Here the Committee found: "a preponderance of the evidence establishes probable cause that Dr. Marya engaged in the conduct addressed [in the paragraph] above and that this conduct violated APM 015 Part II, Section D of the Faculty Code of Conduct and significantly impaired a central function of the University."

*Regarding harassment of students, colleagues and members of the University Community:*

> Many Jewish UCSF physician colleagues of Dr. Marya felt singled out and harassed based on their background (ethnicity, nationality, religion or shared ancestry) by these statements, which did not objectively or individually judge their competence as physicians, and which had the clear potential effect of undermining patients' confidence in receiving competent care from these UCSF physicians based only on suspicion due to the protected characteristics described in the Faculty Code of Conduct. UCSF also received many complaints from other physicians outside of UCSF who expressed similar complaints that a UCSF physician colleague would engage in broad questioning of other physicians' competency based only on their perceived association with Zionism" through their religion, shared ancestry or nationality.

Here the Committee found: "a preponderance of the evidence establishes probable cause that Dr. Marya engaged in harassment of students, colleagues and members of the University community, as prohibited by APM 015 Part II, Sections A, C, and D of the Faculty Code of Conduct."

*Regarding the UCSF Violence and Bullying Policy:*

"Several UCSF community members stated that they felt Dr. Marya's statements were derogatory, insulting and belittling, and the Committee finds that a reasonable person would agree with this assessment."

The Committee analyzed "Dr. Marya's tweets in the aggregate as a 'pattern of behavior over time' with the intent or effect of intimidating, degrading, excluding, or mischaracterizing those colleagues whose opinions differed from hers from speaking or acting."

Here, the Committee found: "a preponderance of the evidence establishes probable cause that Dr. Marya engaged in the conduct addressed [in the paragraphs] above and that this conduct violated the UCSF Violence and Bullying Policy." Further, "the Committee also finds that this violation was a serious violation of this policy, and therefore there is probable cause that Dr. Marya violated APM 015, Part II Section C-8 of the Faculty Code of Conduct."

*Regarding the UCSF Social Media and Electronic Communications Policies:*

The Committee found that your social media activity did not respect the consent or confidentiality of your colleagues, and concluded that: "a preponderance of the evidence establishes probable cause that Dr. Marya...violated the UCSF Social Media Policy" and that "this violation was a serious violation of this policy, and therefore there is probable cause that Dr. Marya violated APM 015, Part II Section C-8 of the Faculty Code of Conduct."

In addition: "the Committee finds that a preponderance of the evidence establishes probable cause that Dr. Marya…violated the UCSF Electronic Communications Policy" and that "this violation was a serious violation of this policy, and therefore there is probable cause that Dr. Marya violated APM 015, Part II Section C-8 of the Faculty Code of Conduct."

*Regarding Regents Policy 1111:*

The Committee found that you published a confidential complaint, thereby "failing to act protect private records" and "failing to act in a responsible manner."

The Committee found: "that a preponderance of the evidence establishes probable cause that Dr. Marya…violated the Regents Policy 1111" and that "this violation was a serious violation of this policy, and therefore there is probable cause that Dr. Marya violated APM 015, Part II Section C-8 of the Faculty Code of Conduct."

**Opportunity to Respond in Writing:**

You received a copy of the Committee's report on April 4, 2025, and provided a written response prepared by your counsel on April 22, 2025. I have reviewed and considered your response in considering whether to accept the Committee's recommendations. In your response to the investigation report you discussed your inability to respond due to redactions to certain materials included in the exhibits. Your response did not substantively address many of the findings made by the Committee.

***Ad Hoc* Committee's Recommendation:**

The Committee recommended discipline in the form of Dismissal and a 10-year Letter of Censure.

**Disciplinary Proposal:**

I accept the *Ad Hoc* Committee's findings that a preponderance of the evidence establishes probable cause that your conduct violated the Faculty Code of Conduct. In addition, I accept that this finding of probable cause constitutes good cause under APM 150.

In considering the nature and seriousness of the misconduct and the types of discipline described in APM 150, the *Ad Hoc* Committee's report and recommendations, your response to the *Ad Hoc* Committee's report, and the recommendation of Vice Provost Brian Alldredge, I propose the following discipline:

- 10-year Letter of Censure
- Dismissal

As a reminder, retaliation or intimidation may constitute misconduct, and this can lead to sanctions for the person who retaliates or intimidates someone in connection with an investigation. Given the specific nature of the findings and your conduct on social media with regard to postings about individuals, we want to emphasize that such actions toward individuals who made complaints or participated in this investigation will be regarded as retaliation.

Please note that the Letter of Censure will become a part of any Advance packet for any academic action during the period for which the discipline is imposed, and will be available to all appropriate reviewers, including all faculty eligible to vote on an action, merit and promotion committees, and all campus reviewers. References to this discipline letter, such as in the Chair's letter of departmental recommendation, will remain in your file permanently but will not be available for review for any future academic actions.

In accordance with the UCSF Procedure for Investigation of Faculty Misconduct and the Administration of Discipline (Investigation Procedure), you have 15 business days from the date of the transmittal of this notice of Intent to Impose Discipline letter, unless an extension is requested and granted, to notify the Vice Provost, in writing, whether you accept the proposed sanction. All extension requests must be: (1) made in writing, (2) supported by good cause, and (3) submitted to the Vice Provost before the deadline.

Under the Investigation Procedure, failure to respond by the deadline is deemed to be an acceptance of the proposed findings and sanctions, see Investigation Procedure, Section V.B.1. If you do not respond, or if you accept the findings and proposed sanctions, I will then send you a formal Discipline Letter imposing the proposed sanctions.

If you decline to accept the findings and proposed sanction of dismissal, you may file a grievance under APM 140, or you may request a hearing before the properly constituted advisory committee of the Academic Senate as provided by Regents Bylaw 40.3(c). Pursuant to APM 150-40, you may select only one of these grievance review mechanisms for this sanction.

If you decline to accept the findings and proposed sanction with regard to the Letter of Censure, you may also file a grievance under APM 140 as to that proposed discipline.

Any questions that you may have concerning relevant University policies and procedures may be directed to Academic Employee Relations Specialist Sara Stillwell at Sara.Stillwell@ucsf.edu.

Sam Hawgood, MBBS
Chancellor


cc: Executive Vice Provost Lucey
    Vice Provost Alldredge
    Dean Talmadge King
    Chair Robert Wachter
    Assistant Vice Provost Light

# EXHIBIT L



University of California
San Francisco

**Sam Hawgood, MBBS**
Chancellor
Arthur and Toni Rembe Rock
 Distinguished Professor

Office of the Chancellor
UCSF Box 0402
550 16th Street, Room 7107
San Francisco, CA 94143

tel: 415.476.6582
Sam.Hawgood@ucsf.edu

www.ucsf.edu

**IN STRICT CONFIDENCE**
**TO BE OPENED BY ADDRESSEE ONLY**

**NOTICE OF ACTION: DISSMISAL and LETTER OF CENSURE**

May 20, 2025

RUPA MARYA, MD
Health Sciences Clinical Professor
Department of Medicine
*Sent via email to:* Rupa.Marya@ucsf.edu; ███████████

Dear Dr. Marya:

On April 28, 2025, you were provided with a Notice of Intent to Impose Discipline letter. This Notice informed you of my intent to dismiss you from your employment with the University and also to place a Letter of Censure in your Academic Personnel file for a period of ten years to express institutional rebuke for your actions.

That letter also informed you of your right to grieve this proposed discipline under APM 140 and/or for the proposed dismissal only, to seek a hearing before the properly constituted advisory committee of the Academic Senate as provided by Regents Bylaw 40.3(c). You were also informed that pursuant to APM 150-40, you may select only one of these grievance review mechanisms for the proposed dismissal. You responded on May 16, 2025 and stated that you did not accept the proposed discipline and that you intended to request a hearing in front of the Academic Senate pursuant to Senate Bylaw 337.

This Notice of Action is being issued to you regarding the dismissal and Letter of Censure (attached), both of which are effective today, May 20, 2025. Your appointment is now terminated. The Letter of Censure and this Notice of Action will be placed in your academic personnel file.

Any questions that you may have concerning relevant University policies and procedures may be directed to Assistant Vice Provost Emerald Light at emerald.light@ucsf.edu.

*Sam Hawgood*

Sam Hawgood, MBBS
Chancellor
Arthur and Toni Rembe Rock Distinguished Professor

Attachment

cc:   Executive Vice Chancellor and Provost Lucey
      Vice Provost Alldredge
      Assistant Vice Provost Light
      Dean King
      Chair Wachter

# EXHIBIT M



University of California
San Francisco

**IN STRICT CONFIDENCE**
**TO BE OPENED BY ADDRESSEE ONLY**

<span style="color:red">**LETTER OF CENSURE**</span>

**Sam Hawgood, MBBS**
Chancellor
Arthur and Toni Rembe Rock
  Distinguished Professor

Office of the Chancellor
UCSF Box 0402
550 16th Street, Room 7107
San Francisco, CA 94143

tel: 415.476.6582
Sam.Hawgood@ucsf.edu

www.ucsf.edu

May 20, 2025

*Sent via email to:* rupa.marya@ucsf.edu, ███████████

Dear Dr. Marya:

I write to impose discipline on you in the form of this Letter of Censure.

This discipline is imposed after a faculty misconduct investigation was performed by an *Ad Hoc* Committee comprised of three faculty members. The *Ad Hoc* Committee concluded that there is probable cause to believe that you violated the Faculty Code of Conduct (APM 015).

### ***Ad Hoc* Committee Findings:**

In concluding that there is probable cause to believe that you have violated the Faculty Code of Conduct, the *Ad Hoc* Committee made the following findings.

*Dr. Marya violated the standards described in the Faculty Code of Conduct in her September 21, 2024 post on X.com.*

As described in the Committee's report:

> Per several witnesses interviewed by the Committee, this post on social media created an atmosphere of disruption and fear in the School of Medicine, specifically in the first-year class. Several witnesses, including Student 1 and 2, told the Committee that this statement led many Jewish students to feel marginalized and unsafe. Students were made vulnerable to speculation as to whether they were the person who was being named in the X post.

Further, the Committee detailed the consequences of this post:

> The administration had to go into crisis management mode to address the fear and anxiety among students. The administration met with the first-year class to discuss how to address the significant impact, including having support sessions for individual students and organizing additional programing to address disruptions. These efforts included additional office hours, restorative justice groups, and meetings with student leaders. Additionally, student leadership felt it was important to make all students feel welcome on campus and issued a letter condemning Dr. Marya's statement and avowing support for all their fellow students of all nationalities. These efforts to lessen the hostile environment created by Dr. Marya's statement took away valuable time from students, faculty and staff to advance learning and teaching which constitute valuable work of the University and one of its core missions.



As to the Faculty Code of Conduct, the Committee found this post "significantly impaired a central function of the University as it caused many disruptions to the learning environment and the functionality of the UCSF Medical School," and that "a preponderance of the evidence establishes probable cause that Dr. Marya violated the Ethical Principle as stated in APM 015 Part II, Section A of the Faculty Code of Conduct, and significantly impaired a central function of the University when she posted on social media about a first year UCSF medical student."

*Regarding conduct towards colleagues, the Committee found:*

…once Dr. Marya disagrees with a colleague over a political or personal opinion, she does not hesitate to call them out publicly, in derogatory terms, misrepresenting their positions and exposing them to the rebuke of her followers on social media (of which she has 27,000 on X and 2,000 on Substack). This is not living up to the standards of the Faculty Code of Conduct which states, "In the exchange of criticism and ideas professors show due respect for the opinions of others.

Here the Committee found: "a preponderance of the evidence establishes probable cause that Dr. Marya engaged in the conduct addressed [in the paragraph] above and that this conduct violated APM 015 Part II, Section D of the Faculty Code of Conduct and significantly impaired a central function of the University."

*Regarding harassment of students, colleagues and members of the University Community:*

Many Jewish UCSF physician colleagues of Dr. Marya felt singled out and harassed based on their background (ethnicity, nationality, religion or shared ancestry) by these statements, which did not objectively or individually judge their competence as physicians, and which had the clear potential effect of undermining patients' confidence in receiving competent care from these UCSF physicians based only on suspicion due to the protected characteristics described in the Faculty Code of Conduct. UCSF also received many complaints from other physicians outside of UCSF who expressed similar complaints that a UCSF physician colleague would engage in broad questioning of other physicians' competency based only on their perceived association with Zionism" through their religion, shared ancestry or nationality.

Here the Committee found: "a preponderance of the evidence establishes probable cause that Dr. Marya engaged in harassment of students, colleagues and members of the University community, as prohibited by APM 015 Part II, Sections A, C, and D of the Faculty Code of Conduct."

*Regarding the UCSF Violence and Bullying Policy:*

"Several UCSF community members stated that they felt Dr. Marya's statements were derogatory, insulting and belittling, and the Committee finds that a reasonable person would agree with this assessment."

The Committee analyzed "Dr. Marya's tweets in the aggregate as a 'pattern of behavior over time' with the intent or effect of intimidating, degrading, excluding, or mischaracterizing those colleagues whose opinions differed from hers from speaking or acting."

Here, the Committee found: "a preponderance of the evidence establishes probable cause that Dr. Marya engaged in the conduct addressed [in the paragraphs] above and that this conduct violated the UCSF Violence and Bullying Policy." Further, "the Committee also finds that this violation was a serious violation of this policy, and therefore there is probable cause that Dr. Marya violated APM 015, Part II Section C-8 of the Faculty Code of Conduct."

*Regarding the UCSF Social Media and Electronic Communications Policies:*

The Committee found that your social media activity did not respect the consent or confidentiality of your colleagues, and concluded that: "a preponderance of the evidence establishes probable cause that Dr. Marya...violated the UCSF Social Media Policy" and that "this violation was a serious violation of this policy, and therefore there is probable cause that Dr. Marya violated APM 015, Part II Section C-8 of the Faculty Code of Conduct."

In addition: "the Committee finds that a preponderance of the evidence establishes probable cause that Dr. Marya…violated the UCSF Electronic Communications Policy" and that "this violation was a serious violation of this policy, and therefore there is probable cause that Dr. Marya violated APM 015, Part II Section C-8 of the Faculty Code of Conduct."

*Regarding Regents Policy 1111:*

The Committee found that you published a confidential complaint, thereby "failing to act protect private records" and "failing to act in a responsible manner."

The Committee found: "that a preponderance of the evidence establishes probable cause that Dr. Marya…violated the Regents Policy 1111" and that "this violation was a serious violation of this policy, and therefore there is probable cause that Dr. Marya violated APM 015, Part II Section C-8 of the Faculty Code of Conduct."

## Opportunity to Respond in Writing:

You received a copy of the Committee's report on April 4, 2025, and provided a written response prepared by your counsel on April 22, 2025. I have reviewed and considered your response in considering whether to accept the Committee's recommendations. In your response to the investigation report you discussed your inability to respond due to redactions to certain materials included in the exhibits. Your response did not substantively address many of the findings made by the Committee.

## *Ad Hoc* Committee's Recommendation:

The Committee recommended discipline in the form of Dismissal and a 10-year Letter of Censure.

## Disciplinary Proposal:

I accept the *Ad Hoc* Committee's findings that a preponderance of the evidence establishes probable cause that your conduct violated the Faculty Code of Conduct. In addition, I accept that this finding of probable cause constitutes good cause under APM 150.

On April 28, 2025, you were provided a letter in which I informed you of my intent to impose discipline on you as described below:

- 10-year Letter of Censure
- Dismissal

You were informed of your opportunity to respond to my April 28, 2025 letter within 15 business days. You submitted a response to that letter on May 16, 2025. In your response, you stated that you would be requesting a hearing before the Privilege and Tenure Committee of the Academic Senate.

Therefore, on May 20, 2025, I issued a written Notice of Action which implemented the dismissal, and by this letter, I am imposing this formal Letter of Censure which will be placed in your academic personnel file for ten years. This Letter of Censure is intended to express institutional rebuke for your actions.

Sam Hawgood, MBBS
Chancellor

cc: Executive Vice Provost Lucey
    Vice Provost Alldredge
    Dean Talmadge King
    Chair Robert Wachter
    Assistant Vice Provost Light