BRYAN H. HECKENLIVELY (State Bar No. 279140)
bryan.heckenlively@mto.com
SKYLAR B. GROVE (State Bar No. 310707)
skylar.grove@mto.com
MILES W. UNTERREINER (State Bar No. 347959)
miles.unterreiner@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street Twenty-Seventh Floor
San Francisco, California 94105
Telephone:    (415) 512-4000
Facsimile:    (415) 512-4077

Attorneys for Defendants The Regents of the
University of California, Sam Hawgood,
Catherine Lucey, Robert Wachter, Won Ha,
Tracey Tsugawa, and Brian Alldredge

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUPA MARYA, M.D.,<br><br>Plaintiff,<br><br>vs.<br><br>BOARD OF REGENTS OF THE UNIVERSITY OF CALIFORNIA; SAM HAWGOOD; CATHERINE LUCEY; ROBERT WACHTER; TRACEY TSUGAWA; BRIAN ALLDREDGE; WON HA; AND DOES 1-20,<br><br>Defendants. | Case No. 3:25-cv-04716-MMC<br><br>**DECLARATION OF BRYAN H. HECKENLIVELY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT AND REQUEST FOR JUDICIAL NOTICE**<br><br>Date:          April 17, 2026<br>Time:          9:00 a.m.<br>Judge:        Hon. Maxine M. Chesney<br>Courtroom:  7 |

Case No. 3:25-cv-04716

DECLARATION OF BRYAN H. HECKENLIVELY ISO MOTION TO DISMISS FAC AND RJN

**<u>DECLARATION OF BRYAN H. HECKENLIVELY</u>**

I, Bryan H. Heckenlively, hereby declare:

1.     I am an attorney with the law firm of Munger, Tolles & Olson LLP and counsel of record for Defendants in this action.  I am licensed to practice law in the State of California.  I make this Declaration in support of Defendants' Motion to Dismiss the First Amended Complaint ("FAC") and Request for Judicial Notice.  Except as otherwise noted, I have personal knowledge of the facts set forth herein; and, if called as a witness, I could and would testify competently thereto.

2.     Attached hereto as **Exhibit A** is a true and correct copy of a document containing a series of social media posts by Plaintiff Rupa Marya, M.D. ("Marya").  **Exhibit A** is publicly accessible at https://drive.google.com/file/d/1TrioXH-4gi-Ig12xBLPo5LoDa9FmaWYs/view as of the date it was last accessed: March 2, 2026.  The document was accessible as of that date by clicking the hyperlink labeled "a social media post" in a public essay purporting to be authored by Marya and publicly accessible at this address: https://docs.google.com/document/d/1yGCSZD6x5BOnkmrFVi7_bJTM4ZpALDRQt5L4-TWq8dg/edit?tab=t.0.  Marya's essay can in turn be accessed by clicking the link labeled "personal statement" in a public letter written in support of Marya, which was accessible here as of the same date: https://cucfa.org/2024/01/our-letter-ucsf-should-not-attack-their-own-faculty/.  These posts are incorporated by reference at Paragraph 39 of the FAC.

3.     Attached hereto as **Exhibit B** is a true and correct copy of a screen capture of a social media post, dated September 21, 2024.  The post is publicly accessible at https://x.com/Scott_Wiener/status/1837570677492404558 as of the date it was last accessed: March 2, 2026.  It is incorporated by reference at Paragraph 51 of the FAC.

4.     Attached hereto as **Exhibit C** is a true and correct copy of a LinkedIn post by the University of California, San Francisco ("UCSF").  The post is publicly accessible at https://www.linkedin.com/posts/ucsf_a-tired-and-familiar-racist-conspiracy-theory-activity-7149547978729357312-7ZR1/ as of the date it was last accessed: March 2, 2026.  It is incorporated by reference at Paragraph 43 of the FAC.

5.      Attached hereto as **Exhibit D** is a true and correct copy of an Instagram post dated January 6, 2024, posted by the University of California, San Francisco.  The post is publicly accessible at https://www.instagram.com/p/C1xxSCZL5Mp/?img_index=1 as of the date it was last accessed: March 2, 2026.  It is incorporated by reference at Paragraph 43 of the FAC.

6.      Attached hereto as **Exhibit E** is a true and correct copy of screen captures of a Twitter post dated January 6, 2024,[1] posted by the University of California, San Francisco.  The post is publicly accessible at https://x.com/UCSF/status/1743785818169250254 as of the date it was last accessed: March 2, 2026.  It is incorporated by reference at Paragraph 43 of the FAC.

7.      Attached hereto as **Exhibit F** is a true and correct copy of the Notice of Intent to Impose Discipline that UCSF Chancellor Sam Hawgood sent to Marya on April 28, 2025, which is incorporated by reference at Paragraphs 62 and 64 of the FAC.

8.      Attached hereto as **Exhibit G** is a true and correct copy of the Health Facility/Peer Review Reporting Form (also known as an "805 Report") that the Medical Staff of UCSF Health submitted to the Medical Board of California on December 5, 2025, which is incorporated by reference at Paragraph 66 of the FAC.

9.      Attached hereto as **Exhibit H** is a true and correct copy of the University of California's Faculty Code of Conduct, set forth in Academic Personnel Manual 015.  The document is publicly accessible at https://www.ucop.edu/academic-personnel-programs/_files/apm/apm-015.pdf as of the date if was last accessed: March 2, 2026.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 2, 2026, at San Francisco, California.

By:     */s/ Bryan H. Heckenlively*
        Bryan H. Heckenlively

---

[1] The post appears to be dated 12:05 a.m. on January 7 because the Page Vault tool used to download and authenticate the post marks time in UTC, which is either 7 or 8 hours ahead of Pacific Time, where it would still have been January 6.

DECLARATION OF BRYAN H. HECKENLIVELY ISO MOTION TO DISMISS FAC AND RJN

# EXHIBIT A



**Rupa Marya, MD** 🔒
@DrRupaMarya

The presence of Zionism in US medicine should be examined as a structural impediment to health equity. Zionism is a supremacist, racist ideology and we see Zionist doctors justifying the genocide of Palestinians. How does their outlook/position impact priorities in US medicine?

> 🔒 **saira rao** 🔒 @sairasameerarao · Jan 1
> Realizing how many American doctors and nurses are Zionists and genuinely terrified for Palestinian, Arab, Muslim, South Asian and Black patients — even more than usual.
>
> And usually it's bad.

**Rupa Marya, MD** 🔒 @DrRupaMarya · Jan 2    ···
How can we have health equity if people with deeply rooted racist philosophies (supremacist ideologies are racist) are in charge of setting funding priorities and shaping the structures of medicine?

💬 1          🔁 30          ♡ 85          �features 35K          🔖 ⬆

**Rupa Marya, MD** 🔒 @DrRupaMarya · Jan 2    ···
Just like white supremacists who want a white Christian ethnostate in the US—those people give poor care to Indigenous, Black and brown people. And those people reinforce structures that make sure caring for BIPOC communities is not a priority. Racism in medicine kills.

💬 1          🔁 16          ♡ 68          features 30K          🔖 ⬆

**Rupa Marya, MD** 🔒 @DrRupaMarya · Jan 2    ···
This is why it's important to make the distinction of a political ideology (Zionism) from a religion (Judaism). There are so many Jewish doctors who don't espouse an ideology of supremacism and justification of land theft, apartheid and genocide. They are not the issue here.

💬 1          🔁 32          ♡ 81          features 41K          🔖 ⬆

**Rupa Marya, MD** 🔒 @DrRupaMarya · Jan 2    ···
The issue is Zionist doctors who will sit in an "Antiracism Task Force" meeting and try to stop brown doctors who want to issue a Ceasefire statement by saying that a ceasefire would be a bad thing (read: let's keep killing brown people in Gaza).

💬 1          🔁 24          ♡ 68          features 30K          🔖 ⬆

**Rupa Marya, MD** 🔒 @DrRupaMarya · Jan 2    ···
Zionism in US medicine—coupled with the Israeli government's operations to discredit & destroy the careers of any critics, funded by the large donors who support US academic medicine—is why US medical institutions have said nothing while Gaza's hospitals are bombed.

💬 1          🔁 20          ♡ 66          features 25K          🔖 ⬆



**Rupa Marya, MD** 🔒 @DrRupaMarya · Jan 2

People who hold any supremacist position are not going to be doctors who advance health equity. They are part of and support structures that obstruct it.

💬 1          ⟲ 22          ♡ 57          �📊 25K          🔖 ↻

**Rupa Marya, MD** 🔒 @DrRupaMarya · Jan 2

This may be an important reason why, in spite of 20 years of investment into health equity, we've closed no gaps in health disparities.

No doubt this deserves some research and careful consideration, to understand the structural impediments to excellence in care for all.

💬 1          ⟲ 14          ♡ 47          �📊 28K          🔖

**Rupa Marya, MD** 🔒 @DrRupaMarya · Jan 2

And to be 💯 clear, this holds for ALL supremacist ideologies—including Hindutva, white supremacism, and patriarchy.

The presence of Zionism in US medicine is something everyone is just waking up to. We already know white doctors are negligent with Black newborns.

💬 1          ⟲ 45          ♡ 69          �📊 154K          🔖 ↻

**Rupa Marya, MD** 🔒 @DrRupaMarya · Jan 2

Those babies live more when cared for by Black doctors. We know that women survive heart attacks more with femme doctors. But we haven't looked at these other ideologies and how they may show up in our structures of care.

💬 1          ⟲ 10          ♡ 52          �📊 22K          🔖

Page 3 of 4

 **Rupa Marya, MD** 🔒 @DrRupaMarya · Jan 2    ···

It's not because white male docs are bad people. It's that racism shows up in structures & attitudes that can have real health outcomes for our patients.

When our patients are from groups on the losing end of supremacist directionality, they are in danger in the health system🩹

💬 1          🔁 9          ♡ 50          📊 19K          🔖 ⬆

 **Rupa Marya, MD** 🔒 @DrRupaMarya · Jan 2    ···

This is a critical article to read (and it reads like a spy novella) to understand the reaches of Zionism in US academic medicine. My own institution UCSF is involved through Helen Diller Foundation's funding.



From thenation.com

💬 1          🔁 35          ♡ 78          📊 26K          🔖 ⬆

Page 4 of 4

# EXHIBIT B



| | |
|---|---|
| Document title: | (21) Senator Scott Wiener on X: "The same UCSF professor who promoted the "doctors' plot" — an age old antisemitic conspiracy theory that Jewish doctors are harming patients — is now targeting a 1st year med student for harassment b/c he's Israeli. This professor is creating a toxic, hostile environment at UCSF https://t.co/APyxFcG635" / X |
| Capture URL: | https://x.com/Scott_Wiener/status/1837570677492404558 |
| Page loaded at (UTC): | Mon, 29 Sep 2025 18:05:40 GMT |
| Capture timestamp (UTC): | Mon, 29 Sep 2025 18:07:24 GMT |
| Capture tool: | 10.61.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/138.0.7204.97 Safari/537.36 |
| Operating system: | Linux (Node 22.17.0) |
| PDF length: | 2 |
| Capture ID: | 6qbaE6r4SmvBb8GFoSBh6L |
| Display Name: | noelle.smith |

PDF REFERENCE #:    ejwrWJjtT8azSdSE4SbzU8



# EXHIBIT C

Case 3:25-cv-04716-MMC   Document 55-1   Filed 03/02/26   Page 13 of 52



**Join now**  **Sign in**

🚀
**Top Content**

👥
**People**

📽
**Learning**

💼
**Jobs**

🧩
**Games**

💻
**Get the app**

# University of California, San Francisco's Post

**University of California, San Francisco**
181,411 followers
1y

A tired and familiar racist conspiracy theory has circulated on social media in recent days stating that "Zionist" doctors are a threat to Arab, Palestinian, South Asian, Muslim, and Black patients, as well as the US health system. This sweeping, baseless, and racist generalization must be condemned. Both Jewish and non-Jewish people see the use of the word "Zionist" in this debunked narrative as an antisemitic attack. It is as morally reprehensible as it is intellectually bankrupt, nothing more than a repackaging of an old racist trope that UCSF renounces.

As a health sciences university and health system, we want our patients, clinicians, faculty, learners, and staff to know that UCSF is committed to serving every individual regardless of race, ethnicity, religion, political view, gender, and sexual identity. We will continue to encourage open dialogue, even on the most difficult and painful topics. But we draw the line on those who attack entire groups of people and promote divisiveness and xenophobia, including Islamophobia and, in this instance, antisemitism.

👍😊❤️ 144

👍 Like          💬 Comment          ➤ Share

To view or add a comment, **sign in**



181,411 followers

Page 1 of 2

A tired and familiar racist conspiracy theory has circulated on social media in recent days stating that "Zionist doctors are a threat t...

View Profile        ➕    Connect

## More from this author



**The Cancer Breakthrough Boom**

University of California, San Francisco  ·  2y



**Ask an Expert: A Tobacco-Free World**

University of California, San Francisco  ·  2y

## Explore topics

Sales

Marketing

IT Services

Business Administration

HR Management

Engineering

Soft Skills

See All

© 2025                                     About

Accessibility                              User Agreement

Privacy Policy                            Your California Privacy Choices

Cookie Policy                             Copyright Policy

Brand Policy                              Guest Controls

Community Guidelines                  Language

Page 2 of 2

# EXHIBIT D



| | |
|---|---|
| Document title: | Instagram |
| Capture URL: | https://www.instagram.com/p/C1xxSCZL5Mp/?img_index=1 |
| Page loaded at (UTC): | Mon, 29 Sep 2025 16:59:49 GMT |
| Capture timestamp (UTC): | Mon, 29 Sep 2025 17:07:16 GMT |
| Capture tool: | 10.61.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/138.0.7204.97 Safari/537.36 |
| Operating system: | Linux (Node 22.17.0) |
| PDF length: | 3 |
| Capture ID: | uNz7qPMgJ3nbhF2DkEKji5 |
| Display Name: | noelle.smith |

PDF REFERENCE #:     ahhHY9gbCwZsEGRchTYiTm

Instagram

Home

Search

Explore

Reels

Messages

Notifications

Create

Profile

A tired and familiar racist conspiracy theory has circulated on social media in recent days stating that "Zionist" doctors are a threat to Arab, Palestinian, South Asian, Muslim, and Black patients, as well as the US health system. This sweeping, baseless, and racist generalization must be condemned.

Both Jewish and non-Jewish people see the use of the word "Zionist" in this debunked narrative as an antisemitic attack. It is as morally reprehensible as it is intellectually bankrupt, nothing more than a repackaging of an old racist trope that UCSF renounces.

More

Also from Meta

Messages

Page 2 of 3

Document title: Instagram
Capture URL: https://www.instagram.com/p/C1xxSCZL5Mp/?img_index=1
Capture timestamp (UTC): Mon, 29 Sep 2025 17:02:37 GMT



Document title: Instagram
Capture URL: https://www.instagram.com/p/C1xxSCZL5Mp/?img_index=1
Capture timestamp (UTC): Mon, 29 Sep 2025 17:03:19 GMT

Page 1 of 1

# EXHIBIT E

**Page Vault**

| | |
|---|---|
| Document title: | (21) UC San Francisco on X: "https://t.co/5K2M0KkTpN" / X |
| Capture URL: | https://x.com/UCSF/status/1743785818169250254 |
| Page loaded at (UTC): | Mon, 29 Sep 2025 17:10:40 GMT |
| Capture timestamp (UTC): | Mon, 29 Sep 2025 17:13:03 GMT |
| Capture tool: | 10.61.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/138.0.7204.97 Safari/537.36 |
| Operating system: | Linux (Node 22.17.0) |
| PDF length: | 2 |
| Capture ID: | 4PKTzE2mTL3dprzydXVYS5 |
| Display Name: | noelle.smith |

PDF REFERENCE #:    uYP3EQCLBrAjiwg2teDGzt

X

Home

Explore

Notifications

Messages

Grok

Lists

Bookmarks

Jobs

Communities

Premium

Verified Orgs

Profile

More

**Post**

**UC San Francisco**
@UCSF

conspiracy theory has circulated on social media in recent days stating that "Zionist" doctors are a threat to Arab, Palestinian, South Asian, Muslim, and Black patients, as well as the US health system. This sweeping, baseless, and racist generalization must be condemned.

Both Jewish and non-Jewish people see the use of the word "Zionist" in this debunked narrative as an antisemitic attack. It is as morally reprehensible as it is intellectually bankrupt, nothing more than a repackaging of an old racist trope that UCSF renounces.

As a health sciences university and health system, we want our patients, clinicians, faculty, learners, and staff to know that UCSF is committed to serving every individual regardless of race, ethnicity, religion, political view, gender, and sexual identity.

We will continue to encourage open dialogue, even on the most difficult and painful topics. But we draw the line on those who attack entire groups of people and promote divisiveness and xenophobia, including Islamophobia and, in this instance, antisemitism.

12:05 AM · Jan 7, 2024 · **1.5M** Views

💬          ↻ 648          ♡ 1.4K          🔖 126          ⬆️

@ **Who can reply?**
Accounts @UCSF mentioned can reply

**Relevant people**

**UC San Francisco**    **Follow**
@UCSF
UC San Francisco is the leading university exclusively focused on health. @UCSF on Instagram, Facebook, LinkedIn and YouTube

**What's happening**

**Paris Fashion Week 2025 Womenswear SS26**
LIVE

Politics · Trending
**Mamdani**
152K posts

Sports · Trending
**Don Kelly**
1,095 posts

Entertainment · Trending
**Shelby Oaks**

Trending in United States
**Driscoll**

Show more

Terms of Service | Privacy Policy | Cookie Policy | Accessibility | Ads info | More··· © 2025 X Corp.

**Noelle Smith**
@nos22444

Page 2 of 10



**Messages**

Document title: (21) UC San Francisco on X: &quot;https://t.co/5K2M0KkTpN&quot; / X
Capture URL: https://x.com/UCSF/status/1743785818169250254
Capture timestamp (UTC): Mon, 29 Sep 2025 17:13:03 GMT

Page 1 of 1



| | |
|---|---|
| Document title: | (21) UC San Francisco on X: "https://t.co/5K2M0KkTpN" / X |
| Capture URL: | https://x.com/UCSF/status/1743785818169250254/photo/1 |
| Page loaded at (UTC): | Mon, 29 Sep 2025 17:07:58 GMT |
| Capture timestamp (UTC): | Mon, 29 Sep 2025 17:09:21 GMT |
| Capture tool: | 10.61.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/138.0.7204.97 Safari/537.36 |
| Operating system: | Linux (Node 22.17.0) |
| PDF length: | 2 |
| Capture ID: | 13VRQ7zXShkobTP5NrCRPP |
| Display Name: | noelle.smith |

PDF REFERENCE #:    dz8Q4HpF9Qdzcvxpft27JK



Document title: (21) UC San Francisco on X: &quot;https://t.co/5K2M0KkTpN&quot; / X
Capture URL: https://x.com/UCSF/status/1743785818169250254/photo/1
Capture timestamp (UTC): Mon, 29 Sep 2025 17:09:21 GMT

Page 1 of 1

**Page Vault**

| | |
|---|---|
| Document title: | (21) UC San Francisco on X: "https://t.co/5K2M0KkTpN" / X |
| Capture URL: | https://x.com/UCSF/status/1743785818169250254/photo/2 |
| Page loaded at (UTC): | Mon, 29 Sep 2025 17:08:54 GMT |
| Capture timestamp (UTC): | Mon, 29 Sep 2025 17:09:47 GMT |
| Capture tool: | 10.61.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/138.0.7204.97 Safari/537.36 |
| Operating system: | Linux (Node 22.17.0) |
| PDF length: | 2 |
| Capture ID: | 2EyUPWaMEzUjKxxGPMXRcj |
| Display Name: | noelle.smith |



Document title: (21) UC San Francisco on X: &quot;https://t.co/5K2M0KkTpN&quot; / X
Capture URL: https://x.com/UCSF/status/1743785818169250254/photo/2
Capture timestamp (UTC): Mon, 29 Sep 2025 17:09:47 GMT                                                Page 1 of 1

**Page Vault**

| | |
|---|---|
| Document title: | (21) UC San Francisco on X: "https://t.co/5K2M0KkTpN" / X |
| Capture URL: | https://x.com/UCSF/status/1743785818169250254/photo/3 |
| Page loaded at (UTC): | Mon, 29 Sep 2025 17:09:36 GMT |
| Capture timestamp (UTC): | Mon, 29 Sep 2025 17:10:09 GMT |
| Capture tool: | 10.61.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/138.0.7204.97 Safari/537.36 |
| Operating system: | Linux (Node 22.17.0) |
| PDF length: | 2 |
| Capture ID: | dh5LMbF1wEyYQW33jq4gcw |
| Display Name: | noelle.smith |

PDF REFERENCE #:    cJGdg2ZiJERLWCsBznXg3Z



Document title: (21) UC San Francisco on X: &quot;https://t.co/5K2M0KkTpN&quot; / X
Capture URL: https://x.com/UCSF/status/1743785818169250254/photo/3
Capture timestamp (UTC): Mon, 29 Sep 2025 17:10:09 GMT                                    Page 1 of 1



| | |
|---|---|
| Document title: | (21) UC San Francisco on X: "https://t.co/5K2M0KkTpN" / X |
| Capture URL: | https://x.com/UCSF/status/1743785818169250254/photo/4 |
| Page loaded at (UTC): | Mon, 29 Sep 2025 17:09:56 GMT |
| Capture timestamp (UTC): | Mon, 29 Sep 2025 17:10:52 GMT |
| Capture tool: | 10.61.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/138.0.7204.97 Safari/537.36 |
| Operating system: | Linux (Node 22.17.0) |
| PDF length: | 2 |
| Capture ID: | qAX17rjAg7GKAZLMSrvk6J |
| Display Name: | noelle.smith |

PDF REFERENCE #:    r9uQPStc4YBivNdp48N36N

UC San Francisco
@UCSF

12:05 AM · Jan 7, 2024 · **1.5M** Views

648    1.4K    126

Who can reply?
Accounts @UCSF mentioned can reply



Document title: (21) UC San Francisco on X: &quot;https://t.co/5K2M0KkTpN&quot; / X
Capture URL: https://x.com/UCSF/status/1743785818169250254/photo/4
Capture timestamp (UTC): Mon, 29 Sep 2025 17:10:52 GMT

Page 1 of 1

# EXHIBIT F



**University of California
San Francisco**

**Sam Hawgood, MBBS**
Chancellor
Arthur and Toni Rembe Rock
  Distinguished Professor

Office of the Chancellor
UCSF Box 0402
550 16th Street, Room 7107
San Francisco, CA 94143

tel: 415.476.6582
Sam.Hawgood@ucsf.edu

www.ucsf.edu

**IN STRICT CONFIDENCE
TO BE OPENED BY ADDRESSEE ONLY**

<span style="color:red">**NOTICE OF INTENT TO IMPOSE DISCIPLINE**</span>

April 28, 2025

*Sent via USPS to:*

RUPA MARYA, MD

██████████████

*Sent via email to:* rupa.marya@ucsf.edu, ████████████

In fulfilling my responsibility to determine whether you have violated the Faculty Code of Conduct, which would warrant the imposition of discipline, I reviewed the report of the *Ad Hoc* Committee which investigated allegations of misconduct on your part, as well as your response to that report.

**_Ad Hoc_ Committee Findings:**

In concluding that there is probable cause to believe that you have violated the Faculty Code of Conduct, the *Ad Hoc* Committee made the following findings.

*Dr. Marya violated the standards described in the Faculty Code of Conduct in her September 21, 2024 post on X.com.*

As described in the Committee's report:

> Per several witnesses interviewed by the Committee, this post on social media created an atmosphere of disruption and fear in the School of Medicine, specifically in the first-year class. Several witnesses, including Student 1 and 2, told the Committee that this statement led many Jewish students to feel marginalized and unsafe. Students were made vulnerable to speculation as to whether they were the person who was being named in the X post.

Further, the Committee detailed the consequences of this post:

> The administration had to go into crisis management mode to address the fear and anxiety among students. The administration met with the first-year class to discuss how to address the significant impact, including having support sessions for individual students and organizing additional programing to address disruptions. These efforts included additional office hours, restorative justice groups, and meetings with student leaders. Additionally, student leadership felt it was important to make all students feel welcome on campus and issued a letter condemning Dr. Marya's statement and avowing support for all their fellow students of all nationalities. These efforts to lessen the hostile environment created by Dr. Marya's statement took away valuable time from students, faculty and staff to advance learning and teaching which constitute valuable work of the University and one of its core missions.



Page two

As to the Faculty Code of Conduct, the Committee found this post "significantly impaired a central function of the University as it caused many disruptions to the learning environment and the functionality of the UCSF Medical School," and that "a preponderance of the evidence establishes probable cause that Dr. Marya violated the Ethical Principle as stated in APM 015 Part II, Section A of the Faculty Code of Conduct, and significantly impaired a central function of the University when she posted on social media about a first year UCSF medical student."

*Regarding conduct towards colleagues, the Committee found:*

> …once Dr. Marya disagrees with a colleague over a political or personal opinion, she does not hesitate to call them out publicly, in derogatory terms, misrepresenting their positions and exposing them to the rebuke of her followers on social media (of which she has 27,000 on X and 2,000 on Substack). This is not living up to the standards of the Faculty Code of Conduct which states, "In the exchange of criticism and ideas professors show due respect for the opinions of others.

Here the Committee found: "a preponderance of the evidence establishes probable cause that Dr. Marya engaged in the conduct addressed [in the paragraph] above and that this conduct violated APM 015 Part II, Section D of the Faculty Code of Conduct and significantly impaired a central function of the University."

*Regarding harassment of students, colleagues and members of the University Community:*

> Many Jewish UCSF physician colleagues of Dr. Marya felt singled out and harassed based on their background (ethnicity, nationality, religion or shared ancestry) by these statements, which did not objectively or individually judge their competence as physicians, and which had the clear potential effect of undermining patients' confidence in receiving competent care from these UCSF physicians based only on suspicion due to the protected characteristics described in the Faculty Code of Conduct. UCSF also received many complaints from other physicians outside of UCSF who expressed similar complaints that a UCSF physician colleague would engage in broad questioning of other physicians' competency based only on their perceived association with Zionism" through their religion, shared ancestry or nationality.

Here the Committee found: "a preponderance of the evidence establishes probable cause that Dr. Marya engaged in harassment of students, colleagues and members of the University community, as prohibited by APM 015 Part II, Sections A, C, and D of the Faculty Code of Conduct."

*Regarding the UCSF Violence and Bullying Policy:*

"Several UCSF community members stated that they felt Dr. Marya's statements were derogatory, insulting and belittling, and the Committee finds that a reasonable person would agree with this assessment."

The Committee analyzed "Dr. Marya's tweets in the aggregate as a 'pattern of behavior over time' with the intent or effect of intimidating, degrading, excluding, or mischaracterizing those colleagues whose opinions differed from hers from speaking or acting."

Here, the Committee found: "a preponderance of the evidence establishes probable cause that Dr. Marya engaged in the conduct addressed [in the paragraphs] above and that this conduct violated the UCSF Violence and Bullying Policy." Further, "the Committee also finds that this violation was a serious violation of this policy, and therefore there is probable cause that Dr. Marya violated APM 015, Part II Section C-8 of the Faculty Code of Conduct."

*Regarding the UCSF Social Media and Electronic Communications Policies:*

The Committee found that your social media activity did not respect the consent or confidentiality of your colleagues, and concluded that: "a preponderance of the evidence establishes probable cause that Dr. Marya...violated the UCSF Social Media Policy" and that "this violation was a serious violation of this policy, and therefore there is probable cause that Dr. Marya violated APM 015, Part II Section C-8 of the Faculty Code of Conduct."

Rupa Marya, MD
April 28, 2025
Page three

In addition: "the Committee finds that a preponderance of the evidence establishes probable cause that Dr. Marya…violated the UCSF Electronic Communications Policy" and that "this violation was a serious violation of this policy, and therefore there is probable cause that Dr. Marya violated APM 015, Part II Section C-8 of the Faculty Code of Conduct."

*Regarding Regents Policy 1111:*

The Committee found that you published a confidential complaint, thereby "failing to act protect private records" and "failing to act in a responsible manner."

The Committee found: "that a preponderance of the evidence establishes probable cause that Dr. Marya…violated the Regents Policy 1111" and that "this violation was a serious violation of this policy, and therefore there is probable cause that Dr. Marya violated APM 015, Part II Section C-8 of the Faculty Code of Conduct."

**<u>Opportunity to Respond in Writing:</u>**

You received a copy of the Committee's report on April 4, 2025, and provided a written response prepared by your counsel on April 22, 2025. I have reviewed and considered your response in considering whether to accept the Committee's recommendations. In your response to the investigation report you discussed your inability to respond due to redactions to certain materials included in the exhibits. Your response did not substantively address many of the findings made by the Committee.

**<u>*Ad Hoc* Committee's Recommendation:</u>**

The Committee recommended discipline in the form of Dismissal and a 10-year Letter of Censure.

**<u>Disciplinary Proposal:</u>**

I accept the *Ad Hoc* Committee's findings that a preponderance of the evidence establishes probable cause that your conduct violated the Faculty Code of Conduct. In addition, I accept that this finding of probable cause constitutes good cause under APM 150.

In considering the nature and seriousness of the misconduct and the types of discipline described in APM 150, the *Ad Hoc* Committee's report and recommendations, your response to the *Ad Hoc* Committee's report, and the recommendation of Vice Provost Brian Alldredge, I propose the following discipline:

- 10-year Letter of Censure
- Dismissal

As a reminder, retaliation or intimidation may constitute misconduct, and this can lead to sanctions for the person who retaliates or intimidates someone in connection with an investigation. Given the specific nature of the findings and your conduct on social media with regard to postings about individuals, we want to emphasize that such actions toward individuals who made complaints or participated in this investigation will be regarded as retaliation.

Please note that the Letter of Censure will become a part of any Advance packet for any academic action during the period for which the discipline is imposed, and will be available to all appropriate reviewers, including all faculty eligible to vote on an action, merit and promotion committees, and all campus reviewers. References to this discipline letter, such as in the Chair's letter of departmental recommendation, will remain in your file permanently but will not be available for review for any future academic actions.

In accordance with the UCSF Procedure for Investigation of Faculty Misconduct and the Administration of Discipline (Investigation Procedure), you have 15 business days from the date of the transmittal of this notice of Intent to Impose Discipline letter, unless an extension is requested and granted, to notify the Vice Provost, in writing, whether you accept the proposed sanction. All extension requests must be: (1) made in writing, (2) supported by good cause, and (3) submitted to the Vice Provost before the deadline.

Rupa Marya, MD
April 28, 2025
Page four

Under the Investigation Procedure, failure to respond by the deadline is deemed to be an acceptance of the proposed findings and sanctions, see Investigation Procedure, Section V.B.1. If you do not respond, or if you accept the findings and proposed sanctions, I will then send you a formal Discipline Letter imposing the proposed sanctions.

If you decline to accept the findings and proposed sanction of dismissal, you may file a grievance under APM 140, or you may request a hearing before the properly constituted advisory committee of the Academic Senate as provided by Regents Bylaw 40.3(c). Pursuant to APM 150-40, you may select only one of these grievance review mechanisms for this sanction.

If you decline to accept the findings and proposed sanction with regard to the Letter of Censure, you may also file a grievance under APM 140 as to that proposed discipline.

Any questions that you may have concerning relevant University policies and procedures may be directed to Academic Employee Relations Specialist Sara Stillwell at Sara.Stillwell@ucsf.edu.

Sam Hawgood

Sam Hawgood, MBBS
Chancellor


cc:  Executive Vice Provost Lucey
     Vice Provost Alldredge
     Dean Talmadge King
     Chair Robert Wachter
     Assistant Vice Provost Light

Page 4 of 4

# EXHIBIT G



**Medical Board of California**
# Health Facility/Peer Review Reporting Form
**Required by Section 805 of the California Business & Professions Code**

**Enforcement Program**
2005 Evergreen Street, Suite 1200
Sacramento, CA 95815-5401
Phone: (916) 263-2528
Fax: (916) 263-2435
805reporting@mbc.ca.gov

**NOTE:** Certain actions, with respect to staff privileges, membership or employment of physicians, podiatrists, and licensed midwives must be reported to the Medical Board of California when they are imposed or voluntarily accepted for a medical disciplinary cause or reason. Reports on osteopathic physicians, physician assistants, dentists and psychologists should be directed to their respective Boards. Please see the reverse/second page of this form for further information.

## REPORTING ENTITY (Check One)

[✓] A medical or professional staff of any health care facility or clinic licensed under Division 2 (commencing with Section 1200) of the Health and Safety Code or of a facility certified to participate in the federal Medicare program as an ambulatory surgical center – §805(a)(1)(B)(i)

[ ] A health care service plan licensed under Chapter 2.2 (commencing with Section 1340) of the Health and Safety Code or a disability insurer that contracts with licentiates to provide services at alternative rates of payment pursuant to Section 10133 of the Insurance Code – §805(a)(1)(B)(ii)

[ ] Any medical, midwifery or podiatric professional society having as members at least 25 percent of the eligible licentiates in the area in which it functions (which must include at least one county), which is not organized for profit and which has been determined to be exempt from taxes pursuant to Section 23701 of the Revenue and Taxation Code – §805(a)(1)(B)(iii)

[ ] A committee organized by any entity consisting of or employing more than 25 licentiates of the same class that functions for the purpose of reviewing the quality of professional care provided by members or employees of that entity – §805(a)(1)(B)(iv)

| Name of Entity | Telephone Number |
|---|---|
| *UCSF Health* | *(415) 476-1000* |

| Chief Executive Officer/Medical Director/Administrator | Chief of Medical Staff |
|---|---|
| *Suresh Gunasekaran, President & CEO* | *Lee Atkinson-McEvoy, MD* |

| Name of person preparing report | Telephone Number | Email Address |
|---|---|---|
| *Kosal Bo* | *(415) 244-8677* | *kosal.bo@ucsf.edu* |

| Street address | City | State | Zip Code |
|---|---|---|---|
| *1800 Owens Street* | *San Francisco* | *CA* | *94153* |

## LICENTIATE (Check One)

[✓] Physician      [ ] Podiatrist      [ ] Licensed Midwife

| Name | License Number |
|---|---|
| *Rupa Marya, MD* | *A87992* |

Medical Board of California    State of California | Business, Consumer Services, and Housing Agency | Department of Consumer Affairs    ENF-805 (Rev 06/25)

**ACTION TAKEN** CHECK HERE IF THIS IS A SUPPLEMENTAL REPORT ☐

**Date(s) of Action(s) and Duration (attach additional sheets if necessary)**
- *Suspension of employment – 9/22/2024, indefinite*
- *Termination of employment – 5/20/2025, permanent*
- *Automatic resignation from Medical Staff – 11/20/2025, permanent*

## Type(s) of Action(s) (Check all that apply)

**(a)  For a medical disciplinary cause or reason:**

☐ Denial/rejection of application for staff privileges        ☐ Termination or revocation of membership

☐ Denial/rejection of application for membership        ☑ Termination or revocation of employment

☐ Termination or revocation of staff privileges

**(b) For a cumulative total of 30 days or more for any 12-month period, and for a medical disciplinary cause or reason:**

☐ Restriction(s) imposed on staff privileges        ☐ Restriction(s) voluntarily accepted on staff privileges

☐ Restriction(s) imposed on membership        ☐ Restriction(s) voluntarily accepted on membership

☐ Restriction(s) imposed on employment        ☐ Restriction(s) voluntarily accepted on employment

**If staff privileges were restricted, list specific restrictions imposed or voluntarily accepted (attach additional sheets if necessary):**

**(c) Following notice of an impending investigation based on information indicating medical disciplinary cause or reason:**

☐ Licentiate resigned staff privileges        ☐ Licentiate took leave of absence from staff privileges

☐ Licentiate resigned from membership        ☐ Licentiate took leave of absence from membership

☐ Licentiate resigned from employment        ☐ Licentiate took leave of absence from employment

☐ Licentiate withdrew or abandoned their application for staff privileges or membership

☐ Licentiate withdrew or abandoned their request for renewal of staff privileges or membership

**(d) For a summary suspension that remains in effect for a period in excess of 14 days for a medical disciplinary cause or reason**

☐ Imposition of summary suspension on staff privileges        ☐ Imposition of summary suspension on membership

☑ Imposition of summary suspension on employment

## Description of Action

Attach additional sheet(s) describing the facts and circumstances of the medical disciplinary cause or reason and any other relevant information related to the action taken, including, but not limited to, the number of cases reviewed, time frame covered, any patient deaths involved, any malpractice filings as a result of the physician's, podiatrist's, or midwife's actions, any expert/peer opinions obtained, etc.

| | |
|---|---|
| _(signature)_  12/05/25 | _(signature)_  12/05/25 |
| Signature                          Date | Signature                          Date |
| Chief Executive Officer/Medical Director/Administrator | Chief of Medical Staff |

## ADDITIONAL INFORMATION

To complete this form, for definition of terms, when, how, and who should report, please refer to Section 805 of the California Business and Professions Code.  You may access this information via https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?sectionNum=805.&lawCode=BPC under California Law, Business and Professions Code.

**PLEASE NOTE:**   Section 805(k) of the California Business and Professions Code states: "A willful failure to file an 805 report by any person who is designated or otherwise required by law to file an 805 report is punishable by a fine not to exceed one hundred thousand dollars ($100,000) per violation.  The fine may be imposed in any civil or administrative action or proceeding brought by or on behalf of any agency having regulatory jurisdiction over the person regarding whom the report was or should have been filed.  If the person who is designated or otherwise required to file an 805 report is a licensed physician and surgeon, the action or proceeding shall be brought by the Medical Board of California.  The fine shall be paid to that agency but not expended until appropriated by the Legislature.  A violation of this subdivision may constitute unprofessional conduct by the licentiate.  A person who is alleged to have violated this subdivision may assert any defense available at law.  As used in this subdivision, 'willful' means a voluntary and intentional violation of a known legal duty."

Section 805(l) of the California Business and Professions Code states: "Except as otherwise provided in subdivision (k), any failure by the administrator of any peer review body, the chief executive officer or administrator of any health care facility, or any person who is designated or otherwise required by law to file an 805 report, shall be punishable by a fine that, under no circumstances shall exceed fifty thousand dollars ($50,000) per violation.  The fine may be imposed in any civil or administrative action or proceeding brought by or on behalf of any agency having regulatory jurisdiction over the person regarding whom the report was or should have been filed.  If the person who is designated or otherwise required to file an 805 report is a licensed physician and surgeon, the action or proceeding shall be brought by the Medical Board of California.  The fine shall be paid to that agency but not expended until appropriated by the Legislature.  The amount of the fine imposed, not exceeding fifty thousand dollars ($50,000) per violation, shall be proportional to the severity of the failure to report and shall differ based upon written findings, including whether the failure to file caused harm to a patient or created a risk to patient safety; whether the administrator of any peer review body, the chief executive officer or administrator of any health care facility, or any person who is designated or otherwise required by law to file an 805 report exercised due diligence despite the failure to file or whether they knew or should have known that an 805 report would not be filed; and whether there has been a prior failure to file an 805 report.  The amount of the fine imposed may also differ based on whether a health care facility is a small or rural hospital as defined in Section 124840 of the Health and Safety Code."

Section 805(m) of the California Business and Professions Code states: "A health care service plan registered under Chapter 2.2 (commencing with Section 1340) of Division 2 of the Health and Safety Code or a disability insurer that negotiates and enters into a contract with licentiates to provide services at alternative rates of payment pursuant to Section 10133 of the Insurance Code, when determining participation with the plan or insurer, shall evaluate, on a case-by-case basis, licentiates who are the subject of an 805 report, and not automatically exclude or deselect these licentiates."

### CONFIDENTIALITY

This report is not a waiver of the confidentiality of medical records and committee reports.  The contents of this report may be viewed only by those persons specified in Section 800(c) of the Business and Professions Code, except as required by Section 805.5 of the Business and Professions Code.

### COPY TO LICENTIATE

A copy of the 805 report, with a cover letter informing the Licentiate of his or her right to submit additional statements or other information pursuant to Section 800(c) of the Business and Professions Code, must be sent by the reporting entity to the Licentiate.

### SUPPLEMENTAL REPORT

A supplemental report must be made within thirty (30) days following the date the Licentiate is deemed to have satisfied any terms, conditions, or sanctions imposed as corrective action by the reporting entity.

**ATTACHMENT TO 805 REPORT REGARDING RUPA MARYA, MD**

On September 22, 2024, UCSF placed Dr. Rupa Marya on paid administrative leave pending investigation by the campus of allegations of unprofessional conduct. That campus investigation resulted in Dr. Marya's separation from University employment on May 20, 2025. As of that date, Dr. Marya was no longer covered by the University's insurance policies. Since then, Dr. Marya has failed to provide proof of other insurance, which resulted in an automatic resignation (not for a medical disciplinary cause or reason) effective November 20, 2025. In the interim, however, the Medical Staff had initiated its own investigation. That process was not complete at the time of the automatic resignation.

22398371.1

# EXHIBIT H

GENERAL UNIVERSITY POLICY                                           APM - 015
REGARDING ACADEMIC APPOINTEES
The Faculty Code of Conduct

**General University Policy Regarding Academic Appointees: APM - 015 - The Faculty Code of Conduct**

This policy is the Faculty Code of Conduct as approved by the Assembly of the Academic Senate on June 15, 1971, and amended by the Assembly on May 30, 1974, and with amendments approved by the Assembly on March 9, 1983, May 6, 1986, May 7, 1992, October 31, 2001, May 28, 2003, June 12, 2013, February 8, 2017, and January 15, 2026, and by The Regents on July 18, 1986, May 15, 1987, June 19, 1992, November 15, 2001, July 17, 2003, July 18, 2013, March 15, 2017, and January 21, 2026. In addition, technical changes were made September 1, 1988, June 11, 2010, and September 23, 2020.

Additional policies regarding the scope and application of the Faculty Code of Conduct and the University's policies on faculty conduct and the administration of discipline are set forth in APM - 016, the University Policy on Faculty Conduct and the Administration of Discipline.

**The Faculty Code of Conduct as Approved
by the Assembly of the Academic Senate**

(Code of Professional Rights, Responsibilities,
and Conduct of University Faculty, and
University Disciplinary Procedures)

**Preamble**

The University seeks to provide and sustain an environment conducive to sharing, extending, and critically examining knowledge and values, and to furthering the search for wisdom. Effective performance of these central functions requires that faculty members be free within their respective fields of competence to pursue and teach the truth in accord with appropriate standards of scholarly inquiry.

The faculty's privileges and protections, including that of tenure, rest on the mutually supportive relationships between the faculty's special professional competence, its academic freedom, and the central functions of the University. These relationships are also the source of the professional responsibilities of faculty members.

It is the intent of the Faculty Code of Conduct to protect academic freedom, to help preserve the highest standards of teaching and scholarship, and to advance the mission of the University as an institution of higher learning.

Part I of this Code sets forth the responsibility of the University to maintain conditions and rights supportive of the faculty's pursuit of the University's central functions.

Part II of this Code elaborates standards of professional conduct, derived from general professional consensus about the existence of certain precepts as basic to acceptable faculty behavior. Conduct which

Rev. 1/29/2026                                                        Page 1

GENERAL UNIVERSITY POLICY                                                    APM - 015
REGARDING ACADEMIC APPOINTEES
The Faculty Code of Conduct

departs from these precepts is viewed by faculty as unacceptable because it is inconsistent with the mission of the University. The articulation of types of unacceptable faculty conduct is appropriate both to verify that a consensus about minimally acceptable standards in fact does exist and to give fair notice to all that departures from these minimal standards may give rise to disciplinary proceedings.

In Part II a clear distinction is made between statements of (1) ethical principles and (2) types of unacceptable behavior.

1.  **Ethical Principles**

    These are drawn primarily from the 1966 *Statement on Professional Ethics* and subsequent revisions of June 1987, issued by the American Association of University Professors. They comprise ethical prescriptions affirming the highest professional ideals. They are aspirational in character and represent objectives toward which faculty members should strive. Behavior in accordance with these principles clearly precludes the application of a disciplinary sanction. These Ethical Principles are to be distinguished from *Types of Unacceptable Faculty Conduct* referred to in the following paragraph. The *Types of Unacceptable Faculty Conduct*, unlike the Ethical Principles, are mandatory in character, and state minimum levels of conduct below which a faculty member cannot fall without being subject to University discipline.

2.  **Types of Unacceptable Faculty Conduct**

    Derived from the Ethical Principles, these statements specify examples of types of unacceptable faculty behavior which are subject to University discipline because, as stated in the introductory section to Part II, they are "not justified by the Ethical Principles" and they "significantly impair the University's central functions as set forth in the Preamble."

The Ethical Principles encompass major concerns traditionally and currently important to the profession. The examples of types of unacceptable faculty conduct set forth below are not exhaustive. It is expected that case adjudication, the lessons of experience and evolving standards of the profession will promote reasoned adaptation and change of this Code. Faculty may be subjected to disciplinary action under this Code for any type of conduct which, although not specifically enumerated herein, meets the standard for unacceptable faculty behavior set forth above. It should be noted, however, that no provision of the Code shall be construed as providing the basis for judging the propriety or impropriety of collective withholding of services by faculty. Rules and sanctions that presently exist to cover such actions derive from sources external to this Code.

Part III of this Code deals with the enforcement process applicable to unacceptable faculty behavior. That process must meet basic standards of fairness and must reflect significant faculty involvement. In order to guide each campus in the development of disciplinary procedures that comply with this policy and Senate Bylaws, Part III provides an outline of mandatory principles to which each Division must adhere and discretionary principles which are strongly recommended.

Rev. 1/29/2026                                                              Page 2

GENERAL UNIVERSITY POLICY                                          APM - 015
REGARDING ACADEMIC APPOINTEES
The Faculty Code of Conduct

### Part I – Professional Rights of Faculty

In support of the University's central functions as an institution of higher learning, a major responsibility of the administration is to protect and encourage the faculty in its teaching, learning, research, and public service. The authority to discipline faculty members in appropriate cases derives from the shared recognition by the faculty and the administration that the purpose of discipline is to preserve conditions hospitable to these pursuits. Such conditions, as they relate to the faculty, include, for example:

1. free inquiry, and exchange of ideas;

2. the right to present controversial material relevant to a course of instruction;

3. enjoyment of constitutionally protected freedom of expression;

4. freedom to address any matter of institutional policy or action when acting as a member of the faculty whether or not as a member of an agency of institutional governance;

5. participation in the governance of the University, as provided in the Bylaws and Standing Orders of The Regents and the regulations of the University, including

   (a) approval of course content and manner of instruction,

   (b) establishment of requirements for matriculation and for degrees,

   (c) appointment and promotion of faculty,

   (d) selection of chairs of departments and certain academic administrators,

   (e) discipline of members of the faculty, and the formulation of rules and procedures for discipline of students,

   (f) establishment of norms for teaching responsibilities and for evaluation of both faculty and student achievement, and

   (g) determination of the forms of departmental governance;

6. the right to be judged by one's colleagues, in accordance with fair procedures and due process, in matters of promotion, tenure, and discipline, solely on the basis of the faculty members' professional qualifications and professional conduct.

### Part II – Professional Responsibilities, Ethical Principles, and Unacceptable Faculty Conduct

This listing of faculty responsibilities, ethical principles, and types of unacceptable behavior is organized around the individual faculty member's relation to teaching and students, to scholarship, to the University,

Rev. 1/29/2026                                                        Page 3

GENERAL UNIVERSITY POLICY                                                APM - 015
REGARDING ACADEMIC APPOINTEES
The Faculty Code of Conduct

to colleagues, and to the community. Since University discipline, as distinguished from other forms of reproval or administrative actions, should be reserved for faculty misconduct that is either serious in itself or is made serious through its repetition, or its consequences, the following general principle is intended to govern all instances of its application:

> University discipline under this Code may be imposed on a faculty member only for conduct which is not justified by the ethical principles and which significantly impairs the University's central functions as set forth in the Preamble. To the extent that violations of University policies mentioned in the examples below are not also inconsistent with the ethical principles, these policy violations may not be independent grounds for imposing discipline as defined herein. The *Types of Unacceptable Conduct* listed below in Sections A through E are examples of types of conduct which meet the preceding standards and hence are presumptively subject to University discipline. Other types of serious misconduct, not specifically enumerated herein, may nonetheless be the basis for disciplinary action if they also meet the preceding standards.

A.  **Teaching and Students**

**Ethical Principles**. "As teachers, the professors encourage the free pursuit of learning of their students. They hold before them the best scholarly standards of their discipline. Professors demonstrate respect for students as individuals and adhere to their proper roles as intellectual guides and counselors. Professors make every reasonable effort to foster honest academic conduct and to assure that their evaluations of students reflect each student's true merit. They respect the confidential nature of the relationship between professor and student. They avoid any exploitation, harassment, or discriminatory treatment of students. They acknowledge significant academic or scholarly assistance from them. They protect their academic freedom." (AAUP Statement, 1966; Revised, 1987)

The integrity of the faculty-student relationship is the foundation of the University's educational mission. This relationship vests considerable trust in the faculty member, who, in turn, bears authority and accountability as mentor, educator, and evaluator. The unequal institutional power inherent in this relationship heightens the vulnerability of the student and the potential for coercion. The pedagogical relationship between faculty member and student must be protected from influences or activities that can interfere with learning consistent with the goals and ideals of the University. Whenever a faculty member is responsible for academic supervision of a student, a personal relationship between them of a romantic or sexual nature, even if consensual, is inappropriate. Any such relationship jeopardizes the integrity of the educational process.

In this section, the term student refers to all individuals under the academic supervision of faculty.

Rev. 1/29/2026                                                          Page 4

GENERAL UNIVERSITY POLICY                                    APM - 015
REGARDING ACADEMIC APPOINTEES
The Faculty Code of Conduct

**Types of unacceptable conduct:**

1.  Failure to meet the responsibilities of instruction, including:

    (a)  arbitrary denial of access to instruction;

    (b)  significant intrusion of material unrelated to the course;

    (c)  significant failure to adhere, without legitimate reason, to the rules of the faculty in the conduct of courses, to meet class, to keep office hours, or to hold examinations as scheduled;

    (d)  evaluation of student work by criteria not directly reflective of course performance;

    (e)  undue and unexcused delay in evaluating student work.

2.  Discrimination, including harassment, against a student on political grounds, or for reasons of race, color, religion, sex, sexual orientation, gender, gender expression, gender identity, ethnic origin, national origin, ancestry, marital status, pregnancy, physical or mental disability, medical condition (cancer-related or genetic characteristics), genetic information (including family medical history), or service in the uniformed services as defined by the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA), as well as state military and naval service, or, within the limits imposed by law or University regulations, because of age or citizenship or for other arbitrary or personal reasons.

3.  Sexual violence and sexual harassment, as defined by University policy, of a student.

4.  Violation of the University policy, including the pertinent guidelines, applying to nondiscrimination against students on the basis of disability.

5.  Use of the position or powers of a faculty member to coerce the judgment or conscience of a student or to cause harm to a student for arbitrary or personal reasons.

6.  Participating in or deliberately abetting disruption, interference, or intimidation in the classroom.

7.  Entering into a romantic or sexual relationship with any student for whom a faculty member has, or should reasonably expect to have in the future[1], academic responsibility (instructional, evaluative, or supervisory).

---

[1] A faculty member should reasonably expect to have in the future academic responsibility (instructional, evaluative, or supervisory) for (1) students whose academic program will require them to enroll in a course taught by the faculty member, (2) students known to the faculty member to have an interest in an academic area within the faculty

Rev. 1/29/2026                                                        Page 5

GENERAL UNIVERSITY POLICY                                              APM - 015
REGARDING ACADEMIC APPOINTEES
The Faculty Code of Conduct

8. Exercising academic responsibility (instructional, evaluative, or supervisory) for any student with whom a faculty member has a romantic or sexual relationship.

B. **Scholarship**

**Ethical Principles**. "Professors, guided by a deep conviction of the worth and dignity of the advancement of knowledge, recognize the special responsibilities placed upon them. Their primary responsibility to their subject is to seek and to state the truth as they see it. To this end professors devote their energies to developing and improving their scholarly competence. They accept the obligation to exercise critical self-discipline and judgment in using, extending, and transmitting knowledge. They practice intellectual honesty. Although professors may follow subsidiary interests, these interests must never seriously hamper or compromise their freedom of inquiry." (AAUP Statement, 1966; Revised, 1987)

**Types of unacceptable conduct:**

Violation of canons of intellectual honesty, such as research misconduct and/or intentional misappropriation of the writings, research, and findings of others.

C. **The University**

**Ethical Principles**. "As a member of an academic institution, professors seek above all to be effective teachers and scholars. Although professors observe the stated regulations of the institution, provided the regulations do not contravene academic freedom, they maintain their right to criticize and seek revision. Professors give due regard to their paramount responsibilities within their institution in determining the amount and character of the work done outside it. When considering the interruption or termination of their service, professors recognize the effect of their decision upon the program of the institution and give due notice of their intentions." (AAUP Statement, 1966; Revised, 1987)

**Types of unacceptable conduct:**

1. Intentional disruption of functions or activities sponsored or authorized by the University.

---

member's academic expertise, or (3) any student for whom a faculty member must have academic responsibility (instructional, evaluative, or supervisory) in the pursuit of a degree.

Rev. 1/29/2026                                                          Page 6

GENERAL UNIVERSITY POLICY                                              APM - 015
REGARDING ACADEMIC APPOINTEES
The Faculty Code of Conduct

2. Incitement of others to disobey University rules when such incitement constitutes a clear and present danger that violence or abuse against persons or property will occur or that the University's central functions will be significantly impaired.

3. Unauthorized use of University resources or facilities on a significant scale for personal, commercial, political, or religious purposes.

4. Forcible detention, threats of physical harm to, or harassment of another member of the University community, that interferes with that person's performance of University activities.

5. Discrimination, including harassment, against University employees or individuals seeking employment; providing services pursuant to a contract; or applying for or engaged in an unpaid internship, volunteer capacity, or training program leading to employment on political grounds, or for reasons of race, color, religion, sex, sexual orientation, gender, gender expression, gender identity, ethnic origin, national origin, ancestry, marital status, pregnancy, physical or mental disability, medical condition (cancer-related or genetic characteristics), genetic information (including family medical history), or service in the uniformed services as defined by the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA), as well as state military and naval service, or, within the limits imposed by law or University regulations, because of age or citizenship or for other arbitrary or personal reasons.

6. Sexual violence and sexual harassment, as defined by University policy, of another member of the University community.

7. Violation of the University policy, including the pertinent guidelines, applying to nondiscrimination against employees on the basis of disability.

8. Serious violation of University policies governing the professional conduct of faculty, including but not limited to policies applying to research, outside professional activities, conflicts of commitment, clinical practices, violence in the workplace, and whistleblower protections.

D. **Colleagues**

**Ethical Principles**. "As colleagues, professors have obligations that derive from common membership in the community of scholars. Professors do not discriminate against or harass colleagues. They respect and defend the free inquiry of associates. In the exchange of criticism and ideas professors show due respect for the opinions of others. Professors acknowledge academic debts and strive to be objective in their professional judgment of colleagues. Professors accept their share of faculty responsibilities for the governance of their institution." (AAUP Statement, 1966; Revised, 1987)

GENERAL UNIVERSITY POLICY                                    APM - 015
REGARDING ACADEMIC APPOINTEES
The Faculty Code of Conduct

**Types of unacceptable conduct:**

1. Making evaluations of the professional competence of faculty members by criteria not directly reflective of professional performance.

2. Discrimination, including harassment, against faculty on political grounds, or for reasons of race, color, religion, sex, sexual orientation, gender, gender expression, gender identity, ethnic origin, national origin, ancestry, marital status, pregnancy, physical or mental disability, medical condition (cancer- related or genetic characteristics), genetic information (including family medical history), or service in the uniformed services as defined by the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA), as well as state military and naval service, or, within the limits imposed by law or University regulations, because of age or citizenship or for other arbitrary or personal reasons.

3. Sexual violence and sexual harassment, as defined by University policy, of another member of the University community.

4. Violation of the University policy, including the pertinent guidelines, applying to nondiscrimination against faculty on the basis of disability.

5. Breach of established rules governing confidentiality in personnel procedures.

E. **The Community**

**Ethical Principles**. "Faculty members have the same rights and obligations as all citizens. They are as free as other citizens to express their views and to participate in the political processes of the community. When they act or speak in their personal and private capacities, they should avoid deliberately creating the impression that they represent the University." (U.C. Academic Council Statement, 1971)

**Types of unacceptable conduct:**

1. Intentional misrepresentation of personal views as a statement of position of the University or any of its agencies. (An institutional affiliation appended to a faculty member's name in a public statement or appearance is permissible, if used solely for purposes of identification.)

2. Commission of a criminal act which has led to conviction in a court of law and which clearly demonstrates unfitness to continue as a member of the faculty.

Rev. 1/29/2026                                              Page 8

GENERAL UNIVERSITY POLICY                                      APM - 015
REGARDING ACADEMIC APPOINTEES
The Faculty Code of Conduct

### Part III – Enforcement and Sanctions

The Assembly of the Academic Senate recommends that each Division, in cooperation with the campus administration, develop and periodically re-examine procedures dealing with the investigation of allegations of faculty misconduct and the conduct of disciplinary proceedings.

Procedures shall be consistent with the Bylaws of the Academic Senate. Each Division should duly notify the University Committee on Rules and Jurisdiction and the University Committee on Privilege and Tenure of the procedures it has adopted and any subsequent changes therein. These Committees in turn are directed to report periodically to the Assembly of the Academic Senate on procedures adopted by the Divisions and to recommend to the Assembly such action as they deem appropriate for assuring compliance with the Bylaws of the Academic Senate or the promotion of uniformity among Divisions to the extent to which it appears necessary and desirable.

A.  In the development of disciplinary procedures, each Division must adhere to the following principles:

1.  No disciplinary sanction for professional misconduct shall be imposed by the administration except in accordance with specified campus procedures adopted after appropriate consultation with agencies of the Academic Senate, as prescribed in the introduction to this part of the Code. Systemwide procedures for the conduct of disciplinary hearings are set forth in Academic Senate Bylaw 336.

2.  No disciplinary sanction shall be imposed until after the faculty member has had an opportunity for a hearing before the Divisional Committee on Privilege and Tenure or Special Committee convened pursuant to Academic Senate Bylaw 336 (hereafter, the "Hearing Committee"), and subsequent to a filing of a charge by the appropriate administrative officer.

3.  The Chancellor is deemed to know about an alleged violation of the Faculty Code of Conduct when it is reported to any academic administrator at the level of department chair or above. Additionally, for an allegation of sexual violence or sexual harassment, the Chancellor is deemed to know about an alleged violation of the Faculty Code of Conduct when the allegation is first reported to any academic administrator at the level of department chair or above or the campus Title IX Officer. The Chancellor must initiate related disciplinary action by delivering notice of proposed action to the respondent no later than three years after the Chancellor is deemed to have known about the alleged violation. There is no limit on the time within which a complainant may report an alleged violation.

4.  The Chancellor may not initiate notice of proposed disciplinary action unless there has been a finding of *probable cause*. The *probable cause* standard means that the facts as alleged in the complaint, if true, justify the imposition of discipline for a violation of the Faculty Code of Conduct and that the Chancellor is satisfied that the University can produce credible evidence to support the claim. In cases where the Chancellor wants a disciplinary action to

GENERAL UNIVERSITY POLICY                                                        APM - 015
REGARDING ACADEMIC APPOINTEES
The Faculty Code of Conduct

proceed, the Hearing Committee must hold a hearing and make findings on the evidence presented unless the accused faculty member settles the matter with the Chancellor prior to the hearing or the accused faculty member explicitly waives the right to a hearing.

5.  The procedures adopted shall include designation of the following disciplinary sanctions authorized in the University Policy on Faculty Conduct and the Administration of Discipline, of which this Faculty Code of Conduct is an integral part: written censure, reduction in salary, demotion, suspension, denial or curtailment of emeritus status, and dismissal from the employ of the University. The Hearing Committee shall not recommend the imposition of a sanction more severe than that in the notice of proposed disciplinary action. More than one disciplinary sanction may be imposed for a single act of misconduct, e.g., a letter of censure and a suspension.

B.  In the development of disciplinary procedures, it is recommended that each Division adhere to the following principles:

1.  In order to facilitate the efficient and timely handling of disciplinary matters, procedures in the Academic Senate Bylaw 336 allow each Divisional Committee on Privilege and Tenure to sit in hearing panels smaller than the full committee. The University Committee on Privilege and Tenure will establish and coordinate a Systemwide Reserve Privilege and Tenure Pool. The Systemwide Privilege and Tenure Pool may constitute part or all of the Hearing Committee, depending on the circumstances.

2.  There should be an appropriate mechanism for consideration and investigation of allegations of misconduct received from members of the faculty, staff, students, the administration, and other members of the University community. Procedures should be developed which encourage a single formal investigation of the allegations leading to the proposed disciplinary action.

3.  Because it is desirable that the faculty meaningfully participate in its own self-discipline, and in order to provide the administration with faculty advice in the beginning stages of what may become formal disciplinary proceedings, appropriate procedures should be developed to involve the faculty in participating in the investigation of allegations of misconduct and/or in making recommendations to appropriate administrative officers whether a disciplinary charge should be filed. Divisions are encouraged to develop procedures to provide faculty investigators with training, consultation, or legal counsel to assist with the investigation of faculty disciplinary cases.

4.  The following deadlines should be adhered to, unless the timeframes associated with specific policies or campus procedures require a different timeframe (e.g., the University policy on sexual violence and sexual harassment requires that an investigation be concluded within 60 to 90 business days) or there is an extension for good cause:

GENERAL UNIVERSITY POLICY                                                    APM - 015
REGARDING ACADEMIC APPOINTEES
The Faculty Code of Conduct

> (a) Upon receipt of a report of an alleged Faculty Code of Conduct violation, an initial assessment, including a limited inquiry when appropriate to determine how to proceed, should be completed within 30 business days following receipt of the report;
>
> (b) The investigation and the investigation report should be completed within 120 business days following the notice of investigation to the parties; and
>
> (c) Disciplinary charges should be filed by the Chancellor or Chancellor's designee within 40 business days of receipt of the investigation outcome.

5. There should be provision for early resolution of allegations of faculty misconduct before formal disciplinary proceedings are instituted. Procedures should be developed for mediation of cases where mediation is viewed as acceptable by the Chancellor and the faculty member accused of misconduct. Mediators should be trained in mediation, be regarded as neutral third parties and have experience in the University environment. In cases where a settlement resolving disciplinary charges is entered into after a matter has been referred to an Academic Senate committee, the Chancellor is encouraged to consult with the Chair of the Hearing Committee prior to finalizing the settlement.

6. Appropriate precautions should be taken to safeguard the confidentiality of investigative and disciplinary proceedings. Procedures should be developed that allow information about an ongoing disciplinary proceeding, including information about the outcome, to be shared with complainant(s), to the extent allowable by State law and University policy.

7. There should be provision, to the maximum feasible extent, for separating investigative and judicial functions. A faculty member who has participated in investigating an allegation of misconduct or in recommending that a charge should be filed should thereafter not participate, as a member of the Committee, in the hearing of that charge.

8. In the implementation of all procedures, specific provisions should be made for the time span within which certain actions may or must be taken. Every effort should be made to conform to reasonable, specified time frames. Consistent with Academic Senate Bylaw 336, unless extended for good cause, a hearing should commence no later than 60 calendar days from the date disciplinary charges are filed with the Committee on Privilege and Tenure. The chair of the Hearing Committee will be appointed within 14 calendar days of receipt of the disciplinary charges. The full Hearing Committee, whether drawn from the Systemwide Reserve Privilege and Tenure Pool or not, shall be appointed according to Academic Senate Bylaw 336, and no later than 50 calendar days from the date disciplinary charges are filed. A faculty member who is entitled to a hearing should not be permitted thereafter to delay imposition of discipline by refusing to cooperate or being unavailable for a scheduled hearing. A hearing shall not be postponed because the faculty member is on leave or fails to appear.

GENERAL UNIVERSITY POLICY                                                    APM - 015
REGARDING ACADEMIC APPOINTEES
The Faculty Code of Conduct

9.  There should be consideration of provision for the availability of removal or termination of a sanction, either automatically or by administrative discretion, in individual cases. The nature and circumstances of the offense should determine the severity and type of discipline.

10. Procedures should be developed for keeping records of disciplinary matters in a confidential manner and sharing such records with Senate and administrative officers with a need to know in accordance with State law and University policy.

11. Pursuant to Academic Senate Bylaw 336, "good cause" consists of material or unforeseen circumstances sufficient to justify the extension sought.

**Revision History**

January 29, 2026:

- Substantive revisions to incorporate the recommendation to establish a Systemwide Reserve Privilege and Tenure Pool, coordinated by the University Committee on Privilege and Tenure.
- Substantive revisions to incorporate timeframes for completion of initial assessments, investigations and investigation reports, and the filing of disciplinary charges, as well as extensions for good cause.
- Substantive revisions to reflect a deadline for the appointment of the full Hearing Committee.
- Technical revisions to reflect conforming language with, and timeframes specified in, Academic Senate Bylaw 336.

September 23, 2020:

- Technical revision to remove gendered language.

For details on prior revisions, please visit the policy issuance web page.

Rev. 1/29/2026                                                               Page 12