BRYAN H. HECKENLIVELY (State Bar No. 279140)
bryan.heckenlively@mto.com
MILES W. UNTERREINER (State Bar No. 347959)
miles.unterreiner@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street Twenty-Seventh Floor
San Francisco, California 94105
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

Attorneys for Defendants The Regents of the University of California, Sam Hawgood, Catherine Lucey, Robert Wachter, Won Ha, and Tracey Tsugawa

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUPA MARYA, M.D.,<br><br>Plaintiff,<br><br>vs.<br><br>BOARD OF REGENTS OF THE UNIVERSITY OF CALIFORNIA; SAM HAWGOOD; CATHERINE LUCEY; ROBERT WACHTER; TRACEY TSUGAWA; BRIAN ALLDREDGE; WON HA; AND DOES 1-20,<br><br>Defendants. | Case No. 3:25-cv-04716-MMC<br><br>**DECLARATION OF BRYAN H. HECKENLIVELY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT AND REQUEST FOR JUDICIAL NOTICE**<br><br>Date: October 30, 2026<br>Time: 9:00 a.m.<br>Judge: Hon. Maxine M. Chesney<br>Courtroom: 7 |

**DECLARATION OF BRYAN H. HECKENLIVELY**

I, Bryan H. Heckenlively, hereby declare:

1. I am an attorney with the law firm of Munger, Tolles & Olson LLP and counsel of record for Defendants in this action. I am licensed to practice law in the State of California. I make this Declaration in support of Defendants' Motion to Dismiss the Second Amended Complaint and Request for Judicial Notice. Except as otherwise noted, I have personal knowledge of the facts set forth herein; and, if called as a witness, I could and would testify competently thereto.

2. Attached hereto as **Exhibit A** is a true and correct copy of a document containing a series of social media posts by Plaintiff Rupa Marya, M.D. ("Marya"). **Exhibit A** is publicly accessible at https://drive.google.com/file/d/1TrioXH-4gi-Ig12xBLPo5LoDa9FmaWYs/view as of the date it was last accessed: August 31, 2026. These posts are incorporated by reference at Paragraph 39 of the Second Amended Complaint ("SAC").

3. Attached hereto as **Exhibit B** is a true and correct copy of a screen capture of a social media post, dated September 21, 2024. The post is publicly accessible at https://x.com/Scott_Wiener/status/1837570677492404558 as of the date it was last accessed: August 31, 2026. It is incorporated by reference at Paragraph 51 of the SAC.

4. Attached hereto as **Exhibit C** is a true and correct copy of a LinkedIn post by the University of California, San Francisco ("UCSF"). The post is publicly accessible at https://www.linkedin.com/posts/ucsf_a-tired-and-familiar-racist-conspiracy-theory-activity-7149547978729357312-7ZR1/ as of the date it was last accessed: August 31, 2026. It is incorporated by reference at Paragraph 43 of the SAC.

5. Attached hereto as **Exhibit D** is a true and correct copy of an Instagram post dated January 6, 2024, posted by the University of California, San Francisco. The post is publicly accessible at https://www.instagram.com/p/C1xxSCZL5Mp/?img_index=1 as of the date it was last accessed: August 31, 2026. It is incorporated by reference at Paragraph 43 of the SAC.

6. Attached hereto as **Exhibit E** is a true and correct copy of screen captures of a

social media post dated January 6, 2024,[1] posted by the University of California, San Francisco. The post is publicly accessible at https://x.com/UCSF/status/1743785818169250254 as of the date it was last accessed: August 31, 2026. It is incorporated by reference at Paragraph 43 of the SAC.

7. Attached hereto as **Exhibit F** is a true and correct copy of the Health Facility/Peer Review Reporting Form (also known as an "805 Report") that the Medical Staff of UCSF Health submitted to the Medical Board of California on December 5, 2025, which is incorporated by reference at Paragraph 66 of the SAC.

8. Attached hereto as **Exhibit G** is a true and correct copy of the Notice of Intent to Impose Discipline that UCSF Chancellor Sam Hawgood sent to Marya on April 28, 2025, which is incorporated by reference at Paragraphs 62 and 64 of the FAC.

9. Attached hereto as **Exhibit H** is a true and correct copy of the University of California's General University Policy Regarding Academic Appointees: Non-Senate Academic Appointees/Grievances, which is set forth in Academic Personnel Manual 140 ("APM 140"). The document is publicly accessible at https://www.ucop.edu/academic-personnel-programs/_files/apm/apm-140.pdf as of the date if was last accessed: August 31, 2026.

10. Attached hereto as **Exhibit I** is a true and correct copy of the Letter of Censure that UCSF Chancellor Sam Hawgood sent to Marya on May 20, 2025, which is incorporated by reference at Paragraph 64 of the SAC.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on September 1, 2026, at San Francisco, California.

By: *\/s/ Bryan H. Heckenlively*
Bryan H. Heckenlively

[1] The post appears to be dated 12:05 a.m. on January 7 because the Page Vault tool used to download and authenticate the post marks time in UTC, which is 8 hours ahead of Pacific Standard Time. 12:05am UTC on January 7 would have been 4:05pm Pacific Standard Time on January 6.

# EXHIBIT A



**Rupa Marya, MD** 🔒
@DrRupaMarya

The presence of Zionism in US medicine should be examined as a structural impediment to health equity. Zionism is a supremacist, racist ideology and we see Zionist doctors justifying the genocide of Palestinians. How does their outlook/position impact priorities in US medicine?



**saira rao** 🔒 @sairasameerarao · Jan 1

Realizing how many American doctors and nurses are Zionists and genuinely terrified for Palestinian, Arab, Muslim, South Asian and Black patients — even more than usual.

And usually it's bad.

**Rupa Marya, MD** 🔒 @DrRupaMarya · Jan 2 ···

How can we have health equity if people with deeply rooted racist philosophies (supremacist ideologies are racist) are in charge of setting funding priorities and shaping the structures of medicine?

1 · 30 · 85 · 35K

**Rupa Marya, MD** 🔒 @DrRupaMarya · Jan 2 ···

Just like white supremacists who want a white Christian ethnostate in the US—those people give poor care to Indigenous, Black and brown people. And those people reinforce structures that make sure caring for BIPOC communities is not a priority. Racism in medicine kills.

1 · 16 · 68 · 30K

**Rupa Marya, MD** 🔒 @DrRupaMarya · Jan 2 ···

This is why it's important to make the distinction of a political ideology (Zionism) from a religion (Judaism). There are so many Jewish doctors who don't espouse an ideology of supremacism and justification of land theft, apartheid and genocide. They are not the issue here.

1 · 32 · 81 · 41K

**Rupa Marya, MD** 🔒 @DrRupaMarya · Jan 2 ···

The issue is Zionist doctors who will sit in an "Antiracism Task Force" meeting and try to stop brown doctors who want to issue a Ceasefire statement by saying that a ceasefire would be a bad thing (read: let's keep killing brown people in Gaza).

1 · 24 · 68 · 30K

**Rupa Marya, MD** 🔒 @DrRupaMarya · Jan 2 ···

Zionism in US medicine—coupled with the Israeli government's operations to discredit & destroy the careers of any critics, funded by the large donors who support US academic medicine—is why US medical institutions have said nothing while Gaza's hospitals are bombed.

1 · 20 · 66 · 25K

**Rupa Marya, MD** 🔒 @DrRupaMarya · Jan 2

People who hold any supremacist position are not going to be doctors who advance health equity. They are part of and support structures that obstruct it.

1 22 57 25K

**Rupa Marya, MD** 🔒 @DrRupaMarya · Jan 2

This may be an important reason why, in spite of 20 years of investment into health equity, we've closed no gaps in health disparities.

No doubt this deserves some research and careful consideration, to understand the structural impediments to excellence in care for all.

1 14 47 28K

**Rupa Marya, MD** 🔒 @DrRupaMarya · Jan 2

And to be 💯 clear, this holds for ALL supremacist ideologies—including Hindutva, white supremacism, and patriarchy.

The presence of Zionism in US medicine is something everyone is just waking up to. We already know white doctors are negligent with Black newborns.

1 45 69 154K

**Rupa Marya, MD** 🔒 @DrRupaMarya · Jan 2

Those babies live more when cared for by Black doctors. We know that women survive heart attacks more with femme doctors. But we haven't looked at these other ideologies and how they may show up in our structures of care.

1 10 52 22K

**Rupa Marya, MD** @DrRupaMarya · Jan 2

It's not because white male docs are bad people. It's that racism shows up in structures & attitudes that can have real health outcomes for our patients.

When our patients are from groups on the losing end of supremacist directionality, they are in danger in the health system❤️‍🩹

1 9 50 19K

**Rupa Marya, MD** @DrRupaMarya · Jan 2

This is a critical article to read (and it reads like a spy novella) to understand the reaches of Zionism in US academic medicine. My own institution UCSF is involved through Helen Diller Foundation's funding.




Who Is Funding Canary Mission? Inside the Doxxing Operation Targeting Anti-Zi...

From thenation.com

1 35 78 26K

# EXHIBIT B

Page Vault

| | |
|---|---|
| Document title: | (21) Senator Scott Wiener on X: "The same UCSF professor who promoted the "doctors' plot" — an age old antisemitic conspiracy theory that Jewish doctors are harming patients — is now targeting a 1st year med student for harassment b/c he's Israeli. This professor is creating a toxic, hostile environment at UCSF https://t.co/APyxFcG635" / X |
| Capture URL: | https://x.com/Scott_Wiener/status/1837570677492404558 |
| Page loaded at (UTC): | Mon, 29 Sep 2025 18:05:40 GMT |
| Capture timestamp (UTC): | Mon, 29 Sep 2025 18:07:24 GMT |
| Capture tool: | 10.61.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/138.0.7204.97 Safari/537.36 |
| Operating system: | Linux (Node 22.17.0) |
| PDF length: | 2 |
| Capture ID: | 6qbaE6r4SmvBb8GFoSBh6L |
| Display Name: | noelle.smith |

Home
Explore
20+ Notifications
Messages
Grok
Lists
Bookmarks
Jobs
Communities
Premium
Verified Orgs
Profile
More

← Post

**Senator Scott Wiener**
@Scott_Wiener

The same UCSF professor who promoted the "doctors' plot" — an age old antisemitic conspiracy theory that Jewish doctors are harming patients — is now targeting a 1st year med student for harassment b/c he's Israeli.

This professor is creating a toxic, hostile environment at UCSF

**Rupa Marya, MD**
@DrRupaMarya
Follow

Med students at UCSF are concerned that a first year student from Israel is in their class. They're asking if he participated in the genocide of Palestinians in the IDF before matriculating into medical school in CA. How do we address this in our professional ranks?

7:12 PM · Sep 21, 2024 · **248K** Views

376 737 3.8K 219

Post your reply Reply

Search

**Relevant people**

**Senator Scott Wie...** Follow
@Scott_Wiener
CA State Senator. Chair, Budget Committee. Passionate about health care, climate, making it easier to build housing, transit, clean energy. Democrat🏳️‍🌈 🔯 🎗️

**What's happening**

**Paris Fashion Week 2025 Womenswear SS26**
LIVE

Technology · Trending
**iOS 26.0.1**
1,154 posts

Only on X · Trending
**#MondayVibes**
Trending with #MondayMood
2,970 posts

Politics · Trending
**Prime Minister Netanyahu**
16.1K posts

Music · Trending
**Lil Tjay**

Show more

# EXHIBIT C

Linkedin Join now Sign in

Top Content People Learning Jobs Games Get the app

# University of California, San Francisco’s Post

**University of California, San Francisco**
181,411 followers
1y

A tired and familiar racist conspiracy theory has circulated on social media in recent days stating that “Zionist” doctors are a threat to Arab, Palestinian, South Asian, Muslim, and Black patients, as well as the US health system. This sweeping, baseless, and racist generalization must be condemned. Both Jewish and non-Jewish people see the use of the word “Zionist” in this debunked narrative as an antisemitic attack. It is as morally reprehensible as it is intellectually bankrupt, nothing more than a repackaging of an old racist trope that UCSF renounces.

As a health sciences university and health system, we want our patients, clinicians, faculty, learners, and staff to know that UCSF is committed to serving every individual regardless of race, ethnicity, religion, political view, gender, and sexual identity. We will continue to encourage open dialogue, even on the most difficult and painful topics. But we draw the line on those who attack entire groups of people and promote divisiveness and xenophobia, including Islamophobia and, in this instance, antisemitism.

144

Like Comment Share

To view or add a comment, sign in

181,411 followers

View Profile

+ Connect

## More from this author



**The Cancer Breakthrough Boom**

University of California, San Francisco · 2y



**Ask an Expert: A Tobacco-Free World**

University of California, San Francisco · 2y

## Explore topics

- Sales
- Marketing
- IT Services
- Business Administration
- HR Management
- Engineering
- Soft Skills
- See All

© 2025

About

Accessibility

User Agreement

Privacy Policy

Your California Privacy Choices

Cookie Policy

Copyright Policy

Brand Policy

Guest Controls

Community Guidelines

Language

# EXHIBIT D

| | |
|---|---|
| Document title: | Instagram |
| Capture URL: | https://www.instagram.com/p/C1xxSCZL5Mp/?img_index=1 |
| Page loaded at (UTC): | Mon, 29 Sep 2025 16:59:49 GMT |
| Capture timestamp (UTC): | Mon, 29 Sep 2025 17:07:16 GMT |
| Capture tool: | 10.61.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/138.0.7204.97 Safari/537.36 |
| Operating system: | Linux (Node 22.17.0) |
| PDF length: | 3 |
| Capture ID: | uNz7qPMgJ3nbhF2DkEKji5 |
| Display Name: | noelle.smith |

Instagram
Home
Search
Explore
Reels
Messages
Notifications
Create
Profile

A tired and familiar racist conspiracy theory has circulated on social media in recent days stating that “Zionist” doctors are a threat to Arab, Palestinian, South Asian, Muslim, and Black patients, as well as the US health system. This sweeping, baseless, and racist generalization must be condemned.

Both Jewish and non-Jewish people see the use of the word “Zionist” in this debunked narrative as an antisemitic attack. It is as morally reprehensible as it is intellectually bankrupt, nothing more than a repackaging of an old racist trope that UCSF renounces.

More
Also from Meta
Messages

Instagram

Home
Search
Explore
Reels
Messages
Notifications
Create
Profile

As a health sciences university and health system, we want our patients, clinicians, faculty, learners, and staff to know that UCSF is committed to serving every individual regardless of race, ethnicity, religion, political view, gender, and sexual identity.

UCSF

We will continue to encourage open dialogue, even on the most difficult and painful topics. But we draw the line on those who attack entire groups of people and promote divisiveness and xenophobia, including Islamophobia and, in this instance, antisemitism.

ucsf • Follow

Liked by **erelie** and **others**
January 6, 2024

More
Also from Meta
Messages



Document title: Instagram
Capture URL: https://www.instagram.com/p/C1xxSCZL5Mp/?img_index=1
Capture timestamp (UTC): Mon, 29 Sep 2025 17:03:19 GMT

# EXHIBIT E

PageVault

| | |
|---|---|
| Document title: | (21) UC San Francisco on X: "https://t.co/5K2M0KkTpN" / X |
| Capture URL: | https://x.com/UCSF/status/1743785818169250254 |
| Page loaded at (UTC): | Mon, 29 Sep 2025 17:10:40 GMT |
| Capture timestamp (UTC): | Mon, 29 Sep 2025 17:13:03 GMT |
| Capture tool: | 10.61.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/138.0.7204.97 Safari/537.36 |
| Operating system: | Linux (Node 22.17.0) |
| PDF length: | 2 |
| Capture ID: | 4PKTzE2mTL3dprzydXVYS5 |
| Display Name: | noelle.smith |

Post

Search

Home
Explore
20+ Notifications
Messages
Grok
Lists
Bookmarks
Jobs
Communities
Premium
Verified Orgs
Profile
More
Post

UC San Francisco
@UCSF

conspiracy theory has circulated on social media in recent days stating that "Zionist" doctors are a threat to Arab, Palestinian, South Asian, Muslim, and Black patients, as well as the US health system. This sweeping, baseless, and racist generalization must be condemned.

Both Jewish and non-Jewish people see the use of the word "Zionist" in this debunked narrative as an antisemitic attack. It is as morally reprehensible as it is intellectually bankrupt, nothing more than a repackaging of an old racist trope that UCSF renounces.

As a health sciences university and health system, we want our patients, clinicians, faculty, learners, and staff to know that UCSF is committed to serving every individual regardless of race, ethnicity, religion, political view, gender, and sexual identity.

We will continue to encourage open dialogue, even on the most difficult and painful topics. But we draw the line on those who attack entire groups of people and promote divisiveness and xenophobia, including Islamophobia and, in this instance, antisemitism.

12:05 AM · Jan 7, 2024 · **1.5M** Views

648 1.4K 126

**Who can reply?**
Accounts @UCSF mentioned can reply

Noelle Smith
@nos22444

## Relevant people

**UC San Francisco**
@UCSF
Follow
UC San Francisco is the leading university exclusively focused on health. @UCSF on Instagram, Facebook, LinkedIn and YouTube

## What's happening

X FASHION
**Paris Fashion Week 2025 Womenswear SS26**
LIVE

Politics · Trending
**Mamdani**
152K posts

Sports · Trending
**Don Kelly**
1,095 posts

Entertainment · Trending
**Shelby Oaks**

Trending in United States
**Driscoll**

Show more

Terms of Service | Privacy Policy | Cookie Policy | Accessibility | Ads info | More··· © 2025 X Corp.

Messages

| | |
|---|---|
| Document title: | (21) UC San Francisco on X: "https://t.co/5K2M0KkTpN" / X |
| Capture URL: | https://x.com/UCSF/status/1743785818169250254/photo/1 |
| Page loaded at (UTC): | Mon, 29 Sep 2025 17:07:58 GMT |
| Capture timestamp (UTC): | Mon, 29 Sep 2025 17:09:21 GMT |
| Capture tool: | 10.61.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/138.0.7204.97 Safari/537.36 |
| Operating system: | Linux (Node 22.17.0) |
| PDF length: | 2 |
| Capture ID: | 13VRQ7zXShkobTP5NrCRPP |
| Display Name: | noelle.smith |




UC San Francisco
@UCSF

12:05 AM · Jan 7, 2024 · **1.5M** Views

648 1.4K 126

**Who can reply?**
Accounts @UCSF mentioned can reply



Document title: (21) UC San Francisco on X: "https://t.co/5K2M0KkTpN" / X
Capture URL: https://x.com/UCSF/status/1743785818169250254/photo/1
Capture timestamp (UTC): Mon, 29 Sep 2025 17:09:21 GMT

| | |
|---|---|
| Document title: | (21) UC San Francisco on X: "https://t.co/5K2M0KkTpN" / X |
| Capture URL: | https://x.com/UCSF/status/1743785818169250254/photo/2 |
| Page loaded at (UTC): | Mon, 29 Sep 2025 17:08:54 GMT |
| Capture timestamp (UTC): | Mon, 29 Sep 2025 17:09:47 GMT |
| Capture tool: | 10.61.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/138.0.7204.97 Safari/537.36 |
| Operating system: | Linux (Node 22.17.0) |
| PDF length: | 2 |
| Capture ID: | 2EyUPWaMEzUjKxxGPMXRcj |
| Display Name: | noelle.smith |




UC San Francisco
@UCSF

12:05 AM · Jan 7, 2024 · **1.5M** Views

648 1.4K 126

**Who can reply?**
Accounts @UCSF mentioned can reply

Page Vault

| | |
|---|---|
| Document title: | (21) UC San Francisco on X: "https://t.co/5K2M0KkTpN" / X |
| Capture URL: | https://x.com/UCSF/status/1743785818169250254/photo/3 |
| Page loaded at (UTC): | Mon, 29 Sep 2025 17:09:36 GMT |
| Capture timestamp (UTC): | Mon, 29 Sep 2025 17:10:09 GMT |
| Capture tool: | 10.61.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/138.0.7204.97 Safari/537.36 |
| Operating system: | Linux (Node 22.17.0) |
| PDF length: | 2 |
| Capture ID: | dh5LMbF1wEyYQW33jq4gcw |
| Display Name: | noelle.smith |




UC San Francisco
@UCSF

12:05 AM · Jan 7, 2024 · **1.5M** Views

648 1.4K 126

**Who can reply?**
Accounts @UCSF mentioned can reply



Document title: (21) UC San Francisco on X: "https://t.co/5K2M0KkTpN" / X
Capture URL: https://x.com/UCSF/status/1743785818169250254/photo/3
Capture timestamp (UTC): Mon, 29 Sep 2025 17:10:09 GMT

PageVault

| | |
|---|---|
| Document title: | (21) UC San Francisco on X: "https://t.co/5K2M0KkTpN" / X |
| Capture URL: | https://x.com/UCSF/status/1743785818169250254/photo/4 |
| Page loaded at (UTC): | Mon, 29 Sep 2025 17:09:56 GMT |
| Capture timestamp (UTC): | Mon, 29 Sep 2025 17:10:52 GMT |
| Capture tool: | 10.61.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/138.0.7204.97 Safari/537.36 |
| Operating system: | Linux (Node 22.17.0) |
| PDF length: | 2 |
| Capture ID: | qAX17rjAg7GKAZLMSrvk6J |
| Display Name: | noelle.smith |

UC San Francisco
@UCSF

12:05 AM · Jan 7, 2024 · **1.5M** Views

648 1.4K 126

**Who can reply?**
Accounts @UCSF mentioned can reply

UCSF

**We will continue to encourage open dialogue, even on the most difficult and painful topics. But we draw the line on those who attack entire groups of people and promote divisiveness and xenophobia, including Islamophobia and, in this instance, antisemitism.**

648 1.4K 1.5M



Document title: (21) UC San Francisco on X: "https://t.co/5K2M0KkTpN" / X
Capture URL: https://x.com/UCSF/status/1743785818169250254/photo/4
Capture timestamp (UTC): Mon, 29 Sep 2025 17:10:52 GMT

# EXHIBIT F

Medical Board of California

# Health Facility/Peer Review Reporting Form

**Required by Section 805 of the California Business & Professions Code**

**Enforcement Program**
2005 Evergreen Street, Suite 1200
Sacramento, CA 95815-5401
Phone: (916) 263-2528
Fax: (916) 263-2435
805reporting@mbc.ca.gov

**NOTE:** Certain actions, with respect to staff privileges, membership or employment of physicians, podiatrists, and licensed midwives must be reported to the Medical Board of California when they are imposed or voluntarily accepted for a medical disciplinary cause or reason. Reports on osteopathic physicians, physician assistants, dentists and psychologists should be directed to their respective Boards. Please see the reverse/second page of this form for further information.

## REPORTING ENTITY (Check One)

- [x] A medical or professional staff of any health care facility or clinic licensed under Division 2 (commencing with Section 1200) of the Health and Safety Code or of a facility certified to participate in the federal Medicare program as an ambulatory surgical center – §805(a)(1)(B)(i)

- [ ] A health care service plan licensed under Chapter 2.2 (commencing with Section 1340) of the Health and Safety Code or a disability insurer that contracts with licentiates to provide services at alternative rates of payment pursuant to Section 10133 of the Insurance Code – §805(a)(1)(B)(ii)

- [ ] Any medical, midwifery or podiatric professional society having as members at least 25 percent of the eligible licentiates in the area in which it functions (which must include at least one county), which is not organized for profit and which has been determined to be exempt from taxes pursuant to Section 23701 of the Revenue and Taxation Code – §805(a)(1)(B)(iii)

- [ ] A committee organized by any entity consisting of or employing more than 25 licentiates of the same class that functions for the purpose of reviewing the quality of professional care provided by members or employees of that entity – §805(a)(1)(B)(iv)

| Name of Entity | Telephone Number |
|---|---|
| *UCSF Health* | *(415) 476-1000* |

| Chief Executive Officer/Medical Director/Administrator | Chief of Medical Staff |
|---|---|
| *Suresh Gunasekaran, President & CEO* | *Lee Atkinson-McEvoy, MD* |

| Name of person preparing report | Telephone Number | Email Address |
|---|---|---|
| *Kosal Bo* | *(415) 244-8677* | *kosal.bo@ucsf.edu* |

| Street address | City | State | Zip Code |
|---|---|---|---|
| *1800 Owens Street* | *San Francisco* | *CA* | *94153* |

## LICENTIATE (Check One)

- [x] Physician
- [ ] Podiatrist
- [ ] Licensed Midwife

| Name | License Number |
|---|---|
| *Rupa Marya, MD* | *A87992* |

## ACTION TAKEN CHECK HERE IF THIS IS A SUPPLEMENTAL REPORT ☐

**Date(s) of Action(s) and Duration (attach additional sheets if necessary)**

- *Suspension of employment – 9/22/2024, indefinite*
- *Termination of employment – 5/20/2025, permanent*
- *Automatic resignation from Medical Staff – 11/20/2025, permanent*

### Type(s) of Action(s) (Check all that apply)

**(a) For a medical disciplinary cause or reason:**

☐ Denial/rejection of application for staff privileges
☐ Termination or revocation of membership
☐ Denial/rejection of application for membership
☑ Termination or revocation of employment
☐ Termination or revocation of staff privileges

**(b) For a cumulative total of 30 days or more for any 12-month period, and for a medical disciplinary cause or reason:**

☐ Restriction(s) imposed on staff privileges
☐ Restriction(s) voluntarily accepted on staff privileges
☐ Restriction(s) imposed on membership
☐ Restriction(s) voluntarily accepted on membership
☐ Restriction(s) imposed on employment
☐ Restriction(s) voluntarily accepted on employment

**If staff privileges were restricted, list specific restrictions imposed or voluntarily accepted (attach additional sheets if necessary):**

**(c) Following notice of an impending investigation based on information indicating medical disciplinary cause or reason:**

☐ Licentiate resigned staff privileges
☐ Licentiate took leave of absence from staff privileges
☐ Licentiate resigned from membership
☐ Licentiate took leave of absence from membership
☐ Licentiate resigned from employment
☐ Licentiate took leave of absence from employment
☐ Licentiate withdrew or abandoned their application for staff privileges or membership
☐ Licentiate withdrew or abandoned their request for renewal of staff privileges or membership

**(d) For a summary suspension that remains in effect for a period in excess of 14 days for a medical disciplinary cause or reason**

☐ Imposition of summary suspension on staff privileges
☐ Imposition of summary suspension on membership
☑ Imposition of summary suspension on employment

### Description of Action

Attach additional sheet(s) describing the facts and circumstances of the medical disciplinary cause or reason and any other relevant information related to the action taken, including, but not limited to, the number of cases reviewed, time frame covered, any patient deaths involved, any malpractice filings as a result of the physician's, podiatrist's, or midwife's actions, any expert/peer opinions obtained, etc.

| | | | |
|---|---|---|---|
| [signature] | 12/05/25 | [signature] | 12/05/25 |
| Signature<br>Chief Executive Officer/Medical Director/Administrator | Date | Signature<br>Chief of Medical Staff | Date |

## ADDITIONAL INFORMATION

To complete this form, for definition of terms, when, how, and who should report, please refer to Section 805 of the California Business and Professions Code. You may access this information via https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?sectionNum=805.&lawCode=BPC under California Law, Business and Professions Code.

**PLEASE NOTE:** Section 805(k) of the California Business and Professions Code states: "A willful failure to file an 805 report by any person who is designated or otherwise required by law to file an 805 report is punishable by a fine not to exceed one hundred thousand dollars ($100,000) per violation. The fine may be imposed in any civil or administrative action or proceeding brought by or on behalf of any agency having regulatory jurisdiction over the person regarding whom the report was or should have been filed. If the person who is designated or otherwise required to file an 805 report is a licensed physician and surgeon, the action or proceeding shall be brought by the Medical Board of California. The fine shall be paid to that agency but not expended until appropriated by the Legislature. A violation of this subdivision may constitute unprofessional conduct by the licentiate. A person who is alleged to have violated this subdivision may assert any defense available at law. As used in this subdivision, 'willful' means a voluntary and intentional violation of a known legal duty."

Section 805(l) of the California Business and Professions Code states: "Except as otherwise provided in subdivision (k), any failure by the administrator of any peer review body, the chief executive officer or administrator of any health care facility, or any person who is designated or otherwise required by law to file an 805 report, shall be punishable by a fine that, under no circumstances shall exceed fifty thousand dollars ($50,000) per violation. The fine may be imposed in any civil or administrative action or proceeding brought by or on behalf of any agency having regulatory jurisdiction over the person regarding whom the report was or should have been filed. If the person who is designated or otherwise required to file an 805 report is a licensed physician and surgeon, the action or proceeding shall be brought by the Medical Board of California. The fine shall be paid to that agency but not expended until appropriated by the Legislature. The amount of the fine imposed, not exceeding fifty thousand dollars ($50,000) per violation, shall be proportional to the severity of the failure to report and shall differ based upon written findings, including whether the failure to file caused harm to a patient or created a risk to patient safety; whether the administrator of any peer review body, the chief executive officer or administrator of any health care facility, or any person who is designated or otherwise required by law to file an 805 report exercised due diligence despite the failure to file or whether they knew or should have known that an 805 report would not be filed; and whether there has been a prior failure to file an 805 report. The amount of the fine imposed may also differ based on whether a health care facility is a small or rural hospital as defined in Section 124840 of the Health and Safety Code."

Section 805(m) of the California Business and Professions Code states: "A health care service plan registered under Chapter 2.2 (commencing with Section 1340) of Division 2 of the Health and Safety Code or a disability insurer that negotiates and enters into a contract with licentiates to provide services at alternative rates of payment pursuant to Section 10133 of the Insurance Code, when determining participation with the plan or insurer, shall evaluate, on a case-by-case basis, licentiates who are the subject of an 805 report, and not automatically exclude or deselect these licentiates."

CONFIDENTIALITY

This report is not a waiver of the confidentiality of medical records and committee reports. The contents of this report may be viewed only by those persons specified in Section 800(c) of the Business and Professions Code, except as required by Section 805.5 of the Business and Professions Code.

COPY TO LICENTIATE

A copy of the 805 report, with a cover letter informing the Licentiate of his or her right to submit additional statements or other information pursuant to Section 800(c) of the Business and Professions Code, must be sent by the reporting entity to the Licentiate.

SUPPLEMENTAL REPORT

A supplemental report must be made within thirty (30) days following the date the Licentiate is deemed to have satisfied any terms, conditions, or sanctions imposed as corrective action by the reporting entity.

**ATTACHMENT TO 805 REPORT REGARDING RUPA MARYA, MD**

On September 22, 2024, UCSF placed Dr. Rupa Marya on paid administrative leave pending investigation by the campus of allegations of unprofessional conduct. That campus investigation resulted in Dr. Marya's separation from University employment on May 20, 2025. As of that date, Dr. Marya was no longer covered by the University's insurance policies. Since then, Dr. Marya has failed to provide proof of other insurance, which resulted in an automatic resignation (not for a medical disciplinary cause or reason) effective November 20, 2025. In the interim, however, the Medical Staff had initiated its own investigation. That process was not complete at the time of the automatic resignation.

# EXHIBIT G

UCSF
University of California
San Francisco

**IN STRICT CONFIDENCE**
**TO BE OPENED BY ADDRESSEE ONLY**

**NOTICE OF INTENT TO IMPOSE DISCIPLINE**

**Sam Hawgood, MBBS**
Chancellor
Arthur and Toni Rembe Rock
Distinguished Professor

Office of the Chancellor
UCSF Box 0402
550 16th Street, Room 7107
San Francisco, CA 94143

tel: 415.476.6582
Sam.Hawgood@ucsf.edu

www.ucsf.edu

April 28, 2025

*Sent via USPS to:*

RUPA MARYA, MD
[redacted]

*Sent via email to:* rupa.marya@ucsf.edu, [redacted]

In fulfilling my responsibility to determine whether you have violated the Faculty Code of Conduct, which would warrant the imposition of discipline, I reviewed the report of the *Ad Hoc* Committee which investigated allegations of misconduct on your part, as well as your response to that report.

**_Ad Hoc_ Committee Findings:**

In concluding that there is probable cause to believe that you have violated the Faculty Code of Conduct, the *Ad Hoc* Committee made the following findings.

*Dr. Marya violated the standards described in the Faculty Code of Conduct in her September 21, 2024 post on X.com.*

As described in the Committee's report:

> Per several witnesses interviewed by the Committee, this post on social media created an atmosphere of disruption and fear in the School of Medicine, specifically in the first-year class. Several witnesses, including Student 1 and 2, told the Committee that this statement led many Jewish students to feel marginalized and unsafe. Students were made vulnerable to speculation as to whether they were the person who was being named in the X post.

Further, the Committee detailed the consequences of this post:

> The administration had to go into crisis management mode to address the fear and anxiety among students. The administration met with the first-year class to discuss how to address the significant impact, including having support sessions for individual students and organizing additional programing to address disruptions. These efforts included additional office hours, restorative justice groups, and meetings with student leaders. Additionally, student leadership felt it was important to make all students feel welcome on campus and issued a letter condemning Dr. Marya's statement and avowing support for all their fellow students of all nationalities. These efforts to lessen the hostile environment created by Dr. Marya's statement took away valuable time from students, faculty and staff to advance learning and teaching which constitute valuable work of the University and one of its core missions.

As to the Faculty Code of Conduct, the Committee found this post "significantly impaired a central function of the University as it caused many disruptions to the learning environment and the functionality of the UCSF Medical School," and that "a preponderance of the evidence establishes probable cause that Dr. Marya violated the Ethical Principle as stated in APM 015 Part II, Section A of the Faculty Code of Conduct, and significantly impaired a central function of the University when she posted on social media about a first year UCSF medical student."

*Regarding conduct towards colleagues, the Committee found:*

> …once Dr. Marya disagrees with a colleague over a political or personal opinion, she does not hesitate to call them out publicly, in derogatory terms, misrepresenting their positions and exposing them to the rebuke of her followers on social media (of which she has 27,000 on X and 2,000 on Substack). This is not living up to the standards of the Faculty Code of Conduct which states, "In the exchange of criticism and ideas professors show due respect for the opinions of others.

Here the Committee found: "a preponderance of the evidence establishes probable cause that Dr. Marya engaged in the conduct addressed [in the paragraph] above and that this conduct violated APM 015 Part II, Section D of the Faculty Code of Conduct and significantly impaired a central function of the University."

*Regarding harassment of students, colleagues and members of the University Community:*

> Many Jewish UCSF physician colleagues of Dr. Marya felt singled out and harassed based on their background (ethnicity, nationality, religion or shared ancestry) by these statements, which did not objectively or individually judge their competence as physicians, and which had the clear potential effect of undermining patients' confidence in receiving competent care from these UCSF physicians based only on suspicion due to the protected characteristics described in the Faculty Code of Conduct. UCSF also received many complaints from other physicians outside of UCSF who expressed similar complaints that a UCSF physician colleague would engage in broad questioning of other physicians' competency based only on their perceived association with Zionism" through their religion, shared ancestry or nationality.

Here the Committee found: "a preponderance of the evidence establishes probable cause that Dr. Marya engaged in harassment of students, colleagues and members of the University community, as prohibited by APM 015 Part II, Sections A, C, and D of the Faculty Code of Conduct."

*Regarding the UCSF Violence and Bullying Policy:*

"Several UCSF community members stated that they felt Dr. Marya's statements were derogatory, insulting and belittling, and the Committee finds that a reasonable person would agree with this assessment."

The Committee analyzed "Dr. Marya's tweets in the aggregate as a 'pattern of behavior over time' with the intent or effect of intimidating, degrading, excluding, or mischaracterizing those colleagues whose opinions differed from hers from speaking or acting."

Here, the Committee found: "a preponderance of the evidence establishes probable cause that Dr. Marya engaged in the conduct addressed [in the paragraphs] above and that this conduct violated the UCSF Violence and Bullying Policy." Further, "the Committee also finds that this violation was a serious violation of this policy, and therefore there is probable cause that Dr. Marya violated APM 015, Part II Section C-8 of the Faculty Code of Conduct."

*Regarding the UCSF Social Media and Electronic Communications Policies:*

The Committee found that your social media activity did not respect the consent or confidentiality of your colleagues, and concluded that: "a preponderance of the evidence establishes probable cause that Dr. Marya...violated the UCSF Social Media Policy" and that "this violation was a serious violation of this policy, and therefore there is probable cause that Dr. Marya violated APM 015, Part II Section C-8 of the Faculty Code of Conduct."

In addition: "the Committee finds that a preponderance of the evidence establishes probable cause that Dr. Marya…violated the UCSF Electronic Communications Policy" and that "this violation was a serious violation of this policy, and therefore there is probable cause that Dr. Marya violated APM 015, Part II Section C-8 of the Faculty Code of Conduct."

*Regarding Regents Policy 1111:*

The Committee found that you published a confidential complaint, thereby "failing to act protect private records" and "failing to act in a responsible manner."

The Committee found: "that a preponderance of the evidence establishes probable cause that Dr. Marya…violated the Regents Policy 1111" and that "this violation was a serious violation of this policy, and therefore there is probable cause that Dr. Marya violated APM 015, Part II Section C-8 of the Faculty Code of Conduct."

**Opportunity to Respond in Writing:**

You received a copy of the Committee's report on April 4, 2025, and provided a written response prepared by your counsel on April 22, 2025. I have reviewed and considered your response in considering whether to accept the Committee's recommendations. In your response to the investigation report you discussed your inability to respond due to redactions to certain materials included in the exhibits. Your response did not substantively address many of the findings made by the Committee.

***Ad Hoc* Committee's Recommendation:**

The Committee recommended discipline in the form of Dismissal and a 10-year Letter of Censure.

**Disciplinary Proposal:**

I accept the *Ad Hoc* Committee's findings that a preponderance of the evidence establishes probable cause that your conduct violated the Faculty Code of Conduct. In addition, I accept that this finding of probable cause constitutes good cause under APM 150.

In considering the nature and seriousness of the misconduct and the types of discipline described in APM 150, the *Ad Hoc* Committee's report and recommendations, your response to the *Ad Hoc* Committee's report, and the recommendation of Vice Provost Brian Alldredge, I propose the following discipline:

- 10-year Letter of Censure
- Dismissal

As a reminder, retaliation or intimidation may constitute misconduct, and this can lead to sanctions for the person who retaliates or intimidates someone in connection with an investigation. Given the specific nature of the findings and your conduct on social media with regard to postings about individuals, we want to emphasize that such actions toward individuals who made complaints or participated in this investigation will be regarded as retaliation.

Please note that the Letter of Censure will become a part of any Advance packet for any academic action during the period for which the discipline is imposed, and will be available to all appropriate reviewers, including all faculty eligible to vote on an action, merit and promotion committees, and all campus reviewers. References to this discipline letter, such as in the Chair's letter of departmental recommendation, will remain in your file permanently but will not be available for review for any future academic actions.

In accordance with the UCSF Procedure for Investigation of Faculty Misconduct and the Administration of Discipline (Investigation Procedure), you have 15 business days from the date of the transmittal of this notice of Intent to Impose Discipline letter, unless an extension is requested and granted, to notify the Vice Provost, in writing, whether you accept the proposed sanction. All extension requests must be: (1) made in writing, (2) supported by good cause, and (3) submitted to the Vice Provost before the deadline.

Under the Investigation Procedure, failure to respond by the deadline is deemed to be an acceptance of the proposed findings and sanctions, see Investigation Procedure, Section V.B.1. If you do not respond, or if you accept the findings and proposed sanctions, I will then send you a formal Discipline Letter imposing the proposed sanctions.

If you decline to accept the findings and proposed sanction of dismissal, you may file a grievance under APM 140, or you may request a hearing before the properly constituted advisory committee of the Academic Senate as provided by Regents Bylaw 40.3(c). Pursuant to APM 150-40, you may select only one of these grievance review mechanisms for this sanction.

If you decline to accept the findings and proposed sanction with regard to the Letter of Censure, you may also file a grievance under APM 140 as to that proposed discipline.

Any questions that you may have concerning relevant University policies and procedures may be directed to Academic Employee Relations Specialist Sara Stillwell at Sara.Stillwell@ucsf.edu.

Sam Hawgood

Sam Hawgood, MBBS
Chancellor

cc: Executive Vice Provost Lucey
Vice Provost Alldredge
Dean Talmadge King
Chair Robert Wachter
Assistant Vice Provost Light

# EXHIBIT H

# General University Policy Regarding Academic Appointees: APM - 140 - Non-Senate Academic Appointees/Grievances

## 140-0 Policy

This policy provides non-Senate academic appointees the opportunity to present grievances. The use of this policy shall not be discouraged by the University either directly or indirectly.

## 140-4 Scope/Definition

a. A grievance is defined as a complaint by an eligible non-Senate academic appointee that alleges that:

   (1) a specific administrative act was arbitrary or capricious and adversely affected the appointee's then-existing terms or conditions of appointment; and/or

   (2) a violation of applicable University rules, regulations, or Academic Personnel policies occurred that adversely affected the appointee's then-existing terms or conditions of appointment.

b. For the purposes of this policy, an act is not arbitrary or capricious if the decision-maker exercised reasoned judgment.

c. A grievance alleging a violation of APM - 137 (Non-Senate Academic Appointees/Term Appointment), 145 (Non-Senate Academic Appointees/ Layoff and Involuntary Reduction in Time), or 150 (Non-Senate Academic Appointees/Corrective Action and Dismissal) shall be filed under APM - 140-4-a(2) only.

## 140-6 Responsibility

a. It is the responsibility of each Chancellor to establish and publish procedures to implement this policy. Prior to planned issuance, such procedures should be submitted to the Provost and Executive Vice President–Academic Affairs for approval.

b. Each Chancellor shall designate an administrator or office as the grievance liaison for academic appointees.

## 140-14 Eligibility

a. This policy applies to all academic appointees of the University who are not members of the Academic Senate except as provided in APM - 140-14-b, -c, and -d. For non-Senate academic appointees covered by a Memorandum of Understanding (MOU), this policy applies only to the extent provided for in the MOU.

b. APM - 140 does not apply to Postdoctoral Scholars (see APM - 390).

c. Under this policy, student academic appointees not covered by an MOU shall only be eligible to grieve matters related to their academic appointment. Complaints pertaining to academic standing or non-employment-related matters are under the jurisdiction of applicable student grievance or academic appeal procedures.

d. Housestaff (interns and residents) shall be eligible to use APM - 140 unless alternative policies and procedures are instituted by the campus.

e. When a non-Senate faculty member receives notice of termination before the expiration of the non-Senate faculty member's appointment, the non-Senate faculty member may select as a grievance mechanism either APM - 140, as described in this policy, or Regents' Bylaw 40.3(c), the procedures of which are described in Academic Senate Bylaw 337. In selecting either APM - 140 or Regents' Bylaw 40.3(c), the non-Senate faculty member waives the right to invoke the other mechanism to review the same grievance.

## 140-15 Mediation

The intent of this policy is to encourage voluntary resolution including mediation when it is desired by both parties. Each campus is encouraged to implement a mediation process to facilitate voluntary resolution of grievances.

## 140-23 Filing Deadlines

a. A Step II formal grievance must be filed in writing with the grievance liaison within thirty (30) calendar days from the date on which the appointee knew, or could reasonably be expected to know, of the event or act that gave rise to the grievance, or within thirty (30) calendar days after the date of separation, whichever is earlier.

b. A Step III formal grievance appeal must be filed in writing with the grievance liaison within fifteen (15) calendar days from the date on which the Step II response is issued.

c. Filing deadlines shall apply unless a written extension has been granted by the grievance liaison. Either party may submit a written request for an extension to a filing deadline. It is the responsibility of the grievant to file a Step II formal grievance or a Step III formal grievance appeal by the filing deadline or to file a written request for an extension before the filing deadline.

## 140-31 Step I – Informal Grievance Resolution

a. Step I of the grievance process is the attempt at informal resolution. Prior to filing a Step II formal grievance, the grievant is encouraged to attempt an informal resolution with the immediate supervisor or responsible administrator whose action is being grieved. Attempts at informal resolution do not extend the time limits for filing a formal grievance unless a written extension is granted by the grievance liaison.

b. If informal resolution with the immediate supervisor or responsible administrator is attempted but unsuccessful, a grievant may request that the grievance liaison assist in resolving the grievance. Where appropriate, the grievance liaison may work with the parties to reach an informal resolution.

c. When a grievance alleges sexual harassment, the grievant may elect to substitute the campus Sexual Harassment Complaint Resolution Procedure as Step I. If a grievant selects this mechanism and the complaint is not resolved to the grievant's satisfaction, the grievant may file a Step II formal grievance in writing with the grievance liaison within fifteen (15) calendar days from the date the grievant is notified of the result of the pre- grievance complaint resolution process of the sexual harassment procedure or within forty-five (45) calendar days from the date the grievant filed the sexual harassment complaint, whichever is earlier.

## 140-32 Step II – Formal Grievance Review

a. If a grievance is not resolved informally to the satisfaction of the grievant, the grievant may file a Step II formal grievance. A Step II grievance must be filed in writing with the grievance liaison within the thirty (30) calendar-day period specified in APM - 140-23-a unless a written extension has been granted by the grievance liaison. Except by written mutual agreement of the parties, no additional issues shall be introduced after the Step II grievance has been filed. Attempts at informal resolution do not extend the time limits for filing a formal grievance unless a written extension is granted by the grievance liaison. Attempts at informal resolution may continue after a formal grievance has been filed, but are not required.

b. The formal written grievance must include the following information.

(1) If the grievance alleges that a specific administrative act was arbitrary or capricious and adversely affected the grievant's then-existing terms or conditions of appointment, the grievance must state the specific administrative act(s) to be reviewed, the name of the person(s) alleged to have carried out the administrative act(s), the date(s) the alleged act(s) occurred, and a description of how the administrative act(s) were arbitrary or capricious.

(2) If the grievance alleges that a violation of applicable University rules, regulations, or Academic Personnel policies occurred that adversely affected the grievant's then- existing terms or conditions of appointment, the grievance must state the applicable University rules, regulations, or Academic Personnel policies the grievant believes have been violated; the name of the person(s) alleged to have violated the applicable University rules, regulations, or Academic Personnel policies; the date(s) the alleged violation(s) occurred; and a description of how the rules, regulations, or Academic Personnel policies have been violated.

(3) All grievances must state how the alleged act(s) and/or violation(s) adversely affected the grievant's then-existing terms or conditions of appointment and the remedy requested.

c. Upon receipt of a formal written grievance, the grievance liaison shall complete an initial review of the grievance and determine whether the grievance is complete, timely, within the jurisdiction of APM - 140, and contains sufficient facts which support the allegations made in the grievance. Within ten (10) calendar days, the grievance liaison shall notify the grievant in writing of the acceptance of the grievance. If the grievance is not accepted, the reasons shall be specified as follows:

(1) If the grievance liaison determines that the grievance is incomplete or factually insufficient, the grievant will have ten (10) calendar days from the date of the written notice to provide information to make the grievance complete, including additional facts. If the grievant fails to make the grievance complete or provide sufficient facts, the grievance will be dismissed.

(2) If the grievance liaison determines that the grievance is untimely or outside the jurisdiction of APM - 140, the grievance will be dismissed.

(3) If the grievance raises multiple issues, the grievance liaison will make a determination described above with regard to each issue. The grievance liaison may accept some issues and dismiss others pursuant to this review process.

(4) If all or part of a grievance is dismissed at this stage, the grievance liaison will provide the grievant with a written explanation of the basis for the dismissal.

d. When a formal written grievance is accepted, the grievance liaison shall forward the grievance and any supportive materials to the Step II reviewer for review and written decision, and notify the Step II reviewer and the grievant of the date the Step II response is due. Generally, the Step II reviewer will be the department or unit head. However, if the department or unit head took the action that is being grieved, the grievance liaison may exercise discretion and designate another administrator as the Step II reviewer, and so notify the department or unit head and the grievant.

e. If a Step II grievance raises allegations of discrimination, harassment, or retaliation in violation of APM - 035, the grievance liaison shall forward a copy of the grievance to the appropriate campus compliance office for review. Each campus shall implement procedures for the investigation of such grievances under this policy that include procedures for coordination with the relevant campus compliance offices such as Title IX, Title VII, ADA, and/or Equal Employment Office. The results of any related grievances or investigations shall be provided to the grievance liaison. At the discretion of the grievance liaison, information regarding related grievances or investigations may be forwarded to the Step II reviewer for consideration in making a Step II decision.

f. The Step II reviewer shall review the grievance and, if appropriate, shall investigate and/or meet with the parties. Within thirty (30) calendar days from the date of receipt of the formal grievance, the Step II reviewer shall send a written response to the grievant and the grievance liaison. The response will include a statement that the grievance is denied or upheld in whole or in part and that the grievant has the right to appeal the decision to Step III of the grievance procedure.

## 140-33 Step III – Formal Grievance Appeal

a. A formal grievance not resolved to the satisfaction of the grievant at Step II may be appealed in writing to Step III with the grievance liaison within fifteen (15) calendar days from the date on which the Step II response is issued. The Step III formal grievance appeal must set forth the unresolved issue(s) and the remedy requested. Except by written mutual agreement of the parties, no issues shall be introduced in the appeal that were not included in the original grievance.

b. All formal grievance appeals will be subject to Step III-A administrative consideration unless there is a written request for Step III-B hearing consideration and the issue(s) appealed are subject to Step III-B hearing consideration.

### (1) Step III-A Administrative Consideration

(a) Except when otherwise eligible for hearing consideration, within seven (7) calendar days from receipt of a formal grievance appeal, the grievance liaison

shall forward the appeal, the Step II formal grievance, and the Step II response to the Chancellor for review and written decision.

(b) Based on the record, the Chancellor shall determine whether the Step II formal grievance was properly reviewed and whether the decision made at Step II shall be upheld, rejected, or modified.

(c) The Chancellor shall provide a final written decision to the grievant within thirty (30) calendar days following receipt of the formal grievance appeal. The written decision shall include a statement of the reasons if the decision of the Step II reviewer is rejected or modified in whole or in part and a statement that the decision is final.

(2) **Step III-B Hearing Consideration**

(a) Only the following issues may be appealed for Step III-B hearing consideration:

- non-reappointment (see APM - 137-30-c);
- layoff or involuntary reduction in time (see APM - 145);
- corrective action: written censure, suspension, reduction in salary, or demotion (see APM - 150);
- dismissal (see APM - 150);
- medical separation (see APM - 080);
- allegations of discrimination in violation of APM - 035 involving non-reappointment, layoff, involuntary reduction in time, corrective action, or dismissal;
- allegations that procedures in a personnel review were not in consonance with the applicable rules and requirements of the University and/or that the challenged decision was reached on the basis of impermissible criteria, including (but not limited to) race, color, national origin, religion, sex, sexual orientation, gender identity, pregnancy, physical or mental disability, medical condition (cancer-related or genetic characteristics), genetic information (including family medical history), ancestry, marital status, age, citizenship, service in the uniformed services as defined by the Uniformed Services Employment and Reemployment Rights Act of 1994 or political conviction.

(b) Within seven (7) calendar days from receipt of a written request for hearing consideration, the grievance liaison shall determine whether the grievant has identified an issue eligible to be appealed for hearing consideration. If the grievance liaison determines the appeal does not identify an issue eligible to be appealed for hearing consideration, the grievance liaison shall notify the grievant and submit the appeal for determination under Step III-A administrative consideration. When an appeal is eligible for hearing consideration, the grievance liaison shall coordinate a hearing consistent with the policies set forth in APM - 140-80.

## 140-80 Conduct of Hearing

In advance of the hearing, the parties shall attempt to stipulate in writing issues to be submitted for review at the hearing. If the parties cannot agree on the issues, the hearing officer shall define them.

Hearings shall be conducted in accordance with the following standards.

a. **Election of Hearing Officer**

(1) The grievant shall elect whether the grievance is heard by a University or a non-University hearing officer. Election by the grievant shall be in writing and shall be final. The Chancellor shall establish procedures for the selection of the University hearing officer. If the grievant elects a non-University hearing officer, in accord with campus procedures the University shall select the provider. The procedures of the chosen provider shall be used to select the hearing officer.

(2) Whenever possible, within forty-five (45) calendar days from the receipt of the election a hearing officer shall be selected and within sixty (60) calendar days thereafter a hearing date shall be scheduled. The hearing officer shall coordinate the hearing process through the grievance liaison.

b. **Hearing**

(1) The hearing officer shall convene a hearing in which each party shall have the opportunity to present evidence, cross-examine witnesses, and submit rebuttal evidence. Evidence may be oral and/or documentary. Issues regarding the admissibility and weight of evidence shall be decided by the hearing officer. The hearing officer shall not have the authority to issue subpoenas. The hearing officer shall handle all procedural issues that arise before and during the hearing.

(2) Upon request, each party shall provide the other with copies of materials to be introduced at the hearing and names of witnesses who will testify on the party's

behalf in its case. To the extent possible, such materials and names of witnesses shall be exchanged at least ten (10) calendar days prior to the hearing.

(3) In cases alleging a violation of APM - 137-30-c, 145, or 150, the University's representative shall proceed first in presenting the University's case at the hearing. In all other cases, the grievant shall proceed first in presenting the case at the hearing.

(4) The hearing shall be closed unless both parties agree in writing to the presence of additional persons. In the absence of such an agreement, the hearing shall be closed to all persons other than the principal parties to the grievance, i.e., the supervisor or department or unit head, the supervisor's or department or unit head's representative, the grievant, the grievant's representative, and the grievance liaison.

(5) All materials, reports, and other evidence introduced into the hearing and recorded by an audio recorder, stenographic services, or by other means shall be considered confidential to the extent allowed by law and University policy.

(6) The hearing officer shall be bound by the provisions of APM - 160-20- d(2) pertaining to the Academic Senate Committee on Privilege and Tenure regarding access to records.

(7) An audio recording will be made by the University unless the parties agree in advance to share the costs of making a stenographic record. The grievant shall be permitted to arrange for stenographic recording at the grievant's expense if the University does not agree to share the cost. The parties should be made aware that an audio recording is being made, who will have custody of the recording, and how copies may be obtained.

c. **Hearing Officer's Authority**

(1) The hearing officer shall provide the parties in the case and the Chancellor with a written statement of findings and recommendation(s) within thirty (30) calendar days of the close of the hearing. In cases alleging a violation of APM - 145 or 150, the hearing officer shall determine whether the University has established by a preponderance of evidence that it had good cause to take such action. In cases alleging a violation of APM - 137-30-c, the hearing officer shall determine whether the University has established by a preponderance of evidence that it met the standard set forth in APM - 137-30-c. In all other cases, the hearing officer shall determine whether the grievant has established that (1) a specific administrative act was arbitrary or capricious (see APM - 140-4-b) and adversely affected the appointee's then-existing terms or conditions of appointment; and/or (2) a violation of applicable University rules, regulations, or Academic Personnel policies occurred which adversely affected

the appointee’s then-existing terms or conditions of appointment. The hearing officer shall make findings of fact based upon the evidence presented at the hearing. The hearing officer shall not recommend adding to, deleting from, or otherwise modifying the provisions of University rules, regulations, or Academic Personnel policies.

(2) No evidence other than that presented at the hearing shall be considered by the hearing officer or have weight, except that notice may be taken of any facts that are commonly known and accepted by the parties.

(3) The hearing officer shall not substitute the hearing officer’s judgment for the academic judgment of a peer review committee or administrative officer, nor shall the hearing officer be empowered to evaluate the academic qualifications or competence of academic appointees.

(4) The Chancellor shall review the hearing officer’s findings and recommendations and issue a final written decision within thirty (30) calendar days of receipt of the hearing officer’s findings and recommendation(s). The Chancellor shall provide to the grievant a statement of the reasons if the hearing officer’s recommendation(s) is rejected or modified. If a decision is based on facts different from those found by the hearing officer, those findings must be based on materials in the record.

d. **Fees**

There shall be no cost to the grievant for a University hearing officer. In the case of a grievance heard by a non-University hearing officer, the hearing officer’s fees shall be borne equally by the University and the grievant if the Chancellor accepts the hearing officer’s recommendation(s). The fee shall be borne entirely by the University if the Chancellor rejects or modifies the recommendation(s) of the non-University hearing officer.

## 140-85 General Provisions

a. **Representation**

Grievants may represent themselves or may be represented by another person at any stage of the grievance process. The University shall be represented as the Chancellor deems appropriate; representation may be provided by the Office of the General Counsel.

b. **Time Limits**

Prior to expiration of a time limit, extensions may be granted by the grievance liaison upon written request by either party. If the grievant fails to meet a deadline, the grievance will be considered resolved on the basis of the last University response. If a University official

fails to meet a deadline, the grievant may move the grievance to the next step in the process. Time limits that expire on days that are not business days at the location where the grievance is filed shall be automatically extended to the next University business day.

c. **Pay Status**

The grievant and the grievant's representative, if employed by the University, shall be granted leave with pay based on their regular pay status to attend hearings and meetings convened by the University to consider grievances under this policy. Time spent by the grievant and the grievant's representative in investigation and preparation of a grievance shall not be on pay status. Time spent by University employee-witnesses in meetings and hearings convened by the University shall be taken as leave with pay based on their regular pay status.

d. **Remedy**

If the grievance is sustained in whole or in part, the remedy shall not exceed restoring to the grievant the pay, benefits, or rights lost either as a result of the violation of University rules, regulations, or Academic Personnel policies, or as a result of an arbitrary or capricious administrative action, less any income earned from any other employment. If the hearing officer's findings and recommendation(s) include a remedy for back pay, the amount of back pay shall be determined by the administration. Disputes over the amount of back pay due may be referred back to the hearing officer for a separate recommendation. Any claim of back pay by a grievant must be supported by appropriate documentation. Payment of attorney's fees shall not be part of the remedy. Unless specifically authorized by the grievance liaison, compensation shall not be paid for any period that is the result of extension(s) of time requested by or on behalf of the grievant.

e. **Consolidation of Grievances**

The following may be consolidated in one review: grievances of two or more academic appointees, where the grievances are related and consolidation is appropriate under the circumstances; two or more grievances filed by the same grievant that are based on the same incident, issues, or act; or two or more grievances filed by the same grievant that are based on the same pattern of conduct. The grievance liaison shall decide whether grievances will be consolidated.

**Revision History**

April 18, 2025:

- Technical revisions to remove redundant policy language and add Equal Employment Opportunity Office to the list of campus compliance offices.

April 20, 2022:

- Technical revisions to update references to Regental governing documents.

September 23, 2020:

- Technical revision to remove gendered language and to correct minor grammatical errors.

For details on prior revisions, please visit the policy issuance web page.

# EXHIBIT I

UCSF
University of California
San Francisco

**IN STRICT CONFIDENCE**
**TO BE OPENED BY ADDRESSEE ONLY**

**LETTER OF CENSURE**

**Sam Hawgood, MBBS**
Chancellor
Arthur and Toni Rembe Rock
Distinguished Professor

Office of the Chancellor
UCSF Box 0402
550 16th Street, Room 7107
San Francisco, CA 94143

tel: 415.476.6582
Sam.Hawgood@ucsf.edu

www.ucsf.edu

May 20, 2025

*Sent via email to:* rupa.marya@ucsf.edu, [redacted]

Dear Dr. Marya:

I write to impose discipline on you in the form of this Letter of Censure.

This discipline is imposed after a faculty misconduct investigation was performed by an *Ad Hoc* Committee comprised of three faculty members. The *Ad Hoc* Committee concluded that there is probable cause to believe that you violated the Faculty Code of Conduct (APM 015).

**_Ad Hoc_ Committee Findings:**

In concluding that there is probable cause to believe that you have violated the Faculty Code of Conduct, the *Ad Hoc* Committee made the following findings.

*Dr. Marya violated the standards described in the Faculty Code of Conduct in her September 21, 2024 post on X.com.*

As described in the Committee's report:

> Per several witnesses interviewed by the Committee, this post on social media created an atmosphere of disruption and fear in the School of Medicine, specifically in the first-year class. Several witnesses, including Student 1 and 2, told the Committee that this statement led many Jewish students to feel marginalized and unsafe. Students were made vulnerable to speculation as to whether they were the person who was being named in the X post.

Further, the Committee detailed the consequences of this post:

> The administration had to go into crisis management mode to address the fear and anxiety among students. The administration met with the first-year class to discuss how to address the significant impact, including having support sessions for individual students and organizing additional programing to address disruptions. These efforts included additional office hours, restorative justice groups, and meetings with student leaders. Additionally, student leadership felt it was important to make all students feel welcome on campus and issued a letter condemning Dr. Marya's statement and avowing support for all their fellow students of all nationalities. These efforts to lessen the hostile environment created by Dr. Marya's statement took away valuable time from students, faculty and staff to advance learning and teaching which constitute valuable work of the University and one of its core missions.

As to the Faculty Code of Conduct, the Committee found this post "significantly impaired a central function of the University as it caused many disruptions to the learning environment and the functionality of the UCSF Medical School," and that "a preponderance of the evidence establishes probable cause that Dr. Marya violated the Ethical Principle as stated in APM 015 Part II, Section A of the Faculty Code of Conduct, and significantly impaired a central function of the University when she posted on social media about a first year UCSF medical student."

*Regarding conduct towards colleagues, the Committee found:*

> …once Dr. Marya disagrees with a colleague over a political or personal opinion, she does not hesitate to call them out publicly, in derogatory terms, misrepresenting their positions and exposing them to the rebuke of her followers on social media (of which she has 27,000 on X and 2,000 on Substack). This is not living up to the standards of the Faculty Code of Conduct which states, "In the exchange of criticism and ideas professors show due respect for the opinions of others.

Here the Committee found: "a preponderance of the evidence establishes probable cause that Dr. Marya engaged in the conduct addressed [in the paragraph] above and that this conduct violated APM 015 Part II, Section D of the Faculty Code of Conduct and significantly impaired a central function of the University."

*Regarding harassment of students, colleagues and members of the University Community:*

> Many Jewish UCSF physician colleagues of Dr. Marya felt singled out and harassed based on their background (ethnicity, nationality, religion or shared ancestry) by these statements, which did not objectively or individually judge their competence as physicians, and which had the clear potential effect of undermining patients' confidence in receiving competent care from these UCSF physicians based only on suspicion due to the protected characteristics described in the Faculty Code of Conduct. UCSF also received many complaints from other physicians outside of UCSF who expressed similar complaints that a UCSF physician colleague would engage in broad questioning of other physicians' competency based only on their perceived association with Zionism" through their religion, shared ancestry or nationality.

Here the Committee found: "a preponderance of the evidence establishes probable cause that Dr. Marya engaged in harassment of students, colleagues and members of the University community, as prohibited by APM 015 Part II, Sections A, C, and D of the Faculty Code of Conduct."

*Regarding the UCSF Violence and Bullying Policy:*

"Several UCSF community members stated that they felt Dr. Marya's statements were derogatory, insulting and belittling, and the Committee finds that a reasonable person would agree with this assessment."

The Committee analyzed "Dr. Marya's tweets in the aggregate as a 'pattern of behavior over time' with the intent or effect of intimidating, degrading, excluding, or mischaracterizing those colleagues whose opinions differed from hers from speaking or acting."

Here, the Committee found: "a preponderance of the evidence establishes probable cause that Dr. Marya engaged in the conduct addressed [in the paragraphs] above and that this conduct violated the UCSF Violence and Bullying Policy." Further, "the Committee also finds that this violation was a serious violation of this policy, and therefore there is probable cause that Dr. Marya violated APM 015, Part II Section C-8 of the Faculty Code of Conduct."

*Regarding the UCSF Social Media and Electronic Communications Policies:*

The Committee found that your social media activity did not respect the consent or confidentiality of your colleagues, and concluded that: "a preponderance of the evidence establishes probable cause that Dr. Marya...violated the UCSF Social Media Policy" and that "this violation was a serious violation of this policy, and therefore there is probable cause that Dr. Marya violated APM 015, Part II Section C-8 of the Faculty Code of Conduct."

In addition: "the Committee finds that a preponderance of the evidence establishes probable cause that Dr. Marya…violated the UCSF Electronic Communications Policy" and that "this violation was a serious violation of this policy, and therefore there is probable cause that Dr. Marya violated APM 015, Part II Section C-8 of the Faculty Code of Conduct."

*Regarding Regents Policy 1111:*

The Committee found that you published a confidential complaint, thereby "failing to act protect private records" and "failing to act in a responsible manner."

The Committee found: "that a preponderance of the evidence establishes probable cause that Dr. Marya…violated the Regents Policy 1111" and that "this violation was a serious violation of this policy, and therefore there is probable cause that Dr. Marya violated APM 015, Part II Section C-8 of the Faculty Code of Conduct."

**Opportunity to Respond in Writing:**

You received a copy of the Committee's report on April 4, 2025, and provided a written response prepared by your counsel on April 22, 2025. I have reviewed and considered your response in considering whether to accept the Committee's recommendations. In your response to the investigation report you discussed your inability to respond due to redactions to certain materials included in the exhibits. Your response did not substantively address many of the findings made by the Committee.

***Ad Hoc* Committee's Recommendation:**

The Committee recommended discipline in the form of Dismissal and a 10-year Letter of Censure.

**Disciplinary Proposal:**

I accept the *Ad Hoc* Committee's findings that a preponderance of the evidence establishes probable cause that your conduct violated the Faculty Code of Conduct. In addition, I accept that this finding of probable cause constitutes good cause under APM 150.

On April 28, 2025, you were provided a letter in which I informed you of my intent to impose discipline on you as described below:

- 10-year Letter of Censure
- Dismissal

You were informed of your opportunity to respond to my April 28, 2025 letter within 15 business days. You submitted a response to that letter on May 16, 2025. In your response, you stated that you would be requesting a hearing before the Privilege and Tenure Committee of the Academic Senate.

Therefore, on May 20, 2025, I issued a written Notice of Action which implemented the dismissal, and by this letter, I am imposing this formal Letter of Censure which will be placed in your academic personnel file for ten years. This Letter of Censure is intended to express institutional rebuke for your actions.

Sam Hawgood

Sam Hawgood, MBBS
Chancellor

cc: Executive Vice Provost Lucey
Vice Provost Alldredge
Dean Talmadge King
Chair Robert Wachter
Assistant Vice Provost Light